UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                                   )
GLENN S. BATES,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )   C.A. NO. 05-10489-MEL
                                   )
TOWN OF HARWICH and                )
HARWICH POLICE DEPARTMENT,         )
CHRISTOPHER KENDER and             )
BARRY MITCHELL,                    )
                                   )
            Defendants.            )
_____)
```

**PLAINTIFF'S STATEMENT OF MATERIAL FACT OF RECORD
AS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED AND WHICH
<u>PRECLUDE SUMMARY JUDGMENT</u>**

   In accordance with Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, Plaintiff Glenn Bates ("Mr. Bates") hereby responds to the statement of undisputed material facts of Defendants, Christopher Kender and Barry Mitchell, ("Defendants") and herein makes his statement of material fact of record as to which there is a genuine issue to be tried.

**I. RESPONSE TO PURPORTED UNDISPUTED FACTS ASSERTED BY DEFENDANTS KENDER AND MITCHELL**

1. At the time of the incident underlying the Complaint, plaintiff was a 40-year-old resident of Harwich who had had numerous encounters with members of the Harwich Police Department, including Sgt. Kender and Lt. Mitchell. Excerpts of Deposition Testimony of Christopher Kender ("Exhibit A"), p.26, l.14-p.27, l.20; p.29, l.1-11; p.30, l.6-15; p.32, l.21-p.33, l8.; Excerpts of Deposition Testimony of Barry Mitchell ("Exhibit B"), p.23, l.6-7; p.24, l.12-19; Excerpts of Deposition Testimony of Glenn Bates ("Exhibit C"), p.52, l.12-13; p.54, l.10-13.

*<u>Undisputed</u>*.

2. Some of these encounters involved violence by plaintiff, including one episode in which he knocked a victim to the ground and bit his right arm, another in which he

knocked the victim to the ground and kicked him with his motorcycle boots, and a third in which he bit the hand of a police officer. Exhibit A, p.27, l.12-20; p.29, l.1-11; p.33, l.1-5. Mitchell himself had been involved in a physical altercation with plaintiff. Exhibit B, p.23, l.21-p.24, l.1.

**Objection.** Motion to Strike. These are hearsay statements regarding prior unrelated incidents that were not witnessed by the cited deponents and are not appropriate for summary judgment.

3.     Plaintiff has an extensive history of mental illness, of which Mitchell was aware. Exhibit B, p.25, l.14-17; p.26, l.11-p.27, l.4.

**Undisputed.**

4.     On November 30, 2001, Bates' mother, Priscilla Hughes, obtained a Warrant of Apprehension from the Orleans District Court, pursuant to G.L. c.123, §12(e), to have plaintiff apprehended and brought before the Court for a psychological evaluation. Warrant of Apprehension ("Exhibit D").

**Disputed.** The warrant of apprehension states only that Mr. Bates be brought before the Court to be examined by a qualified physician. *See* defendants statement of facts. Exhibit D.

5.     In her application for the Warrant of Apprehension, Mrs. Hughes stated that plaintiff had exhibited "violent rage[s]," and "threaten[ed] to hurt police if I ever called them about him." Exhibit D, Application.

**Undisputed.**

6.     Kender was directed by his dispatcher to serve the Warrant of Apprehension on plaintiff. Exhibit A, p.41, l.7-16; p.48, l.12-14. Kender was aware that a Warrant of Apprehension orders that the subject of the Warrant be brought before the Court for a psychological evaluation. Exhibit A, p.41, l.17-p.42, l.4

**Undisputed.**

7.     Kender requested Mitchell's assistance in serving the Warrant, because Mitchell believed he had developed a rapport with plaintiff through his numerous encounters with him. Exhibit A, p.51, l.4-14; Exhibit B, p.28, l.2-7.

**Disputed.** That Mitchell actually believed he had developed a rapport with plaintiff. **Undisputed.** That Kender so testified.

8.     Kender wore a full police uniform when the officers went to serve the Warrant; Mitchell, a detective, was wearing plainclothes, with his badge attached. Exhibit A, p.49, l.14-16; p.50, l.4-16.

2

**Disputed.**  Officer Kender was unsure at his deposition whether Lieutenant Mitchell was wearing a police badge on November 30, 2001.  *See* Plaintiff's Doc.Aff., Exhibit 1 (Deposition Testimony of Officer Kender) at pg. 50.

