UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-10489-MEL

GLENN S. BATES,

　　　　　　　　　Plaintiff

v.

TOWN OF HARWICH AND HARWICH
POLICE DEPARTMENT, CHRISTOPHER
KENDER, AND BARRY MITCHELL,

　　　　　　　　Defendants

DEFENDANTS CHRISTOPHER
KENDER AND BARRY
MITCHELL'S MOTION IN LIMINE
TO PRECLUDE TESTIMONY OF
GLENN BATES ON THE GROUNDS
OF MENTAL INCOMPETENCE

Now come the defendants Christopher Kender and Barry Mitchell and hereby move, *in limine*, to preclude testimony from plaintiff Glenn Bates at trial in this matter on grounds of mental incompetence.  In the alternative, the defendants respectfully request that the plaintiff be required to submit to a *voir dire* examination by the Court and an independent medical examination to determine his competency to testify in this case.

As grounds for this Motion, the defendants state that Mr. Bates, per prior psychological and psychiatric evaluations in the criminal action underlying this case, is incompetent to testify due to mental illness which causes him to experience paranoid delusions rendering him incapable of distinguishing between reality and fantasy.  As such, the defendants submit that Mr. Bates' testimony is inherently unreliable and that allowing him to testify in this matter will be substantially prejudicial to the defense.

As further grounds therefor, the defendants rely on the within Memorandum of Reasons.

<u>MEMORANDUM OF REASONS</u>

I.     <u>BACKGROUND</u>

1.     This action arises from an unprovoked ambush and attack by plaintiff Glenn Bates upon Harwich police sergeant Christopher Kender and lieutenant Barry Mitchell with a hockey stick, an attack which resulted in the shooting of plaintiff by Kender.  The incident occurred while the officers were attempting to serve a Warrant of Apprehension applied for by the plaintiff's mother.  Said Warrant, pursuant to G.L. c. 123, §12(e), ordered plaintiff's apprehension for purposes of psychiatric evaluation.

2.     Following a trial in the Barnstable Superior Court, the plaintiff was convicted on two charges of assault and battery with a dangerous weapon as a result of his attack, while the officers were exonerated of wrongdoing following an investigation into their actions by the District Attorney.

3.     Prior to his criminal trial, the plaintiff was examined by Marc A. Whaley, M.D. (a portion of the criminal trial transcript containing Dr. Whaley's testimony is attached hereto as "Exhibit A").  Dr. Whaley is a board certified physician, specializing in psychiatry, who was permitted to testify as an expert in the underling criminal trial (Exhibit A, p. 368, l. 12-15).  The purpose of Dr. Whaley's pretrial examination of the plaintiff was to conduct an evaluation into the plaintiff's mental capacity to determine whether the plaintiff was able to control his conduct according to the requirements of the law during the incident in question (Exhibit A, p. 368, l. 16-21; p. 379, l. 2-11).

4.     As a result of his evaluation of the plaintiff, Dr. Whaley opined that the plaintiff's "mental state was substantially impaired in order to be able to conform his conduct according to the requirements of the law.  In other words, the mental state that I described, one of

misinterpreting perceptions into meanings of high threat and high danger was of such dominance

of his mental state that he could not conform himself according to – to doing what the law might

require or would require." (Exhibit A, p. 379, l. 9-17).

     5.     More specifically, Dr. Whaley opined that the plaintiff suffers from

schizophrenia, a disease that interferes with his ability to filter information (Exhibit A, p. 377, l.

2-5).  Dr. Whaley also testified as follows:

> there was evidence of paranoid thinking in his description of those events.  And
> its often hard to delineate what is paranoid and what is reality in these situations.
> And Mr. Bates is an intelligent individual who verbally can conceptualize and
> communicate in a fairly effective way and account for a number of details.
> However, the problem – the mental illness aspect of it, of his account is really
> defined by how he elaborates the various details.  And he elaborates them into a
> way that more or less weaves a consistent theme of being persecuted.

(Exhibit A, p. 374, l. 18 – p. 375, l. 5).

     6.     Dr. Whaley also testified that the plaintiff "perceives things in a way that's

different than – than others, in a way that is always interpreted or very frequently interpreted as

threat and – and danger and then may react or act according to those perceptions, faulty as they

might be." (Exhibit A, p. 378, l. 6-11).

     7.     Prior to his criminal trial, the plaintiff was also examined by Frank DiCataldo,

Ph.D. (a portion of the criminal trial transcript containing Dr. DiCataldo's testimony is attached

hereto as "Exhibit B").  Dr. DiCataldo is a forensic psychologist (Exhibit B, p. 389, l. 14-16).

The purpose of Dr. DiCataldo's pre-trial examination of the plaintiff was also to conduct an

evaluation into the plaintiff's mental capacity to determine whether the plaintiff was able to

control his conduct according to the requirements of the law during the incident in question

(Exhibit B, p. 391, l. 11-15; p. 408, l. 12-22).

8.    As a result of his evaluation of the plaintiff, Dr. DiCataldo opined that the plaintiff's "mental illness substantially impaired his ability to both conform his conduct to the requirements of the law and caused a substantial impairment in his ability to appreciate the wrongfulness of his conduct." (Exhibit B, p. 408, l. 18-22).

9.    More specifically, Dr. DiCataldo found that the plaintiff's "mind is working on tracks that are sort of very paranoid and very delusional." (Exhibit B, p. 401, l. 7-8; p. 397, l. 8-11 (his delusional thoughts are the product of a "very disturbed mind"); p. 406, l. 8-9 (he's psychotic and paranoid); p. 424, l. 15). Dr. DiCataldo also explained how the plaintiff's mental illness would impair his ability to accurately perceive what was happening on the night in question as follows:

> So that basically from the time of about the end of September, beginning of October to the time of his arrest, end of November, he's getting revved up increasingly that he's in – he's being harmed. He believes that he is being killed.
>
> He is not sleeping. This is the only thing he can think about. He is not taking care of himself, he is significantly sleep deprived, has not been sleeping at all for two months and is really just very preoccupied with the idea that he – that there is something in this house – there is something in this house that's killing him. It's harming him. He suspects his mother is involved; that somehow his mother is part of this.
>
> So, when the police arrive on November 30, 2001, that – that's where Mr. Bates is. That's his frame of mind. And he's not sleeping, and he thinks – he thinks he's dying. He thinks he's being killed. So, its important to sort of understand what he – you know, how he saw the world that day when the police arrived. . . .
>
> So, when they arrive, he has not slept for weeks or months; and he believes he is being killed. So, he is in a very delusional state of mind at that time.

(Exhibit B, p. 404, l. 5 – p. 405, l. 14).

10.    According to Dr. Whaley, the plaintiff took psychiatric medication for a brief period in 1995 (Exhibit A, p. 373, l. 20-22), and the plaintiff was hospitalized for mental illness at Bridgewater State Hospital for 40 days in the 1980's (Exhibit A, p. 382, l. 4-11).

11.     According to the plaintiff's deposition testimony (relevant portion attached hereto as "Exhibit C"), he took a drug known a "Risperdale" for two years between 2003 and 2005 (Exhibit C, p. 32, l. 19 – p. 33, l. 10).  Risperdale is an antipsychotic medication used to treat schizophrenia.

12.     According to the plaintiff's mother in the Application for Warrant of Apprehension (attached hereto as "Exhibit D"), which was filled-out on the day of the incident, at that time, Mr. Bates was "at home by himself acting violently, screaming, swearing, yelling, load music, ranting and raving."  Mrs. Bates further described her son as delusional, depressed, possibly schizophrenic, anxiety ridden and hating everyone "because he is so sick."

II.    ARGUMENT

The defendants submit that Mr. Bates' mental condition, as described above, renders him incompetent to testify.  In order to give competent testimony, a witness must "have sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue."  U.S. v. Devin, 918 F.2d 280, 292 (1st Cir.1990) (quoting District of Columbia v. Armes, 107 U.S. 519, 521-22, 2 S.Ct. 840 (1883)).  Whether a witness is competent to testify is a question for the Court.  See Fed.R.Ev. 104(a) ("preliminary questions concerning the qualification of a person to be a witness … shall be determined by the court"); Devin, 918 F.2d at 292  ("[t]he determination of competency is primarily for the trial court"); Eisen v. Picard, 452 F.2d 860, 865 n.8 (1st Cir.1971).  "[W]here a prima facie case of incompetence has been made, there should be some reliable evidence that the witness's statements are competent."  Eisen, 452 F.2d at 865 n.8.

As noted, the psychiatrists examining the plaintiff found that he suffers from schizophrenia, which causes him to experience paranoid delusions rending him incapable of

distinguishing between reality and fantasy. These examinations reveal that there is a substantial likelihood that the plaintiff is not capable of giving a correct account of the matters which he has seen or heard, because his mental condition would have caused him to misinterpret those events. Further compounding the problem is the fact that the plaintiff can verbally conceptualize and communicate in a fairly effective manner, accounting for a number of details that may exist only in his mind. Thus, if the plaintiff testifies, the jury may not be able to distinguish between the portions of his testimony, if any, that are true, and the portions that are based solely upon his misunderstanding of the events about which he is testifying.

In addition to the plaintiff's general mental condition and propensity for misinterpreting events, the plaintiff's mental state on the day in question was particularly impaired. According to Dr. DiCataldo, the plaintiff was in a highly delusional state of mind for more than a month prior to the incident believing that someone was trying to kill him. The plaintiff was not sleeping and believed that he was being poisoned. According to the plaintiff's mother, he was delusional and depressed and he was yelling at people who did not exist. Based on these facts, Dr. DiCataldo opined that the plaintiff would have been unable to accurately perceive what was happening when the defendants approached him of the date in question. If the plaintiff was unable to accurately perceive what was happening at that time, his testimonial account of that event is worthless. Therefore, because the plaintiff's mental illness renders him incapable of giving a correct account of the matters which he has seen or heard, he should be declared incompetent to testify and should be prohibited from doing so in the trial of this matter.

III.    CONCLUSION

WHEREFORE, the defendants respectfully request that this Court rule *in limine* that the plaintiff shall be barred from testifying at the trial of this matter on the grounds of mental

incompetence.  In the alternative, as the foregoing facts establish as least a *prima facia* case of

mental incompetence, the defendants respectfully request that the Court hold a hearing on

plaintiff's competence including a *voir dire* examination by the Court and an independent

medical examination.