9.     When the officers arrived at Bates' residence – a multi-family structure in which Bates lived in the upstairs, rear apartment –Mitchell knocked on an outside door at the rear of the building and announced "it's the Harwich Police Glenn, I have to talk to you."  Exhibit A, p.54, l.24-p.55, l.3; p.56, l.1-3; Exhibit B, p.28, l.18-24; p.29, l.5-17.

**Disputed.**  Mr. Bates testified that he did not hear the officers knock or announce their presence.  He was first made aware of someone's presence in the apartment when he saw the reflection in his sliding door of someone coming through the apartment door.  *See* Plaintiff's Doc.Aff., Exhibit 3, Deposition Testimony of Glenn Bates, at pgs. 99-101; see also pg. 118.

10.    After receiving no response, the officers entered the building through the rear door, which was unlocked, and ascended a staircase that led directly to plaintiff's apartment.  As they ascended the stairs, Mitchell again announced their presence and yelled plaintiff's name.  Exhibit A, p.56, l.6-8; p.57, l.10-13; Exhibit B, p.31, l.1-5.

**Disputed.**  Mr. Bates testified that he did not hear the officers knock or announce their presence.  He was first made aware of someone's presence in the apartment when he saw the reflection in his sliding door of someone coming through the apartment door.  *See* Plaintiff's Doc.Aff., Exhibit 3, Deposition Testimony of Glenn Bates, at pgs. 99-101; see also pg. 118..

11.    The staircase leading to plaintiff's apartment was a very narrow, "Cape Cod" style of stairway.  Exhibit A, p.58, l.23-p.59, l.2; Exhibit B, p.30, l.7-12.;

**Undisputed.**

12.    As the officers ascended the stairs, Mitchell observed, through the crack underneath the door of plaintiff's apartment, a pair of sneaker-clad feet moving from left to right.  Exhibit B, p.31, l.8-14.  Kender, who was two to three steps behind Mitchell, heard someone running inside the apartment.  Exhibit A, p.58, l.1-6; p.59, l.17-19.

**Undisputed.**  That Kender and Mitchell so testified.

13.    Mitchell reached the top of the stairway, went to the door of plaintiff's apartment, and again announced the officers' presence.  A voice from inside the apartment said "Come on in."  Exhibit A, p.60, l.5-18; Exhibit B, p.31, l.15-17.

**Disputed.**  Mr. Bates testified that he did not hear the officers knock or announce their presence.  He also testified that the officers were not invited into his apartment.  He was first made aware of someone's presence in the apartment when he saw the reflection in his sliding door of someone coming through the apartment door.  Mr. Bates did not invite

3

the officers into his apartment. *See* Plaintiff's Doc.Aff., Exhibit 3 Deposition Testimony of Glenn Bates, at pgs. 99-101; see also pg. 118.

14.     Mitchell, who did not have his weapon drawn, pushed the unlocked door open, poked his head into the doorway, and looked to the right, the direction in which he had seen the feet move. Exhibit A, p.61, l.23-p.62, l.1-8; Exhibit B, p.32, l.1-4. At that moment he saw plaintiff, off to the side with a hockey stick raised above his head "like an ax." Exhibit B, p.32, l.6-13.

**Disputed**. Mitchell did have his pistol drawn. Mr. Bates saw the barrel of a pistol coming through the door. *See* Plaintiff's Doc.Aff., Exhibit 3 Deposition Testimony of Glenn Bates, at pg. 100 and 102. Mr. Bates struck only the hand holding the pistol with a hockey stick. *See* Plaintiff's Doc.Aff., Exhibit 3, pg. 105-106; 109; and 123.

15.     Bates brought the hockey stick down in a chopping maneuver toward Mitchell's head, but Mitchell pulled back in time to escape its blow, and the stick struck the ground. Exhibit A, p.62, l.9-13; Exhibit B, p.32, l.6-13; p.34, l.20-22.

**Disputed**. Mr. Bates hit Mitchell's hand. *See* Plaintiff's Doc.Aff., Exhibit. 3, pg 105-106; 109; and 123. Kender admitted that Mr. Bates was not swinging the hockey stick as alleged in this paragraph. *See* Plaintiff's Doc.Aff., Exhibit 2, Deposition Testimony of Sargent Christopher Kender) at pg. 70.