<div style="margin-left: 40%;">

DEFENDANTS,
CHRISTOPHER KENDER AND
BARRY MITCHELL
By their attorneys,

/s/ Joseph L. Tehan, Jr.
Joseph L. Tehan, Jr. (BBO # 494020)
Jackie Cowin (BBO # 655880)
Kopelman and Paige, P.C.
101 Arch Street
Boston, MA  02110
(617) 556-0007

</div>

332035/60700/0629

A

1           COMMONWEALTH OF MASSACHUSETTS

2

    BARNSTABLE, SS.
3                                        SUPERIOR COURT
                                         NO. BACR2002-0019

4

5

    ==========================================
6

    COMMONWEALTH OF MASSACHUSETTS
7

    VS.
8

    GLEN S. BATES,
9                     Defendant

10  ==========================================

11

    BEFORE:          RICHARD F. CONNON
12                   SUPERIOR COURT JUSTICE

13

14

    APPEARANCES:     MICHAEL TRUDEAU, ESQUIRE
15                   Assistant District Attorney
                     Cape and Islands Division
16                   For the Commonwealth.

17

                     WILLIAM ROBINSON, ESQUIRE
18                   Committee for Public Counsel Services
                     Cape & Islands Division
19                   For the Defendant.

20

21

22

23

                                 May 1, 2003
24                               BARNSTABLE SUPERIOR COURT

Daniel E. Horgan, Court Reporter
15 Brentway Drive • South Yarmouth, MA 02664

1    And Mr. Robinson.

2         MR. ROBINSON:  I would call Doctor Marc Whaley

3    to the stand, please.

4              MARC WHALEY,

5         having been first duly sworn, was examined and

6    testified as follows:

7              DIRECT EXAMINATION

8      BY MR. ROBINSON:

9    Q  Could you -- keeping your voice up, could you state

10    your name?

11    A  Sure.  My name is, Marc, M-A-R-C, A. Whaley,

12    W-H-A-L-E-Y.

13    Q  What is your occupation?

14    A  I'm a physician specializing in the practice of

15    psychiatry.

16    Q  And briefly, what education did you have to get to

17    that point?

18    A  I did my undergraduate training at the Johns Hopkins

19    University from 1967 to -- no, '64 to '67.  And then

20    went to medical school at Tufts University School of

21    Medicine for the next four years, graduating there in

22    1971 with a doctor of medicine --

23         MR. TRUDEAU:  Your Honor, I would stipulate to

24    the doctor's qualifications.

```
 1              THE COURT:  I'll leave it up to Mr. Robinson.

 2     BY MR. ROBINSON:

 3   Q  Based on that, I'll just ask you a couple of

 4     questions.  And during the past approximately 30

 5     years, have you participated as a forensic

 6     psychiatrist for courts, to assist courts and the

 7     attorneys and other types of inquiries?

 8   A  Not quite that long.  About 24 years, I've done

 9     that.

10   Q  Is there some kind of a -- do you have some kind of

11     a board or certificate?  What would that be?

12   A  That would be -- I'm certified by the American Board

13     of Psychiatry and Neurology in the practice of

14     psychiatry.  It's board certified physician in

15     psychiatry.

16   Q  And calling your attention to roughly the past year,

17     at some point, did my office contact you with regard

18     to conducting an evaluation into the mental capacity

19     of Glenn Bates with regard to an incident that

20     happened in November of 2001?

21   A  Yes, you did.

22   Q  And with regard to that evaluation, what steps did

23     you do prior to today?

24   A  I reviewed a series of written documents and then
```

1    had two separate interviews with Mr. Bates.

2    Q   And approximately how many months apart were those

3    interviews?

4    A   About six or seven months apart.

5    Q   What was -- the most recent was approximately when?

6    A   In March of this year.

7    Q   And did you also have access to other reports

8    relating to the incident in Harwich?

9    A   Yes, I did.

10   Q   And were these primarily police reports of their

11   version of what happened?

12   A   That's correct.

13   Q   And did you also have access to some prior

14   evaluations over the years that had been conducted on

15   Mr. Bates by various either psychological or social

16   work or psychiatric personnel?

17   A   Yes, I did.

18   Q   And did you also have the medical record from Cape

19   Cod Hospital relative to this particular incident?

20   A   I did that as well.

21   Q   And some prior visits for accidents of various

22   kinds?

23   A   That's correct.

24   Q   Now, having those references in mind and focusing

370

1    now on your interviews with Mr. Bates, did Mr.

2    Bates -- would you tell us how you conducted those

3    interviews?  What were you looking for and asking Mr.

4    Bates?  What subjects?

5   A   Well, I was -- they would start out with my telling

6    him who I was and what the purpose of it was; and the

7    fact that what was said was not to be considered

8    confidential; it could come out at court at some

9    point.

10       And then it went on to talk about the incident

11   itself, what his recollection, memory of the incident

12   was, what led up to it, his understanding of the

13   motivations of others at the time.

14       And then we would talk about his past history of

15   similar experiences of being mistreated by his

16   perception by others and his -- some of his past

17   family history, some of his past history of

18   difficulties with authorities of police.  That pretty

19   much covered it.

20  Q   Now, from those interviews, which segments did you

21   consider particular significant, if any?

22  A   Well, they were all pretty significant.  One part of

23   it, one major piece of the significance was when I

24   would leave the interview relatively unstructured,

1    meaning when I would not intervene too much in terms

2    of directing the questions, Mr. Bates would

3    essentially ramble on and particularly return

4    constantly to a theme of being abused by others.

5        He would condense time periods from 20 years ago

6    or 30 years ago to the present and talk about it as if

7    those past events had definitive influence on the

8    present ones, as if there was no difference in time.

9    Q  Could you give some examples of that?

10   A  Sure.  We talked about his treatment by his father

11   that he characterized as being rather physically

12   abusive starting at age 14 when his father dropped a

13   ladder on him, hurt his neck; and then that led to his

14   having neck and back problems which according to Mr.

15   Bates' version prevented him from working really

16   effectively over the years.

17       He talked about when he was 18, his father hit him

18   on the head with an oak chair.  And then -- and that

19   injured him in the same place when he was -- as when

20   he was 14.

21       And then went on quickly to talk about his father

22   being an execution officer in Hawaii during World War

23   II where he was working in internment camps, and he

24   took prisoners back and forth to their trials and to

372

```
 1    executions.  And then quickly talked about himself
 2    being persecuted by his father since he was 14 years
 3    of age, but that he managed to survive by his skills
 4    in camping.  Skills in camping was a reference to his
 5    living in tents, T-E-N-T-S that is, over the years
 6    when he would be homeless at different times since he
 7    was about 17.
 8         So, it was a condensation of time periods and --
 9    and illustrated to me that he was so overwhelmed and
10    has been so overwhelmed with the experience in the
11    world of being persecuted or treated poorly that
12    everything sort of blends together in that one
13    experience of interpersonal interactions.
14  Q  Did he describe for you in any particulars his
15    living state during the days or weeks leading up to
16    the November 30th incident?
17  A  He did.
18  Q  And what did you take from that that you attached
19    some significance to?
20  A  Well, again, there was evidence or there was that
21    same theme of his being persecuted.  He felt or
22    perceived a gas leak in the house.  He was on the
23    second floor apartment of his mother's house and
24    claimed that there had been a gas leak from the
```

1    furnace; and that his mother refused to call the gas

2    company.  So, therefore, she was persecuting him by

3    not doing that.

4        And that he couldn't take a shower because there

5    wasn't enough hot water because of the gas leak.  So,

6    again, he was being persecuted by having to remain

7    dirty essentially by his mother.

8    Q  Did he discuss any -- what he was feeling in terms

9    of distress or physical ailments during the period

10   leading up to this?

11   A  Yes, he claimed that he had trouble breathing; that

12   he said that he was having a stroke, which wouldn't

13   make medical sense at least in that particular term;

14   and that he was confused as well because of this

15   trouble breathing.

16   Q  Did you inquire at anytime whether he was taking any

17   medications?

18   A  I did.

19   Q  What did you learn from that?

20   A  He was not taking any medications.  He -- the only

21   time that he took any psychiatric medication was for a

22   very brief period in 1995, and then again after his --

23   he received a gunshot wound.  He did have some

24   appropriate medication, antipsychotic or psychiatric

1    medication following his gunshot wound, again for a

2    short period of time.

3    Q  And do you know where that was given?  Administered?

4    A  That was administered at Cape Cod Hospital, I

5    believe.

6    Q  And that was not something he chose, was it?

7    A  No, it was not.  He chose after he was on it for a

8    while not to take it.  Which has been one of the

9    problems over the years, is constant denial of any

10   mental illness.

11   Q  Now, you said that one of the things you went over

12   with him was his description of what had happened,

13   what he had seen on the morning of November 30th,

14   2001.

15   A  That's correct.

16   Q  Could you highlight what, if anything, that you

17   thought was significant from that account?

18   A  Again, there was evidence of paranoid thinking in

19   his description of those events.  And it's often hard

20   to delineate what is paranoid and what is reality in

21   these situations.

22       And Mr. Bates is an intelligent individual who

23   verbally can conceptualize and communicate in a fairly

24   effective way and account for a number of details.

1    However, the problem -- the mental illness aspect of

2    it, of his account is really defined by how he

3    elaborates the various details.  And he elaborates

4    them into a way that more or less weaves a consistent

5    theme of being persecuted.

6        So that when he described the incident, itself, he

7    talked about the police sneaking up on him in a

8    stealth manner, not saying anything, not calling out

9    who they were or that they were there, sneaking into

10   his room, specifically to try to catch him with drugs,

11   illicit drugs, and/or take from him about $39,000 that

12   he claimed he had in his possession since a social

13   security settlement in 1995.

14       He felt that the police knew about this large sum

15   of money; and that somehow they either wanted to take

16   it or accuse him of being a drug dealer with a large

17   amount of cash; and that that was their reason for

18   coming in.

19       He initially perceived them as being home

20   invaders; and that he was disabled and impaired at the

21   time because of the gas leak.  So that he felt that he

22   had to defend himself against what he considered to be

23   a home invasion.  So that it -- it -- this experience

24   blended in with practically all the other experiences

376

1  in his life of being persecuted and attacked by others

2  who would exert some kind of power or control over

3  him.

4  Q  And if I told you that -- if, in fact, it turned out

5  there may have been a gas leak, a natural gas leak,

6  would that affect how you viewed his comments on that?

7  A  No.

8  Q  Could you explain a little why?

9  A  Yeah.  Well, the mental illness aspect is the

10  interpretation of a particular detail of reality and

11  the meaning that it -- the particular meaning that it

12  has.  And we know it's mental illness because of how

13  these details are always weaved into a plot against

14  him.

15      And this is a sign of really a disease of the

16  brain.  It's not something that he makes up or is a

17  character problem or a personality problem or

18  something like that.

19      We're all wired in a very complex way, and one of

20  the central things we're wired for through evolution

21  is to detect danger.  Because obviously organisms that

22  didn't detect quickly what was dangerous and what

23  wasn't wouldn't survive.  So, all animals really are

24  wired in various ways to quickly detect danger.

1     We also have systems to sort of filter out what is

2   dangerous and what isn't.  And the disease of

3   schizophrenia, which is what I believe Mr. Bates

4   suffers from, is a disease where the filtering

5   mechanism is defective.