16.     Mitchell turned to retreat down the stairway, attempting to grab Kender as he went. Exhibit A, p.62, l.19-21; Exhibit B, p.32, l.14-23. As he did so, Bates struck him on the back with the hockey stick with a "very jarring blow," which threw Mitchell off-balance and sent him staggering downward against the wall of the staircase. Exhibit A, p.63, l.7-10; Exhibit B, p.33, l.1-3; p.37, l. 11-14.

**Disputed**. Bates saw Kender with his gun drawn and slammed the door on him. Bates then turned away. Mitchell and Kender then burst into the apartment and shot Bates in the back. *See* Plaintiff's Doc.Aff., Exhibit 3, pg. 105-106; *See* also Exhibit 4.

17.     Bates then crossed the threshold of his apartment and advanced toward Kender while swinging the hockey stick in a threatening manner. Exhibit A, p.66, l.8-17. Bates then swung the stick "like a baseball bat" and bludgeoned the top of Kender's head with it, knocking him to one knee. Exhibit A, p.67, l.24-p.68, l.1; p.70, l.6-10, l.17-20; Exhibit B, p.33, l.15-18.

**Disputed**. Bates saw Kender with his gun drawn and slammed the door on him. Bates then turned away. Mitchell and Kender then burst into the apartment and shot Bates in the back. Id.

18.     Kender drew his pistol, trained it on Bates and yelled "Glenn stop! Glenn stop!" Exhibit A, p.70, l.24; p.72, l.4-5; Exhibit B, p.39, l.18-21.

4

**Disputed.**  Bates saw Kender with his gun drawn and slammed the door on him.  Bates then turned away.  Mitchell and Kender then burst into the apartment and shot Bates in the back.  Id.

19.     Bates did not stop, and instead advanced toward Kender, descending the stairs to the second step from the top.  Exhibit A, p.72, l.7-24.  As he did so, Bates raised the stick in a cocking motion, preparing to strike again.  Exhibit B, p.39, l.21-23; p.66, l.9-12.  The cocking motion twisted Bates' body around so that part of his back was exposed to Kender.  Exhibit B, p.66, l.12-21.

**Disputed.**  Bates saw Kender with his gun drawn and slammed the door on him.  Bates then turned away.  Mitchell and Kender then burst into the apartment and shot Bates in the back.  Id.

20.     At that moment, Kender feared for his life, Mitchell's life, and the life of any person in the area, believing that, if Bates hit him with the hockey stick again, he would lose consciousness and Bates would take his gun and kill him and Mitchell.  Exhibit A, p.73, l.13-19; p.82, l.7-12.

**Disputed.**  At the moment when Kender shot Bates, he could not have been fearful because Bates had his back to him.  *See* Plaintiff's Doc.Aff., Exhibit 4.  Officer Kender admitted he was not fearful, but rather felt "cautious" about the situation.  *See* Plaintiff's Doc.Aff., Exhibit 2, Deposition Testimony of Sargent Christopher Kender, at pgs. 69-70.

21.     At the time of the incident, the Harwich Police Department's Use-of-Force Policy, which was enacted by the Massachusetts Police Institute, authorized an officer to use deadly force "to defend himself or another from unlawful attack which he reasonably perceives as an immediate threat of death or serious physical injury."  Policy & Procedure No. 400 ("Exhibit E"), Section IX.

**Undisputed.**

22.     Kender fired his weapon at Bates, aiming at Bates' "center mass" – i.e. the area of Bates' body that was facing him.  Exhibit A, p.75, l.13-20, p.79, l.1-6.  After the shot, Bates continued toward him, swinging the hockey stick from side to side and showing no signs of being wounded.  Exhibit A, p.80, l.12-16; p.81, l.11-16; Exhibit B, p.39, l.24-p.40, l.2.

**Disputed.**  The undisputed medical records show Kender shot Bates in the back.  *See* Plaintiff's Doc.Aff., Exhibit 4.

23.     Kender fired his pistol again, after which Bates fell and slid to the bottom of the stairs.  Exhibit A, p.80, l.1-2, p.80, l.20-p.81, l.4; Exhibit B, p.40, l.2-6.