6     There is either damage to brain cells, or brain

7   cells aren't wired correctly.  But all perceptions

8   that he takes in is filtered through a system that

9   cannot modulate the danger aspect of what is taken in

10  and cannot filter out what is important from what is

11  not important in terms of danger.

12    So that everything comes at him into his brain,

13  the front part of the brain where thought is

14  organized -- everything comes at him with a valence or

15  a tinge of high danger.  And he can't filter out the

16  foreground from the background as normal thinking

17  individuals can.

18    So, schizophrenia is a disorder of thought, a

19  disorder of thinking.  Because the mechanisms of

20  filtering out what is dangerous, what is not is

21  defective.

22    And what the individual then does more or less as

23  a compensation, the only way he can sort of calm down

24  his inner wiring really is to weave it all in terms of

1    a coherent plot or a coherent story that he can then

2    sort of figure out and feel as if he's in control of

3    it.   And by that cognitive thinking, he can then

4    suppress, although ineffectively, the danger signals

5    that are coming up.

6        So, that's why the -- he perceives things in a way

7    that's different than -- than others, in a way that is

8    always interpreted or very frequently interpreted as

9    threat and -- and danger and then may react or act

10   according to those perceptions, faulty as they might

11   be.

12       However, they start out -- the perceptions start

13   out with what is real.  So that the gas leak is a real

14   thing, or the smell of gas is real.  Gas is dangerous.

15   But then that becomes part of an elaborate plot by

16   others to do him harm.  And, therefore, he behaves

17   only according to that narrow interpretation.

18   Q   In your evaluation, in your talking with him and

19   examining his background records, would the presence

20   of police as such, police as police have any special

21   significance from what you could see?

22   A   Yes, they would.

23   Q   And what would that be in your opinion?

24   A   They would be agents of control, agents of

1    essentially danger to him, threat to him.

2  Q  Now, in light of your evaluation of Mr. Bates, do

3    you have an opinion as to whether whatever his conduct

4    was on November 30th, 2001 -- on that morning, was he

5    in a position to conform his conduct to the

6    requirements of the law?

7  A  I do have an opinion about that.

8  Q  What is that opinion?

9  A  That he was -- his mental state was substantially

10   impaired in order to be able to control his conduct

11   according to the requirements of the law.  In other

12   words, the mental state that I described, one of

13   misinterpreting perceptions into meanings of high

14   threat and high danger was of such dominance of his

15   mental state that he could not conform himself

16   according to -- to doing what the law might require or

17   would require.

18        MR. ROBINSON:  Thank you, Doctor.

19              CROSS-EXAMINATION

20   BY MR. TRUDEAU:

21  Q  Good morning, Doctor.

22  A  Good morning.

23  Q  Would you agree with me that there are different

24   degrees of mental illness?

1  A  Yes, I certainly would.

2  Q  And would you also agree with me that someone can

3  clearly have some sort of mental illness, but still

4  conform themselves to the requirements of the law?  Is

5  that correct?

6  A  Absolutely.

7  Q  And in particular, you had occasion to meet with Mr.

8  Bates twice; is that right?

9  A  That's correct.

10  Q  And two different times over a six months interval?

11  A  I think it might have been longer.  Eight or nine

12  months actually.

13  Q  Where were those interviews done?

14  A  They were in the Barnstable House of Correction.

15  Q  And in advance of that, you had the opportunity to

16  review various documents?

17  A  That's correct.

18  Q  And included in that document was the Defendant's

19  criminal record, if you will?

20  A  Yes, that was part of it.

21  Q  What significance, if any, did you draw from that?

22  A  That there were -- without going into all the

23  details of it, that there seemed to be similar

24  incidents over the years where he would have trouble

381

1    with authorities or others and would act accordingly.

2    Q  And would you characterize that trouble as

3    assaultive behavior?

4    A  There were mentions of assaults.  That's right.

5    Q  And in addition to that, as part of your review of

6    the records, did you find that there was assaultive

7    behavior towards what you consider authority figures

8    or police?

9    A  That's correct.

10   Q  And do those go back a number of years?  Is that

11   correct?

12   A  That's correct.

13   Q  And in addition to your review of the records, you

14   also reviewed any prior type of mental health

15   evaluations of the Defendant?

16   A  I did.

17   Q  And would you agree with me that on at least a

18   couple of occasions, he was determined not to have

19   significant mental health issues?

20   A  Not to have the mental health issues that he does

21   have.  That's correct.  I believe that the boat was

22   missed a couple of times.  That's right.

23   Q  And that's your opinion; is that correct?

24   A  That is my opinion, yes.

382

1   Q   But nevertheless, you are aware that he has been

2       evaluated before; is that correct?

3   A   In 1995.  That's correct.

4   Q   And, in fact, he's never been in a psychiatric type

5       of hospital setting for anymore than a few days; is

6       that correct?

7   A   Bridgewater for 40 days.  But that's essentially

8       correct, yes.

9   Q   And when was it that he was in Bridgewater for 40

10      days?

11  A   In the '80's, I believe.

12  Q   And you would agree that he's 40 years old at this

13      point; is that correct?

14  A   That's correct.

15  Q   You indicated in -- well, strike that.  You did a

16      report on this; is that correct?

17  A   That's correct.

18  Q   That you provided to counsel?

19  A   Yes, I did.

20  Q   And just for purposes of the record, I'm going to

21      show you these three pages and ask you if that's what

22      that is?

23  A   Yes, this is a copy of my report of April 9th, 2003.

24  Q   Okay.  And you indicated in that report about the

1    gas leak?

2    A  I mentioned it, yes.

3    Q  Okay.  And if you could indicate where was that in

4    the report?

5    A  No, I take that back.  I did not mention the gas

6    leak there.

7    Q  Okay.  And in that report --

8                    (Witness dropped papers.)

9    Q  Sorry.  In that report, did you also in your review

10    indicate that you found that he was being preoccupied

11    with angry acts and fantasies?

12    A  Where are you referring to?

13    Q  In this portion of your report here.

14    A  Yes, that was that others at different places in the

15    records had described him as that, as exhibiting that.

16    Q  Would that be consistent with an uncontrollable

17    temper?

18    A  Oh, sure, it could be.

19    Q  And that doesn't necessarily mean mental illness,

20    does it?

21    A  Not by itself, no.

22    Q  In addition to that, did you have occasion to speak

23    with the Defendant's mother?

24    A  I did not.

1   Q  And did you have occasion to review the basis for

2   the incident involved?  In other words, what led to

3   the police officers going to 261 Main Street?

4   A  Nothing more than what details were contained in the

5   official documents, the police reports and the filing

6   of the 209A.  I think it was a 209A restraining order.

7   Q  And in addition to that, was there an affidavit for

8   a warrant of apprehension?

9   A  Yes, there was.

10  Q  And what significance, if any, did you find in that?

11  A  That it exhibited or it described evidence of

12  disturbed behavior that was consistent with active

13  mental illness.

14  Q  What was the disturbed behavior that -- if you can

15  recall?  What was the basis for that?

16  A  Well, apparently the other tenant in the building --

17       MR. ROBINSON:  Your Honor --

18       THE COURT:  Sustained.  That's not going to be

19  in evidence.

20       MR. ROBINSON:  I understand, but I just want a

21  limiting.  That this is still limited.

22       THE COURT:  All right.  Ladies and gentlemen,

23  this is being offered again not for the truth of the

24  matter, but as a basis for any opinion that this

1    doctor has rendered with respect to the mental illness

2    of Mr. Bates that could have been the basis of his

3    opinion.  Go ahead.

4    Q  Go ahead, sir?

5    A  The other tenant in the building was quite concerned

6      and frightened about his behavior in that he would be

7      up at all hours of the night yelling at people that

8      weren't there, throwing things in his apartment and

9      behaving in a rather threatening manner.

10          And that this had been a recurring problem.  So

11    that she called, contacted Mr. Bates' mother, who then

12    initiated the proceedings for the warrant of

13    apprehension.

14    Q  Okay.  And in that, was there also threats contained

15      in there outside of the neighbor?  Other than the

16      neighbor?

17    A  I would have to go over the details of that to

18      answer that.

19    Q  I show you this and ask you if you would take a look

20      at that and if you recognize having seen that?

21    A  Yes, I have seen it.

22    Q  Okay.  And does that refresh your memory with

23      respect to what the basis for that was?

24    A  Yes.

```
 1   Q  And if you could, anything other than what you have
 2       said that you took into account as part of your
 3       review?
 4   A  Yes, that he had been threatening to hurt the police
 5       if his mother ever called them about him.
 6   Q  And that was something that you read and took into
 7       account in your evaluation; is that right?
 8   A  That's correct.
 9   Q  Now, you indicated that there was a coherent thought
10       process going on in your interview with the Defendant
11       in explaining the circumstances surrounding this
12       event; is that correct?
13   A  Relatively coherent.  That's correct.
14   Q  And surrounding the area of defense and self-defense
15       and things of that nature; is that correct?
16   A  That's correct.
17   Q  And you considered that something that was an effect
18       of mental illness; is that correct?
19   A  The -- considered what specifically?
20   Q  The coherent thought process in explaining the
21       occurrence of the events?
22   A  No, that wouldn't be necessarily a manifestation of
23       his mental illness, no.
24   Q  Wouldn't you agree with me that that would be
```

1  consistent with establishing an excuse or a defense

2  against criminal charges?

3  A  It could be.

4  Q  And in your interview, you indicated, did you not,

5  that it was more difficult for me to opine that Mr.

6  Bates was unable to appreciate the wrongfulness of his

7  conduct; and that he did make statements such as, I

8  threw the hockey stick down because I knew I didn't

9  have any chance to defend myself against a uniformed

10  police officer and guns; is that correct?

11  A  Yes.

12  Q  And then in your report, did you go on to say, This

13  would indicate some ability to appreciate what types

14  of behavior were required of him based on the notions

15  of right and wrong?

16  A  Yes, a cognitive appreciation of that.  Yes.

17          MR. TRUDEAU:  I have nothing further.

18          THE COURT:  Mr. Robinson?

19          MR. ROBINSON:  Just to clarify one thing.

20                REDIRECT EXAMINATION

21  BY MR. ROBINSON:

22  Q  In that warrant of apprehension, the third party

23  account, the mother relating what the neighbor woman

24  had said, that woman when you used the words he had

1    been threatening -- it was that she felt threatened by

2    the noises and the sounds she heard through the wall

3    in his own room, correct?

4    A   That's correct.  I don't believe there were any

5    direct threats to her.

6    Q   It wasn't based on any confrontation with him and

7    the woman?

8    A   There was none to my knowledge, no.

9    Q   And in terms of whether this was an attempt to

10   create a defense for the charges against him, did Mr.