**Disputed.**  After shooting Bates in the back, Kender and Mitchell physically attacked Bates as he lay helpless on the floor.  *See* Plaintiff's Doc.Aff., Exhibit 3, pg. 121-122; 125-128.

24.  The encounter between the officers and Bates "happened in a matter of seconds," Exhibit B, p.38, l.4-6; p.62, l.19-20.  A "very, very short interval" occurred between the firing of the first and second shots.  Exhibit B, p.67, l.8-9.

**Disputed.**  Timing of events should be left to the province of the jury.

25.  Bates was brought to Cape Cod Hospital in an ambulance called for by Mitchell.  Exhibit B, p.41, l.23-24.  The "clinical resume" from Bates' hospital treatment (i.e. his Discharge Summary) indicates that the sole "reason for hospitalization" was a "gunshot wound."  Clinical Resume ("Exhibit F"), p.1.

**Disputed.**  That the sole reason for hospitalization was a gunshot wound as the totality of the medical records speak for themselves.  *See* Plaintiff's Doc.Aff., Exhibit 5.

26.  Meanwhile, Kender was diagnosed with a serious concussion and post-concussion syndrome, for which he missed six to seven weeks of work.  Exhibit A, p.98, l.10-11; p.99, l.7-11, p.101, l.14-22.  The concussion caused permanent disfigurement to Kender's right eye, which remains more dilated than his left eye.  Exhibit A, p.105, l.20-23.

**Disputed.**  The medical records show merely a report of "mild concussion," and further show that a CAT scan of the head showed no abnormality and a CAT scan of the spine showed no abnormality.  *See* Plaintiff's Doc.Aff., Exhibit 6.

27.  Mitchell was treated for contusions to his back, caused by the blow from the hockey stick, and abrasions to his skin caused by his sliding along the wall.  Exhibit B, p.46, l.3-4, l.13-20.

**Disputed.**  The medical records show do not state that any injuries were caused by blows from a hockey stick.  *See* Plaintiff's Doc.Aff., Exhibit 7.

28.  As a result of the November 30, 2001 incident, Bates was charged in Barnstable Superior Court with two counts of assault and battery with a dangerous weapon, and two counts of assault and battery with intent to kill.  Indictment Slips ("Exhibit G").

**Undisputed.**

29.  At his criminal trial, Bates presented two, mutually exclusive defenses.  First, Bates claimed that he did not assault either Kender or Mitchell, and that they shot him without provocation.  Excerpts from Trial Testimony of Glenn Bates in C.R. No. 2002-0019  ("Exhibit H"), p.320, l.20-p.324, l.8.

6

**Objection.**  Whether the defenses presented were "mutually exclusive" is a question of law, not fact.

30.    Alternatively, Bates claimed that, even if he did commit the crimes as charged, he was not criminally responsible due to mental disease or defect.  Excerpts from Jury Instructions in C.R. No. 2002-0019 ("Exhibit I"), p.518.

**Disputed.**  The document attached does not show what Bates claimed, but rather shows an instruction by the Jude to the jury.

31.    In support of the latter defense, Bates offered the testimony of a psychiatrist, who testified that Bates suffers from a constant sense of "persecution;" that "he perceives things in a different way than others;" and that he "misinterprets perceptions into meanings of high threat and high danger [so] that he could not conform himself … to doing what the law might require." Excerpts of Testimony of Dr. Marc Whaley in C.R. No. 2002-0019 ("Exhibit J"), p.367, l.11-15; p.372, l.20-21; p.374, l.18-19; p.375, l.1; p.376, l.9-14; p.378, l.6-7; p.379, l.9-17.  Bates also offered the testimony of a psychologist, who testified that Bates has "delusional" ideas and "a very disturbed mind," "is very paranoid" and suffers from mental illness that "substantially impaired his ability to both conform his conduct to the requirements of the law and … to appreciate the wrongfulness of his conduct."  Excerpts of Testimony of Dr. Frank DiCataldo in C.R. No. 2002-0019 ("Exhibit K"), p.389, l.12-14; p.395, l.16-17; p.397, l.10-11; p.407, l.14-15; p.408, l.17-22.

**Objection.**  The selected testimony bears no relation to the issues in this summary judgment motion, are taken out of context, are prejudicial, and therefore, should be stricken from the summary judgment record and not considered by the Court.