11   Bates indicate to you ever anything that suggested

12   that he thought he was mentally ill?

13   A   No, he would deny it consistently.

14   Q   And in his statement to you of what happened to him,

15   what he had seen, he never indicated, did he, that --

16   that he, in fact, had hit them, but he was crazy?

17   A   Oh, no, not -- not in any way whatsoever, no.

18   It's -- he interpreted their behavior as threatening;

19   and that his behavior would be justified in the

20   response.  That's the mental illness aspect.

21          MR. ROBINSON:  Thank you.

22          THE COURT:  All right.  Next witness.  Thank

23   you, Doctor.

24          THE WITNESS:  Thank you.

**B**

1    MR. ROBINSON:  Doctor DiCataldo.  I assume he's

2    outside.

3              FRANK DICATALDO,

4        having been first duly sworn, was examined and

5    testified as follows:

6              DIRECT EXAMINATION

7      BY MR. ROBINSON:

8    Q   Good morning, Doctor DiCataldo.

9    A   Good morning.

10   Q   Keeping your voice up, could you state your name for

11   the jury and the Court, please?

12   A   My name is Frank DiCataldo.

13   Q   How are you employed?

14   A   I'm a psychologist, a forensic psychologist and

15   employed doing evaluations of mostly criminal

16   Defendants.

17   Q   What is your educational background?

18   A   I have a Phd. in psychology from St. Louis

19   University which I received in 1989.  And I'm also a

20   post-doctoral fellow in forensic psychology which I

21   received at the University of Massachusetts Medical

22   School in 1990.  I've been licensed in Massachusetts

23   as a psychologist since 1990.

24   Q   And what jobs in the field have you had that would

1    be relevant to a forensic examination?

2          MR. TRUDEAU:  Your Honor, again in the interest

3    of time, I would stipulate to his qualifications.

4          THE COURT:  All right.  But it's up to you how

5    far you want to go.

6          MR. ROBINSON:  Again, just a few questions.

7    A  Certainly.  Well, after my fellowship, I took a job

8    as a full time forensic psychologist at Bridgewater

9    State Hospital.  I worked there for about seven years.

10   And during that time, I did well over 1,000

11   evaluations of issues such as competency to stand

12   trial, criminal responsibility, risk of harm, civil

13   commitment.

14        Since 19 -- since that time, since I left that job

15   at Bridgewater, I have worked with various other state

16   agencies here in Massachusetts including the

17   Department of Mental Health and the Department of

18   Youth Services, you know, continuing to do evaluations

19   about risk and danger to others.

20   Q  And have you ever written or published anything?

21   A  Yes.

22   Q  In this particular area?

23   A  Yes, I have three areas of research interest which I

24   have done research and publication.  One is the

```
 1    relationship between psychiatric symptoms and

 2    dangerousness.   I have a few publications in that

 3    area.

 4        I've also been interested in the rates of mental

 5    disorder, the rates of mental illness among juvenile

 6    delinquents and among adult inmates.  So, that's

 7    another area of interest that I have.

 8        I'm also interested generally in the history of

 9    juvenile delinquency, and I have some publications in

10    that area.

11  Q  Now, Doctor DiCataldo, sometime during the past

12    year, did my office contact you to conduct an

13    evaluation of Mr. Glenn Bates in connection with an

14    incident that happened in Harwich in 2001?

15  A  Yes, you did.

16  Q  As a result of that contact, what steps did you do?

17  A  Well, the first thing I did was ask you to send to

18    me materials including police reports, psychiatric

19    records, other court and social service records

20    related to Mr. Bates.  And the first step I took was

21    to just review those and read those.

22  Q  What did you do after that?

23  A  After that, I -- I contacted your office again

24    and -- to set up a series of interviews with Mr.
```

1   Bates, who at the time was awaiting trial at the

2   Barnstable County House of Correction.

3   Q  And did you do that?

4   A  Yes, I did.

5   Q  And approximately when did you conduct those

6   interviews?

7   A  I did two interviews with Mr. Bates.  One was in

8   December of 2002.  And the second one was in February,

9   this past February of 2003.

10      On one occasion, the first occasion, I saw him for

11  about four hours.  And on the second occasion, I saw

12  him about for three hours.  So, it was two interviews

13  for a total of about seven hours.

14  Q  And in addition to speaking directly with him, did

15  you do any testing or anything?

16  A  Yes, in addition to the just clinical interviewing,

17  going over with him his history, reviewing with him

18  his current mental state, mental status, and most

19  importantly reviewing with him his own interpretation

20  of his mental state at the time of the offense, I also

21  administered one psychological test.

22      It was the Minnesota Multiphasic Personality

23  Inventory, Version II, which is a standard

24  psychological test in the field.  I administered that

```
1    to him on the first occasion when I saw him.
2    Q  And did you -- in addition to talking to Mr. Bates
3    and in reviewing records, did you have any contact
4    with any other individuals?
5    A  Yes, I --
6    Q  What steps did you take in that regard?
7    A  I had a series of phone interviews with Priscilla
8    Hughes.  That's Mr. Bates' mother.  I spoke with her.
9    She had traveled back from Florida here to the Cape,
10   and I spoke with her on the phone a few times.  I
11   think maybe two -- two times, maybe three times.  I
12   don't remember exactly.
13       I made an attempt to contact or to interview over
14   the phone the two arresting police officers that were
15   involved in the arrest of Mr. Bates, but I did not get
16   calls back.  So, I -- I was not able to interview
17   them.
18   Q  Now, particularly with regard to your interviews of
19   Mr. Bates directly, were there -- could you tell us
20   basically how you approached those in terms of what
21   you were looking for, and what you were asking him?
22   How you structured those interviews?
23   A  Sure.  Well, you know, the first thing was to
24   explain to Mr. Bates what the purpose of the interview
```

1    was.  That I was there at the direction of his

2    attorney to conduct an interview with him to

3    essentially determine what his mental state was at the

4    time of his -- of his arrest in November of 2001.

5        The interview begins really by just going over his

6    history.  I wanted to, you know, first get to

7    understand, you know, his history from his point of

8    view from very early childhood all the way up through

9    adulthood.

10       The interview with Mr. Bates, I need tell you, was

11   not easy to do.  He's -- he's very easily excitable.

12   There were times during both interviews when I had to,

13   you know, direct him to sit down because he gets very

14   animated, very excited.  You know, he would begin

15   pacing the room.

16       In fact, at one point, a correctional officer had

17   to come into the room to check to make sure we both

18   were okay.  And we were fine.  It was just that he

19   just gets very, very animated and very, very excited.

20   So, I think one of the reasons why the first interview

21   took so long was, you know, Mr. Bates has a very

22   difficult sort of controlling himself and controlling

23   his emotions, which I think is very relevant to, you

24   know, what he was like in November of 2001.

1    So -- so, that first day, that first interview, we

2    spent a lot of time talking about him and his

3    childhood and his background.  And a lot of it was

4    spent talking about his perception of misjustices.

5    You know, unjustices that have been done to him,

6    perpetrated against him by his family, mostly his

7    father and mother, and by other people.

8    This is something that Mr. Bates carries with him,

9    this idea that various people in the world are out to

10   do him in.  It's pretty much the only thing he can

11   talk about.  So, that first meeting was really talking

12   about those issues.

13   Q  And in that first meeting, did he give you some

14   specific examples relative, for example, to his

15   family?  His mother and father?

16   A  Yes.  Yes, Mr. Bates is under the idea -- I believe

17   it's a delusional idea -- that his -- primarily his

18   father, but also his mother subjected him as a child

19   to various forms of mistreatment, almost torture.

20   Keeping him set off in a basement as a child where he

21   was exposed to various kinds of dangerous gases that

22   he believes caused cognitive problems, caused various

23   physical problems.  His father was a house painter.

24   And Mr. Bates as an early adolescent worked in his

1    father's business.  His father stored a lot of the

2    paints and a lot of the other equipment associated

3    with the paint business like paint thinners and

4    turpentine, things of that nature -- Mr. Bates is

5    under the impression that as a child as young as five,

6    six or seven, he was exposed to all of the vapors, the

7    dangerous gases that would be emitted from these; and

8    that they caused him various mental and physical harm

9    because of all of the years that he was sort of stuck

10    in the basement.

11        He also believes that he was directed by his

12    parents never to open the windows.  He's very fixed on

13    this idea even though it's something that happened,

14    you know, 30, 40 years ago.

15        When you're talking about him, you would almost

16    think it was something that happened just yesterday.

17    He's very sort of preoccupied with this idea that his

18    parents were involved in this; that his parents were

19    involved in a conspiracy together to do him in, to

20    harm him.

21        He also believes his parents -- his mother tells

22    me that Mr. Bates was born with a club foot that was

23    corrected surgically.  It was corrected

24    orthopedically.  Mr. Bates knows this, but believes

1    that his parents subjected him to various kinds of

2    surgeries in order to hide his deformity because they

3    wanted to keep him as a servant; that they wanted to

4    keep him employed and working for them; so that they

5    could exploit him for the money that he would make for

6    various jobs.

7        And that they hid all of the childhood photographs

8    of him as a deformed child.  The idea is completely --

9    completely irrational.  It sort of makes no sense.

10   It's a delusion.  It's the product of a very

11   disturbed -- a very disturbed mind.

12       And again, he also believes that his parents had

13   him work as a child in order so they could garner all

14   of the profits and benefits of that.  That basically

15   they enslaved him in some sense.

16   Q  Did he discuss any physical injuries from his

17   childhood that he felt still affected him?

18   A  Yeah, in addition to sort of the -- you know, the

19   various brain abnormalities he believes were incurred

20   from being exposed to these gases in the basement, he

21   believes that at the age of ten or so, he had a back

22   injury that was caused by a ladder that was -- he and

23   his father were working with that was dropped; and

24   that -- you know, to this day, he wonders about

1    whether his father did that on purpose or not.  To

2    this day complaints that, you know, he still has these

3    sort of back injuries and injuries to his legs.

4    Q  Relative to his mother and closer in time to the

5    events of November of 2001, did he have some specific

6    concerns about what his mother was doing?

7    A  Yeah, Mr. Bates through most of his -- let's say

8    late adolescence to early adulthood lived kind of a

9    nomadic lifestyle.  He is travelling to California and

10   to Florida.  This is not uncommon for sort of lost,

11   you know, young mentally ill persons to sort of --

12   sort of wander aimlessly searching for identity,

13   searching for a place in the world.

14       Eventually he begins to come back as his options

15   in other places begin to dwindle.  He sort of wanders

16   back to Massachusetts, and reluctantly his mother

17   agrees to have him stay in a second floor apartment in

18   a house that she owned in Harwich Port.

19       And he had lived there, I believe, from about the

20   beginning of September, end of August, beginning of

21   September of 2001 until the time that he was arrested.

22   So, he was there for about three months.

23       And Mr. Bates is completely convinced that during

24   that three month period of time or two or three month

1    period of time that he was being exposed again to this

2    theme, delusional theme of dangerous volatile gases

3    that were poisoning him.