32.    Bates' criminal trial testimony regarding the November 30, 2001 incident was similar to testimony he offered at deposition in the instant case.  Specifically, Bates testified that on that morning, he was suffering from severe carbon monoxide poisoning due to malfunctioning heating equipment in his apartment.  He also was "choking to death" due to a gas leak outside his home.  Exhibit C, p.91, l.5-15; Exhibit H, p.301, l.18-19; p. 302, l.18-20; p.311, l.22   According to Bates, the carbon monoxide and gas fumes gave him a stroke, which paralyzed him on his left side.  Exhibit H, p.300, l.8-23; p.302, l.11-17; p.310, l.18-20.  Bates further testified that he was drinking large quantities of water and eating a high-protein diet, which caused his brain to swell.  Id., p.304, l.11-18; p.305, l.22-23.  Bates also stated that he had taken codeine pills the night of November 29, which his mother gave him because "she was trying to poison [him]." Exhibit C, p.71, l.6-13; p.72, l.2-5.

**Undisputed.**

33.    According to Bates, when the officers arrived, he was in a semi-comatose state.  Exhibit C, p.92, l.17-20.  He also claimed that he was listening to stereo headphones at

the time, and could not hear anything above the music. He stated that he awoke when he felt his bed vibrating. Exhibit C, p.124, l.7-13; Exhibit H, p.317, l.5-12.

**Undisputed.**

34.     Bates claimed at the trial and at deposition that Kender shot him "without any provocation," and that he did not assault the police officers. Exhibit C, p.116, l.12-15; p.123, l.17-23; p.125, l.9-19; Exhibit H, p.320, l.20-324, l.8.

**Disputed.**  Bates testified that he struck the officer in the hand with the hockey stick. *See* Defendant's Exhibit C, p. 123. Bates did testify, and still maintains, that he was shot without provocation.

35.     Bates further testified that after he was shot, the officers "jumped on top of me and started beating me up." He claims that the officers kicked him repeatedly in the testicles, causing injuries for which he required surgery, stood on his hand, kneed him in the chest, "smashed" his head into the floor, kicked him in the head, dragged him through the doorway and threw him down the stairway, causing him to break his tailbone. Exhibit C, p.117, l.2-5; p.122, l.2-5, p.125, l.23-p.126, l.5; Exhibit H, p.324, l.20-p.325, l.5.

**Undisputed.**

36.     Plaintiff's medical records reveal neither injury nor treatment consistent with his allegations of a post-shooting beating. Exhibit F.

**Disputed.**   The medical records show injuries in addition to the gunshot wound, including a shattered spleen and liver. *See* Plaintiff's Doc.Aff., Exhibit 5.

37.     At the conclusion of the criminal trial, the jury convicted Bates on both charges of assault and battery with a dangerous weapon. Verdict Slips ("Exhibit L").

**Undisputed.**

38.     Plaintiff testified at deposition that his criminal convictions were "overturned" by the Superior Court, "due to violation of his right to voir dire." Exhibit C, p.133, l.12-18. In fact, plaintiff appealed his convictions, and said appeal was dismissed. Appeals Court Docket for Case No. 2003-P-1526 ("Exhibit M").

**Undisputed.**

39.     The Barnstable County District Attorney's Office conducted an inquest into the November 30, 2001 incident, and concluded that neither Kender nor Mitchell committed any wrongdoing. Report of the District Attorney's Office, ("Exhibit N").

**Objection.**  The Report of the District Attorney is inadmissible and must be stricken from the summary judgment record.  In addition, Bates disputes the characterization of the Report.  The Report sought to determine whether <u>criminal</u> charges should be brought and, specifically, whether the Commonwealth could prove beyond a reasonable doubt that Office Kender did not have a reasonable apprehension of great bodily harm.  *See* Report, pg. 2.

40.     The inquest also concluded that (1) "the forensic evidence is consistent with Sgt. Kender's account that he fired upward at [Bates] as [Bates] advanced upon him from further up the stairs;" (2) "the wound path of the round which struck [Bates] is also consistent with an upward right to left shot into the body of [Bates] as he exposed his right flank to the officer;" and (3) "the round's path is consistent with it having entered the right flank of [Bates] … and it having exited from the left back."  Exhibit M, "Analysis," ¶5-7.