4       He believes that he was being -- he was being

5    slowly killed in this house from gases that were

6    emanating from a defective furnace in her basement.

7    That his concern about it was so grave, so serious

8    that he wasn't sleeping at night.  He was -- he was in

9    a virtual panic about it, feeling that his body was

10   being harmed or poisoned; that he wasn't able to

11   breathe; that his brain was unable to function.

12      It caused him significant, significant distress.

13   He was very distressed about this, very upset about it

14   and would follow various newspaper stories about it,

15   about cases of other people being poisoned by gas.  It

16   was -- it was a -- it was a preoccupation with him.

17      He would try to talk with his mother about this.

18   Of course, she thought it was completely ludicrous,

19   completely irrational.  And the fact that she seemed

20   so indifferent to it, that she seemed not to take him

21   seriously -- to Mr. Bates, that was evidence that she

22   may have been part of this plan.

23      Because she wasn't taking it seriously, because

24   she wasn't listening to him, he began to think that

1    maybe she's poisoning me.  Maybe she's the one that

2    wants to harm me.  So, he began to think that his

3    mother -- this is a paranoid idea.  There is no basis

4    in reality to think that Mrs. Hughes would want to

5    harm her son.  But because of his psychotic frame of

6    mind, the psychotic way that he was thinking, he began

7    to think that his mother might have been trying to

8    kill him.

9  Q  Was there something specific with regard to dry

10   mouth and water relative to the mother?

11  A  Yeah, there was various -- sort of various ideas

12   that seemed to an outsider observing -- to me, they

13   seemed to be incidental, not important.  For Mr.

14   Bates, they took on great significance.

15       He would complain that he had a chronic dry mouth

16   to his mother.  So, she would -- it seemed reasonable

17   enough.  She would say, Well, get something to drink.

18   Drink some water if your mouth is dry.  It makes

19   perfect sense.

20       But to Mr. Bates' frame of mind, he thought his

21   mother was trying to kill him by having him ingest

22   large quantities, copious quantities of water which

23   would cause various -- you know, if you drink large

24   amounts of water, you could actually cause your -- a

1    fatality by the loss of sodium and other kinds of

2    minerals in the body.  He believed that her suggestion

3    to drink water was an attempt on her part to harm him

4    physically by having him drink large amounts of water.

5       He actually would cut out things in the newspaper

6    related to that as evidence of that.  So, you could

7    sort of see how his mind is working on tracks that are

8    sort of very paranoid and very delusional.

9  Q  Now, I think you had mentioned that most of this was

10   within the first four-hour interview?  Or are you now

11   going into the -- you also saw him again?

12 A  Right.  Most of the stuff that I'm taking about here

13   happened during that first interview.  Although, you

14   know, in the second interview, we revisited some of

15   these issues.

16 Q  During the seven hours you were with him, in

17   addition to pacing, did he have any reaction to you as

18   a psychologist examining him basically to see whether

19   or not you thought he was mentally ill?

20 A  You know, I repeatedly tried to remind Mr. Bates of

21   what my purpose was.  You know, I was psychologist.  I

22   was a mental health professional.  I was asked by his

23   lawyer -- that I was really here to evaluate his

24   mental health; you know, to review and make some

1    opinion about -- you know, diagnostic opinion about

2    his mental health and also to arrive at an opinion

3    about what his mental health was like on November of

4    2001 when he was arrested.

5        It really seemed to me that from his point of

6    view, my -- that wasn't my role at all.  From his

7    point of view, my role was that I was going to be some

8    type of spokesperson for him; somebody that would --

9    that he could sort of tell -- that I would be telling

10   the jury his story; that I would be like a journalist

11   doing an interview and then reporting about it in a

12   newspaper.

13       He didn't really -- he didn't get the sense that I

14   was really not here to do that.  I was really here to,

15   you know, provide a clinical judgment.  I was

16   providing a clinical judgment about him.  I wasn't

17   here to announce, you know, his point of view or his

18   story.

19       And there were times when I had to sort of remind

20   him that that was my role.  He -- he would do odd

21   things -- I thought were odd in the interview like,

22   you know, taking notes on a yellow pad and would say

23   to me like, Make sure you write this down.  Or, you

24   know, write it down just like this, as if I was a

1    reporter taking quotes down rather than a psychologist

2    just taking my own sort of notes about his mental

3    state.  So, it -- I wasn't clear that he actually

4    understood what my role was.

5    Q  You verbalized to him what your role was, and he --

6    A  Many times.  And yes.

7    Q  He relayed it back to you?

8    A  He was able to sort of relay it back.  But over

9    time, though, sometimes I think he would drift away

10   from that.

11   Q  Now, part of this -- of your taking notes was also

12   including taking down what he had observed that

13   morning of 2001 when he ended up getting shot; is that

14   correct?

15   A  Yes.  Yes.

16   Q  And what about that account, if anything, did you

17   find significant relative to the issues that you're

18   here for?

19   A  Uh huh.  Well, first, you know, it's my opinion --

20   in order to understand what his frame of mind was,

21   what his mental state was in November of 2001, you

22   really have to go back in time a little bit to when he

23   first moved into the house in September.  That's when

24   it began.

1     When the heat came on, on October 1st, he claims

2    and then he began to be preoccupied with this idea

3    that there are gases emanating from the basement that

4    were poisoning him and that were killing him.

5     So that basically from the time of about the end

6    of September, beginning of October to the time of his

7    arrest, end of November, he's getting revved up

8    increasingly that he's in -- he's being harmed.  He

9    believes that he is being killed.

10     He is not sleeping.  This is the only thing that

11    he can think about.  He is not taking care of himself.

12    So that by the end of November, he is significantly

13    sleep deprived, has not been sleeping at all for two

14    months and is really just very preoccupied with the

15    idea that he -- that there is something in this

16    house -- there is something in this house that's

17    killing him.  It's harming him.  He suspects his

18    mother is involved; that somehow his mother is part of

19    this.

20     So, when the police arrive on November 30th, 2001,

21    that -- that's where Mr. Bates is.  That's his frame

22    of mind.  And he is not sleeping, and he thinks -- he

23    thinks he's dying.  He thinks he is being killed.  So,

24    it's important to sort of understand what he -- you

1    know, how he saw the world that day when the police

2    arrived.  Now, when the police do arrive -- and, of

3    course, they arrive because there's a -- what's known

4    as a Section 12 warrant of apprehension that his

5    mother applied to the Court for.

6        Section 12s are for mentally ill persons to be

7    apprehended and brought to court to be evaluated to

8    see if they need to be in a hospital.  So, the police

9    are there essentially to take Mr. Bates, who they

10   believe is mentally ill, to be evaluated to see if he

11   needs to be in a hospital.  That's why they're there.

12   So, when they arrive, he has not slept for weeks or

13   months; and he believes he is being killed.  So, he is

14   in a very delusional frame of mind at the time.

15       Now, according to Mr. Bates, when they do arrive

16   that morning, he is asleep.  He had fallen sleep maybe

17   like 4:00, sometime in the middle of the night.  He

18   slept with -- listening to classical music on

19   headphones, he reports.

20       And he claims that he never actually hears the

21   police, but actually hears the footsteps, feels the

22   footsteps coming up to greet him.  He -- now he

23   reports -- and, of course, this is in contradiction to

24   the police officers.  I'm aware of that.

1    He reports that they do not announce themselves,

2    do not identify themselves as police officers.  From

3    the reports, one of the officers is in, I think,

4    civilian clothes.  One of them isn't in uniform.

5    And that they come into the room with a -- with a

6    gun, a drawn gun which is in contradiction with what

7    the police say.  Prior -- prior to this, Mr. Bates had

8    taken some steps to booby-trap the house.  Again,

9    remember, he's psychotic.  He is paranoid.

10    He claims that he had -- what he refers to as the

11    Home Alone booby-trap from the film.  There's a

12    carpet, a runner going up the stairs which have those

13    metal -- sometimes they're brass braces that screw in

14    to sort of hold the carpet in place.

15    He had disconnected two or three towards the top

16    of the staircase.  His -- it's a -- it's a ludicrous

17    idea.  His idea was that if anybody came up the steps,

18    if they hit that top third -- second or third step to

19    the top there, that the carpet would come undone; and

20    they would come tumbling down, alerting him that

21    somebody was in the house.

22    I don't know if it would work or not, but I think

23    what's more important to understand about that is that

24    how paranoid he was.  The idea that he needed to have

1   some field of protection around him.  Just in case

2   people came in, he would be alerted to it.  So, he

3   claims he had had that Home Alone booby-trap thing set

4   up.

5       He also claims he had had a hockey stick which was

6   used in the assault against the police officers -- he

7   had had that wedged in the bedroom door so that if

8   somebody tried to open the door, the hockey stick

9   would fall; and that again would alert him.

10      Again, this suggests to me -- that somebody is

11  setting up the staircase that way, somebody is setting

12  up a contraption on the door is very, very concerned

13  about somebody coming in to get them.  And he was

14  concerned about somebody coming in to harm him.  He's

15  very paranoid.

16      So, he claims that the police came in with their

17  guns drawn.  The hockey stick had fallen down; and

18  that he grabbed the hockey stick to protect himself;

19  that he just went to hit the gun, not to hit the

20  police officers.

21      Again, this is what he says -- and in process of

22  that was shot by one of the officers and then came

23  falling down the steps.

24  Q  In light of the evaluation you have done including

1    the interviews and everything else, do you feel you

2    are in a position to render an opinion with regard to

3    the criminal responsibility or lack of criminal

4    responsibility of Mr. Bates on November 30th --

5    A  Yes.

6    Q  -- 2001?

7    A  Yes.

8    Q  And if you do have an opinion?

9    A  Yes.

10   Q  And what is that opinion relative to the legal

11   definition?

12   A  Yeah, it's my opinion -- and I hold this opinion

13   with -- with significant confidence.  I mean, some

14   cases are difficult.  This is not a difficult case in

15   my -- in my opinion.  That on November 30th, 2001, at

16   the time of the offense, Mr. Bates suffered from a

17   mental illness.  He was mentally ill.

18        And that mental illness substantially impaired his

19   ability to both conform his conduct to the

20   requirements of the law and caused a substantial

21   impairment in his ability to appreciate the

22   wrongfulness of his conduct.  And as I said, I hold

23   that opinion with great confidence.