**Objection.**  The Report of the District Attorney is inadmissible and must be stricken from the summary judgment record.  *See* Brooks v. Montgomery County, Ohio, 2006 WL 83045 (S.D.Ohio 2006) (where there is no evidence that the declarant had personal knowledge of the incident in an internal investigation Report, it is not admissible as Rule 56 evidence).  In addition, Bates disputes the characterization of the Report.  The Report sought to determine whether <u>criminal</u> charges should be brought and, specifically, whether the Commonwealth could prove beyond a reasonable doubt that Office Kender did not have a reasonable apprehension of great bodily harm. *See* Report, pg. 2.

## II.     PLAINTIFF'S ADDITIONAL MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

1.)     Officer Kender was on notice that Mr. Bates had a history of combative behavior towards police because he witnessed such combative behavior and was also informed of such combative behavior by other police officers. *See* Plaintiff's Doc.Aff., Exhibit 2, Deposition Testimony of Sargent Christopher Kender) at pg. 38.

2.)     When applying for the warrant of apprehension, Mr. Bates' mother informed the Court that "Glenn was threatening to hurt police if [she] ever called them about him," but Officer Kender was not informed of this information by the Harwich Police Department. *See* Plaintiff's Doc.Aff., Exhibit 2 Deposition Testimony of Sargent Christopher Kender) at pgs. 47-48.

3.)     Upon leaving the police station to serve the warrant of apprehension, Officer Kender did not bring any particular police gear with him.  *See* Plaintiff's Doc.Aff., Exhibit 2, Deposition Testimony of Sargent Christopher Kender) at pg. 48.

4.)     Officer Kender was unsure at his deposition about whether Lieutenant Mitchell was wearing a police badge on November 30, 2001. *See* Plaintiff's Doc.Aff., Exhibit 2, Deposition Testimony of Sargent Christopher Kender) at pg. 50.

5.) Mr. Bates did not hear Defendants' entry into his home and did not invite them in. See Plaintiff's Doc.Aff., Exhibit 3, pg. 101.

6.) Mr. Bates had no conversation with police prior to their entry. Id., pg. 118.

7.) The Officers had approached Mr. Bates' apartment with stealth. Id., pg. 105. The officers were trying to hide their presence. Id., pg. 108.

8.) Officer Kender opened the door to Mr. Bates' apartment and pushed his pistol through. Id., pg. 102.

9.) When Officer Kender pushed the barrel of his gun through the doorway, Mr. Bates hit it twice - - also hitting the officer's hand. Id., pg. 105-106; pg. 109; pg. 123.

10.) Mr. Bates then slammed the door shut, knocking an officer down. Id., pg 102.

11.) The officers then forced the door open. Id., pg 102.

12.) Mr. Bates saw the uniformed officer (Kender) crouched down in a shooting stance with his gun. Id., pg. 104-105.

13.) As the officers attempted to re-enter Mr. Bates' apartment, he held the door but wanted to get away from the door because he feared being shot. Id., pg. 111.

14.) Once the officers gained re-entry into the apartment, Mr. Bates was shot in the back. *See* Plaintiff's Doc.Aff., Exhibit 4.

15.) After being shot, Mr. Bates fell into his apartment. Id., Exhibit 3, pg. 121.

16.) Once Mr. Bates was felled by the gunshot, he was attacked by the Defendants. He was kicked, punched and slapped. Id., pg. 121-122.

    Respectfully submitted,

    GLENN S. BATES

    By his attorneys,

    /s/ Timothy J. Perry
    Timothy J. Perry (BBO#631397)
    Gregory T. Donoghue (BBO#661480)
    PRETI FLAHERTY BELIVEAU & PACHIOS LLP
    10 High Street, Suite 502
    Boston, MA 02110

Tel (617) 226-3800  
Fax (617) 226-3801

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date a true copy of the above document was served upon counsel of record, listed below, vie the Court's ECF system and by pre-paid First Class, United States Mail.

Joseph L. Tehan, Esq.  
Jackie Cowin, Esq.  
Kopelman and Paige, P.C.  
101 Arch Street  
Boston, MA 02110

Charles D. Mulcahy, Esq.  
Wynn & Wynn  
90 New State Highway  
Raynham, MA 02767

Dated: January 19, 2007

                                      /s/ Gregory T. Donoghue  
                                      Gregory T. Donoghue