24   Q  And just to clarify one aspect, if it turned out, in

409

```
1    fact, that there was both carbon monoxide and natural

2    gas fumes emanating in some degree --

3  A  Uh huh.

4  Q  -- to his apartment during that time period, would

5    that affect the way you interpreted what he said?

6  A  No, the fact that there's like a -- if you will,

7    like a cornel of truth, sort of a cornel of truth

8    behind his delusion in no way lessens the significance

9    of the delusion.

10      Whether or not there was actually a defective

11    furnace in the house or not is sort of irrelevant.

12    Whether or not there was natural gas emanating from

13    somewhere in the -- within the property in my opinion

14    is irrelevant.

15      What's more important to sort of stay focussed on

16    here is his interpretation, his attributions that his

17    mother was involved in a conspiracy to do this.  That

18    these things were killing him; that he was in a state

19    of panic about them.  Those are the things to focus on

20    and understand, his reactions, interpretations rather

21    than whether or not there was actual gas in the house.

22      Just as -- just as whether -- just as in a similar

23    vein about his childhood, same thing.  You know, he

24    may have been in the basement.  Whether or not he was
```

1   in the basement or not is irrelevant.  It's his

2   attribution that his parents were trying to harm him

3   by putting him in the basement, that's more

4   significant to pay attention to.

5          MR. ROBINSON:  Thank you, Doctor.

6                  CROSS-EXAMINATION

7    BY MR. TRUDEAU:

8   Q   Good morning, Doctor.

9   A   Good morning.

10  Q   Now, you just testified to these Home Alone

11   precaution systems that you had talked about --

12  A   Yes.

13  Q   You say that that's -- that him doing that is an

14   indication of his mental illness?

15  A   It seems to be a sign of paranoia.

16  Q   And would you agree that that's similar to a burglar

17   alarm?

18  A   In a way, it's similar to a burglar alarm, yes.

19  Q   So then your opinion would be anyone that has a

20   burglar alarm system in their house is paranoid as

21   well?

22  A   No, no, no.  Anybody who has a burglar alarm in

23   their home is being careful and probably using good

24   judgment.  In Mr. Bates' case, the idea of setting up

1    this sort of very distorted, disturbed early warning

2    sign that he got from a movie, that that -- that

3    signals a disturbed mind.

4        Not that somebody would lock their doors or set up

5    a burglar alarm.  That -- that's not the point.  The

6    point is the length at which he would go to do that

7    and the means by which he chose to do it.

8    Q  You're saying that turning a burglar alarm on in

9    your house is different than putting a stick up

10   against a door that would fall down and accomplish the

11   same purpose; is that correct?

12   A  I -- I think that there -- I think that they're

13   different, yes.  I mean, from Mr. Bates' point of

14   view, they're different.  Again, don't forget, he's --

15   he's -- you know, why he putting the stick up?  Why is

16   he -- why is he setting up the staircase that way?  He

17   has this fear, this concern that he is being killed.

18   He is dying; that someone is trying to kill him.  So,

19   he's setting up all these very primitive, very -- very

20   irrational sort of ways to protect himself.

21   Q  Well, didn't you indicate that your opinion was that

22   he was putting up this early warning detection system

23   to find out if someone was entering the house?  His

24   apartment, right?

412

```
1   A  Yes.  Yes.

2   Q  Okay.  That's the same as turning a burglar alarm

3    on?

4   A  Well, no, it's different.

5   Q  So, it's different?

6   A  It's different.  I mean, it's different because --

7   Q  One you're paranoid; one you're not?

8   A  Yeah, because it's different because we are talking

9    about Mr. Bates.  We're talking about his -- his way

10   of viewing the world.  I mean --

11  Q  The person that you're being paid to testify for,

12   right?

13  A  Being paid to testify for?  I'm being --

14          MR. ROBINSON:  I'm going to object to that,

15   Your Honor.

16          THE COURT:  Sustained.

17  Q  And you reviewed a series of records, of hospital

18   records as well as psychiatric evaluations of Mr.

19   Bates; is that correct?

20  A  Yes.

21  Q  And you're aware that at least two other doctors

22   opined in connection with this case that there was no

23   gross psychosis present with respect to -- as a result

24   of their interview with Mr. Bates?
```

1    A  Yes, that was their opinion.  I do recall that.

2    Q  Would you agree that in your review of all of the

3    Defendant's records in preparing to testify today --

4    as part of that, you reviewed prior criminal conduct,

5    if you will?

6    A  Yes.

7    Q  And it was quite extensive; is that fair to say?

8    A  Extensive?  He's been arrested a number of times

9    here locally in the past.

10   Q  And would you characterize -- you said that he had

11   uncontrolled emotions; is that correct?

12   A  Yes.

13   Q  Would you characterize the behavior exhibited in

14   that -- those records that you reviewed as assaultive

15   type of behavior?

16   A  He has been charged a number of times with assaults.

17   Assault and batteries.

18   Q  And would you agree that he has a propensity for

19   violence?

20   A  Propensity?  You would have to define propensity.

21   Let me put it this way:  He has been arrested a number

22   of times in the past for assaults.

23   Q  Well, I'm talking about in your evaluation and

24   review of the records that you have had?

1   A  I'm not sure I understand your question.

2          THE COURT:  Let me just clarify one thing.  So

3   that you know the legal definitions, there's assault

4   and there is assault and battery.  An assault is a

5   threat to commit a battery.  The assault and battery

6   is the actual touching.  The assault is not a

7   touching.  All right.

8          MR. TRUDEAU:  Thank you.

9   Q  You indicated as -- I believe as part of your Direct

10  Examination that he became very agitated or easily

11  agitated?

12  A  He is easily agitated.  That's right.

13  Q  In addition to your observations of him, in your

14  review of his records in preparation of this, would

15  you agree with me that he has a propensity for violent

16  activity?

17  A  Again, you would have to define, what is a

18  propensity?

19          THE COURT:  I would just say rephrase your

20  question striking out violence.  Just go ahead.

21  Q  Does he get angry easily?

22  A  Yes.

23  Q  And as a result of that anger, does -- in your

24  review of the records, is it your opinion that he acts

415

1   out on that anger?

2   A  Yes.

3   Q  And he acts out on that anger towards others; is

4    that correct?

5   A  Yes.

6   Q  And in particular police officers?

7   A  He has had a number of -- yes.  Yes.

8   Q  In your review of the records in preparation for

9    this, did the name Lieutenant Mitchell come up?

10  A  Yes, it came up from Mr. Bates.  Mr. Bates brought

11   him up, yes.

12  Q  And what significance, if any, did you find in that

13   part of your evaluation?

14  A  Well, actually it has great significance.  We'll

15   take Lieutenant Mitchell, for instance.  On the

16   morning of November 30th, 2001, it wasn't the first

17   time these two men had met.  I mean, they both knew

18   each other.

19  Q  Right.

20  A  There is a history, if you will.

21  Q  And he told you that?  That there was a history?

22  A  He told me that.

23  Q  And he told you that he clearly knew Lieutenant

24   Mitchell?

1   A   He knew Lieutenant Mitchell, yes.

2   Q   For a number of years?

3   A   Yes.

4   Q   Now, you indicated that you performed a series of

5       tests or a test that you talked about that you

6       administered to the Defendant?

7   A   Not a series.  I did administer one test.

8   Q   One test?

9   A   Okay.

10  Q   If you could, tell me a little bit about that test?

11  A   Sure.  It's a -- it's a personality test.  It's a

12      standard test in the field of psychology.  It's called

13      the Minnesota Multiphasic Personality inventory,

14      Version II.  Sometimes referred to as the MMPI.  It's

15      about a 540 item, true and false, objective true and

16      false personality test that basically measures two

17      things:  It measures a person's self-report about

18      various symptoms of mental disorder, their self-report

19      about symptoms of mental disorder.

20          And it also provides a profile, if you will, of

21      their personality, a description of their personality.

22      And it's compared -- that the pattern of answers are

23      compared to a normative sample of adults.

24  Q   Okay.  And you administered that test to this

1    Defendant?

2    A  Yes, I did.

3    Q  And what were the results of that?

4    A  Well, simply put, the results were invalid.  The

5    test results were invalid.  That's --

6    Q  Okay.  What does that mean?

7    A  Okay.  Well, the one thing it doesn't mean is -- he

8    answered the test reliably.  That is, that for the

9    similar items or for same items, he answered in the

10   same way.  So, he wasn't like he did it haphazardly or

11   randomly or did it like he didn't care.  So, it was

12   reliable.  It was consistent.

13       He -- he -- it was invalid because he endorsed

14   symptoms of mental illness way beyond what the

15   normative sample endorses.  So, basically the test

16   profile is of limited usefulness because he basically

17   endorses all symptoms.  All symptoms.

18       You know, any question that has a symptom in it,

19   he would endorse it.  I have that.  I have that.  So,

20   the results of it are -- are -- would need to be

21   interpreted with great caution.

22   Q  And you have -- in your report, you indicated that

23   there were a couple of interpretations for --

24   A  Yes.

1  Q  -- this over self-reporting, if you will?

2  A  Yes.  That's a good way of putting it, yes.

3  Q  And one of those is that it was a deliberate act?

4  A  It could.

5  Q  Is that correct?

6  A  It could be that.

7  Q  And what do you mean by that?

8  A  Well, some patients who over-report are doing that

9  because they want to appear mentally ill, and they're

10  malingering or faking a mental illness.  That's why

11  some people might endorse every symptom.  So, it can

12  be a deliberate attempt to make yourself appear to the

13  psychologist that you're sicker, if you will, than you

14  actually are.

15  Q  Okay.  That's clearly a possibility here?

16  A  That's a possibility here, yes.

17  Q  And you indicated that there's -- in your report,

18  you suggested yet another explanation for this --

19  A  Yes, I did.

20  Q  -- result?  What was that?

21  A  The other -- if I recall -- if I recall accurately

22  was that Mr. Bates is in such distress, he's so

23  stressed out, if you will -- you know, emotionally at

24  wits end about everything that -- that as part of

1    that, he just -- he just sort of as a cry for help

2    maybe or as a way to sort of validate his experience,

3    he endorses all of these symptoms.

4        And it's really a function of -- or the cause of

5    that is that he's just so -- so stressed out that he

6    just -- you know, he endorses all these various

7    symptoms.

8    Q  Okay.  And are you familiar with a SURS test?  SARS

9    test?

10    A  Yeah.  I'm familiar with it, yes.

11    Q  What is that?

12    A  Well, simply it's a test of malingering, a test

13    of -- of faking mental disorders.

14    Q  Did you do that?

15    A  No.

16    Q  And you could have done that; is that right?

17    A  I could have.  It's not a very well -- it's not a

18    very well researched -- it's not a commonly used test.

19    It's not a very well researched test.

20    Q  Well, in particular, wouldn't that show as to which

21    of those hypotheses in that test that you said was

22    invalid -- wouldn't that tend to lend strength to one

23    of the two of those explanations?

24    A  Listen.  I mean, you don't need the SURS to tell

1  whether or not -- you don't need the SURS or the MMPI

2  quite frankly to determine whether or not Mr. Bates is

3  mentally ill.

4  Q  No, sir, just answer my question.  Wouldn't that

5  have helped you?

6  A  It may have.  It might have.  It's unclear to me.

7  Q  But nevertheless, it was available and you chose not

8  to do it?

9  A  It was available.  Many tests are available.  I

10  chose not to use it.

11  Q  And what is -- you said malingering.  What is that?

12  What is that phenomena?

13  A  Simply faking.  Faking the symptoms of a mental

14  disorder or faking the symptoms of any physical

15  disorders for that matter.

16  Q  And that, I'm sure, you come in contact with quite

17  commonly in your area?

18  A  It -- it's got to be addressed in every case.  It's

19  something you need to sort of address in each case

20  that you do.

21  Q  And that was clearly an issue with respect to this

22  testing you conducted?

23  A  Well, it was one of the hypotheses, if you will --

24  it was one of the possibilities that I had to think

1  about given that the MMPI result.  You know, could

2  this be that he was just faking.

3  Q  And in addition to the other tests that you did, in

4  your report you indicated that you spoke to him about

5  the incident, itself; is that correct?

6  A  Yes.

7  Q  And in his statement to you, did -- do you remember

8  you testified that he picked up the hockey stick and

9  swung it at what was coming through the door; is that

10  right?

11  A  That's what he says.

12  Q  Now, in your interviews, you said there were two; is

13  that right?

14  A  Yes.

15  Q  And in your interviews with the Defendant, did you

16  experience him to be responsive to your questions?

17  A  Yes.

18  Q  And, in fact, he relayed very accurate details of

19  various events that had occurred over the years, some

20  going back quite some time?

21  A  Not -- just to be clear, accurate in his mind, but

22  very detailed and accurate from his point of view.

23  Whether they were accurate in reality, I don't know.

24  Q  And they could very well have been based in part on

1    reality; is that right?

2    A  Could have.

3    Q  And with respect to mental illness, you would agree

4    with me that there are varying degrees of mental

5    illness; is that right?

6    A  Yes.

7    Q  And someone could very clearly be able to conform

8    their acts to the requirements of the law and

9    understand right from wrong and still have some sort

10   of mental illness; is that right?

11   A  I would -- I would submit that most mentally ill

12   persons can do those things.  It's only a very small

13   fraction of the mentally ill that cannot.

14   Q  And would you agree with me that it's very difficult

15   to make a determination as to the level of mental

16   illness?

17   A  I'm not sure I understand.  Is it difficult to make

18   a determination about the severity of the mental

19   illness, or make a determination about the

20   relationship between mental illness and their ability

21   to understand their behavior?  I mean, I'm --

22   Q  The severity of the mental illness?

23   A  I think that that's -- that's a less complicated

24   task than others.  I think determining the severity of

1    someone's mental disorder is something that can be

2    done with a -- a reasonable degree of confidence.

3    Q   Do you consider the Defendant a risk to others?

4    A   Yes.

5    Q   And do you consider him a danger to others?

6    A   Yes.

7         MR. TRUDEAU:   Thank you.   I have nothing

8    further.

9                 REDIRECT EXAMINATION

10    BY MR. ROBINSON:

11    Q   Doctor, with regard to what Mr. Trudeau asked you

12    about, two other opinions unspecified that said that

13    there was not a paranoid schizophrenia, were there

14    also opinions that you read from the past that said

15    there was?   An opinion that --

16    A   Yes, there -- there were records from Community

17    Mental Health Center where he had been sent to be

18    hospitalized in, I believe, the late '80's that said

19    that he was paranoid schizophrenic.   I also might add

20    interestingly enough there is notes in those records.

21        These records are 15 years before the event.

22    Thirteen years, excuse me -- 13 or 14 years before the

23    arrest where a social worker says he is paranoid of

24    the police.

424

1        So, I mean, this idea about being paranoid about,

2   you know, his mother or the police isn't something

3   that just cropped up in November.  He has had these

4   ideas for 13 or 14 years; and a social worker 13 or 14

5   years ago wrote that.  So, I found that to be highly

6   significant.

7   Q  And you were also just asked -- you started to talk

8      about whether he had mentioned or talked about

9      Lieutenant Mitchell --

10  A  Yes.

11  Q  -- with you?

12  A  Yes.

13  Q  How would you characterize the way that Mr. Bates

14     described his relationship to Lieutenant Mitchell?

15  A  Again, I interpret it as all delusional.  These

16     delusional ideas -- he claims that he and Lieutenant

17     Mitchell go way back into the middle '80's.  That Mr.

18     Bates was part of a drug sting operation working with

19     the government.  Paranoid ideas.  Working with the

20     government to uncover marijuana abuse on the Cape.

21     And that as part of that, had some dealings with

22     Lieutenant Mitchell and other members of the Harwich

23     police department; and that they arrested him on some

24     phony, bogus charges.

425

1      And that since then, they have been involved in

2   this -- this conspiracy of surveilling him, following

3   him, monitoring him and generally harassing him.  And

4   again, it all stems from when he was an adolescent --

5   or an adult, a young adult actually, being involved in

6   this government drug sting that he thinks he was

7   involved in as an undercover double agent of some

8   sort.

9  Q  And in that context, did he indicate that Lieutenant

10   Mitchell with another officer had actually physically

11   harmed him on an occasion?

12  A  He -- he claims that, yes.  I do remember him saying

13   that during the process of arrest that they harmed

14   him.

15  Q  That Officer Mitchell held him while another officer

16   was hitting him?

17  A  I'm sorry.  I don't -- if that's in my report, I can

18   go back and look at it, but I don't recall that.

19  Q  Is your memory exhausted on that?

20  A  Yes.

21  Q  Do you have the number of pages?

22  A  I have my report here.

23  Q  I would ask you to look at Page 12.

24  A  Page 12?  What paragraph?

426

```
1   Q  At the top paragraph.  Assuming you're looking at
2     the same Page 12.  Twelve is by the record evaluation?
3   A  Yes.  Yes, I'm sorry.  I do -- I do see it now.
4     That the sentence as I wrote it, There is -- he claims
5     that Police Officer Blais held him while -- police
6     officer hit him, excuse me -- Police Officer Blais hit
7     him while Police Officer Mitchell held him.  That's
8     what he claims.
9   Q  If you go back to the bottom of Page 11, is your
10    memory exhausted as to what year he said that
11    occurred?
12  A  I don't recall.
13  Q  Would it help if you looked at --
14  A  Yes.
15  Q  -- Page 11?
16  A  Yeah, okay.  He said that happened in 1979.
17  Q  Now, when he was talking -- at some point, you
18    discussed with him the fact that he had been evaluated
19    following his being shot at Bridgewater State Hospital
20    for a period of time, correct?
21  A  Well, he was evaluated first at the hospital by a
22    court psychologist; and then he went to Bridgewater to
23    be evaluated, yes.
24  Q  And one of the doctors that did not make a finding
```

427

1   that he was paranoid schizophrenic was a Packer?

2   A  Yes.

3   Q  And did he describe for you in the course of your

4   conversations what his experience was like at

5   Bridgewater State Hospital?  Did he make any reference

6   to that evaluation or interview?

7   A  Yeah.  Yeah, he -- he was at Bridgewater for 40 days

8   and believed that the -- he believed that Bridgewater,

9   the hospital, was involved with the government to

10   extort a confession from him and were doing things

11   like not giving him his pain medication, not changing

12   his bed linens or -- or other ways of tending to him

13   medically as a way to torture him, to -- to get him to

14   confess to the crime.

15       And he believed quote unquote to me that Doctor

16   Packer was a government agent.  So, he wasn't going to

17   talk to Doctor Packer at all.  He was going to be very

18   cautious and careful because he actually had paranoid

19   ideas about Doctor Packer and about the whole

20   Bridgewater system.

21   Q  Of course, at that time, he was still recovering

22   from the surgery and actually was wearing diapers?

23   A  Yes, he was wearing diapers.

24   Q  He was complaining that they were withholding clean

428

1    diapers from him?

2    A   Yes.   Yes.

3    Q   And just last, on those tests, when you used the

4    words that he checked off a lot of symptoms, not

5    knowing what that test exactly says, were some of

6    those symptoms the type of symptoms you would check

7    off like confused or --

8    A   Yes.

9    Q   -- things that might -- that he had also discussed

10   with you in the context of toxic fumes?

11   A   Yeah.

12   Q   And prior brain damage and that kind of thing?

13   A   Out of the 500 or so items -- I mean, I can't tell

14   you how many there are, but a number of them -- a

15   number of them have to do with paranoid ideas.

16   There's somebody trying to kill you.   There is

17   somebody trying to harm you.   You're being followed.

18   You're being watched.   People are trying to poison

19   your food.   So, there is a lot paranoid ideas; and he

20   was, you know, basically checking all those -- all

21   those out.

22           MR. ROBINSON:   Thank you, Doctor.

23           MR. TRUDEAU:   Just one thing.

24

RECROSS-EXAMINATION

BY MR. TRUDEAU:

Q  You testified that based on your review of the notes and the reports that you found that it was -- that he was paranoid about police; is that --

A  Well, that's what the -- that's what the report says.  That's what's said in black and white.

Q  And wouldn't you agree with me that that's consistent with an individual who has had lengthy involvement with police?

A  Well, not necessarily.  I mean, because it could be somebody who has a long criminal record, has a lot of tangles, has an antisocial character, you know, a bad guy, they might be suspicious of the police.  They might hate the police.

But when you use the word paranoid -- when a clinician -- this isn't like a lay person.  When a clinician uses the word paranoid, that to me says that that person has a delusion or that that's a symptom about their ideas about the police.  And I would --

Q  And part of that is -- a concern or suspicion is part of the paranoia; is that right?

A  That they're suspicious of the police.  Oh, yeah. They're paranoid about them, yeah.

1    MR. TRUDEAU:  Thank you.  I have nothing else.

2    MR. ROBINSON:  Thank you.

3    THE COURT:  Thank you, Doctor.

4    THE WITNESS:  Thank you, Your Honor.

5    MR. ROBINSON:  The defense would rest at this

6    time.  Could we approach side bar just on one of the

7    exhibits?

8        THE COURT:  We're going to take short break

9    anyway.  We're going to take a 15 minute break now.

10   And it may be a relatively short morning.  So, we'll

11   come back in 15 minutes.  Leave your notebooks on your

12   chairs.

13                    (Jury out 10:34 a.m.)

14       MR. ROBINSON:  I just wanted to address -- I

15   thought we wanted to address the Cape Cod medical

16   record issue as to how --

17       THE COURT:  Can you agree on it?

18       MR. TRUDEAU:  I think we would be able to agree

19   on it.  It would just take a few minutes to sit down

20   and go over the --

21       MR. ROBINSON:  There may be -- I don't know --

22   if I might just have one second?  Because I think

23   there might be one point we may not agree on.

24                    (Conversation off the record.)

C

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * *   *
GLENN BATES,                      *
        Plaintiff                 *
                                  *
VS.                               *   CIVIL ACTION
                                  *   NO. 0510489-MEL
TOWN OF HARWICH and HARWICH       *
POLICE DEPARTMENT, CHRISTOPHER    *
KENDER and BARRY MITCHELL,        *
        Defendants                *
* * * * * * * * * * * * * * * *   *
```

**DEPOSITION OF GLENN BATES**, called by the

Defendants, pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Ruth E. Hulke,

Certified Shorthand Reporter No. 114893 and Notary Public

for the Commonwealth of Massachusetts, at the Federal

Court House, Boston, Massachusetts, on Thursday, February

9, 2006, commencing at 10:45 a.m.

# *Leavitt Reporting, Inc.*

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

1  1?  Maybe they didn't know.  And they said, well, maybe

2  we think it's Number 2 and not Number 1.  I really don't

3  know.

4     Q.    Just to explore a couple of terms that people

5  are familiar with in the mental health area.  Do you

6  know, has anyone ever suggested you were bipolar?

7     A.    No.

8     Q.    Schizophrenic?

9     A.    Has anyone?  A lot of people have suggested.

10     Q.    A doctor.

11     A.    Oh, a doctor.  I can't remember -- The doctor

12  didn't tell me exactly what the Axis 1 or 2 or 3.

13  There's like five of them.

14     Q.    So you have no memory of a word description or

15  diagnosis of your mental condition.  Correct?

16     A.    Right.

17     Q.    Have you ever been to McLean Hospital?

18     A.    No.

19     Q.    Have you ever been prescribed medications for

20  your emotional state or your mental condition?

21     A.    Yes.

22     Q.    Which drug or drugs were those, sir?

23     A.    Well, one was called Risperdal.

1    Q.    Could you spell it for us?

2    A.    No.   It's two different spellings.   One is

3    Risperdal and Risperidal.   One is the brand name and one

4    is name on the bottle, I guess.

5    Q.    What do you understand the purpose of that drug

6    to be?

7    A.    Clear thinking.

8    Q.    During what period were you prescribed that

9    drug?

10    A.    August 4th, 2003 to June, 2005.   2005.

11    Q.    Who prescribed that drug to you, Mr. Bates?

12    A.    There was one doctor at the hospital.   There's

13    another doctor at the clinic.

14    Q.    What hospital and what clinic are you referring

15    to?

16    A.    Taunton Hospital, but I don't know the name of

17    the doctor.   I can't remember the name of the doctor.

18    Q.    Was the clinic part of Taunton Hospital?

19    A.    There wasn't a clinic you went to.   It's a

20    place you get sent.   They don't put you in jail.   If

21    you're not bad, they send you there.

22    Q.    Were you prescribed this drug as a condition of

23    probation in any way?

D

Uniform Form DCD-53
*9

# District Court Department of The Trial Court

### Orleans_____ Division

No. _0126 MH 51_

### IN THE MATTER OF ___GLENN BATES___

### WARRANT OF APPREHENSION

To any person in the Commonwealth qualified to serve Criminal Process:

Whereas application has been filed in this court by __his mother, Priscilla Hughes,__ on _11/30/01_
                                                                      (name)                        (date)

for the commitment to a facility of the Department of Mental Health of _____GLENN BATES_____
                                                                                                      (name)

and, after a hearing, it has been decided that there are grounds for having said person examined by a qualified physician:

YOU ARE ORDERED forthwith to apprehend and bring before the _____Orleans_____ division o

the District Court Department, at __Orleans_____, the body of said person so that he may be ex
                                                      (location)

amined by a qualified physician. And you are further ordered that when said person is apprehended, if the court is not in session
you are to convey him to the police station in the town where apprehended and safely keep him there until the next session o
the court.

WITNESS my hand and seal at ___Orleans_____, _Nov. 30, 2001_ xɪ9ɪ

DOB: 3/4/81

621 Main St., Harwichport
Either in Main House or upstairs back apartment
(check to see if his red bike is there; he has no car)

6'2"  (very strong)   180 lbs.   Brown hair   Blue eyes

_____
                              Justice

Hon. Lance J. Garth

EXHIBIT
BATES
2
ICA 2-9-06

Original to Clerk-Magistrate
Copies to Officer and to Respondent

**EXHIBIT**
BATES
1
REN 2-9-06

ORLEANS DISTRICT COURT

APPLICATION FOR WARRANT OF APPREHENSION/SUMMONS

PERSON REQUESTING WARRANT (Please print):
YOUR NAME Priscilla J Hughes        TEL. 432-6389
ADDRESS: 621 Rt 28
TOWN: Harwichport                 ZIP: 02646
YOUR RELATIONSHIP TO SUBJECT:
                                  Mother

SUBJECT'S NAME: Glenn Bates         TEL.
ADDRESS: 621 Rt 28
BIRTH DATE: 3-4-61        MALE: ✓    FEMALE:
HIS/HER CURRENT WHEREABOUTS: address above

WHO ELSE LIVES WITH THE SUBJECT:
NAME                  RELATIONSHIP              AGE
Priscilla  Hughes        Son                    70

PRESENT RISK OF HARM TO HIMSELF/HERSELF or OTHERS:
HE CAN BE SO VIOLENT THAT I WOULDN'T PUT ANYTHING
AGAINST WHAT HE might do to himself, or me or
ANYONE THAT WOULD get in his way

SUBJECT'S PRESENT STATE OF MIND: (COHERENT, VIOLENT, DEPRESSED, SUICIDAL,
THREATENING, ETC.):

DESCRIBE IMMEDIATE PROBLEM: (AND ITS PAST HISTORY, GIVING SPECIFIC FACTS &
DATES - USE BOTH SIDES OF THIS PAGE, IF NECESSARY:
Threatening to hurt police if I ever called them about him
He had a violent RAGE attack Sept 19th. I told him if it
ever happened again I would have to have him hauled o
of my house and he could never come back. It happe
happened again on Thanksgiving Day with threatening phone
calls to his sisters in Cal then at home by himself acting
violently screaming, swearing, yelling, loud music, ranting
and taking up at 11AM my Tenant hearing all this and
being petrified, upset, afraid to live there + she has been
there 5 years and always felt safe, secure and will hav
to leave. I cannot let him threaten to put my life, health,
security, financial ability, peace of mind, terrorising my Tenan
and we all in this name of a mother who's loves him an

Tried years ago to save someone who cared to try help him to no avail. He is delusional, depressed, hears noises, talks and yells at himself, possibly schizophrenic, anxiety ridden. He hates everyone so much now its because he is so sick he can't help. I Tried for years to get help and he refused —

I let him into my life again thinking I could help - I can't go back to my house until he is gone. He needs to be committed to a the facility for a period of months & sent to be taken care of as he is unable to get proper care of himself

take

I hope he will go to a place where people care and he will realize he needs medication for healing

He cannot come back to my house

SUBJECT'S DRUG and/or ALCOHOL HISTORY:

MARIJUANA

IS THE SUBJECT PRESENTLY UNDER THE INFLUENCE OF DRUGS OR ALCOHOL?
RECENT DRUG/ALCOHOL USE: MARIJUANA = He SAID itS THE only
WAY he cAN get rid of PAIN

SUBJECT'S PREVIOUS HOSPITALIZATIONS FOR PSYCHIATRIC OR SUBSTANCE ABUSE
PROBLEMS (LIST SPECIFIC PLACES & APPROXIMATE DATES, IF KNOWN):
None THAT I Know off. He doesn't TrusT Any oove And
won't Let me help

IS THE SUBJECT ON ANY PRESCRIBED MEDICATIONS? IF SO, PLEASE LIST:
No

IS THE SUBJECT UNDER THE CARE OF A PROFESSIONAL FOR ANY PROBLEM?
IF YES, INDICATE THEIR NAME, ADDRESS & PHONE NUMBER, IF POSSIBLE:
No

RELEVANT PAST HISTORY OF SUICIDAL OR THREATENING BEHAVIOR:
YEArs Ago Threatened to jump off Sagamore Bridge

SIGNIFICANT MEDICAL PROBLEMS?                PLEASE STATE THEM:
SigniBicaNt PAIN
BrAin injuries
cAr AccideNTS

DOES SUBJECT HAVE ANY MEDICAL INSURANCE? YES ✓ NO _____ UNSURE OF THIS _____
IF YES, PLEASE SPECIFY NAME OF PLAN AND NUMBER, IF AVAILABLE:
medicAde , SS disAbility

SIGNED: _Lucicia Hughes_          DATE: Nov 30, 2001

Page Two

| APPLICATION FOR FOUR-DAY COMMITMENT FOR MENTAL ILLNESS UNDER G.L. c. 123, § 12(e) | Docket Number (To be added by court) 0126 MH 51 | Trial Court of Massachusetts District Court Department Orleans_____ District Court |
|---|---|---|

IN THE MATTER OF _____GLENN BATES_____
Name of Respondent

Date
Nov. 30, 2001

# APPLICATION FOR FOUR-DAY COMMITMENT
# FOR MENTAL ILLNESS
## G.L. c. 123, § 12(e)

I, _____Priscilla Hughes (mother)_____, hereby apply to this court for an order to commit
(Name of Applicant)

_____my son, Glenn Bates,_____, age __40__, ☒ male ☐ female, to a mental health
(Name of Respondent)

facility for a maximum of four days because he (she) is a mentally ill person and the failure to confine

(her) would cause a likelihood of serious harm.

Date: ___November 30, 2001___

_Priscilla J Hughes_
Signature of Applicant

_Mother_
(Applicant's relationship, if any, to alleged mentally ill person)

Note: 1. Regarding court action upon receipt of this application, G.L. c. 123, § 12(e) provides in pertinent part as follows:

After hearing such evidence as he may consider sufficient, a district court justice may issue a warrant for the apprehension and appearance before him of the alleged mentally ill person if, in his judgment, the condition or conduct of such person makes such action necessary or proper. Following apprehension, the court shall have the person examined by a physician designated to have the authority to admit to a facility or examined by a qualified psychologist in accordance with the regulations of the department. If said physician or qualified psychologist reports that the failure to hospitalize the person would create a likelihood of serious harm by reason of mental illness, the court may order the person committed to a facility for a period not to exceed four days, but the superintendent may discharge him at any time within the four-day period.

2. Pursuant to G.L. c. 123, § 12(e), the four-day maximum commitment period must be computed under Mass. R. Civ. P. 6 [illegible] without including the day the application was filed or any intervening Saturday, Sunday or legal holiday. If the fourth day is a Saturday, Sunday or legal holiday, such day is not to be counted, and the fourth day is to be the next day that is not a Saturday, Sunday or legal holiday.

Original to Clerk-Magistrate
Copies to Petitioner and Respondent