**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| GLENN S. BATES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. 05-10489-MEL |
| | ) | |
| CHRISTOPHER KENDER and | ) | |
| BARRY MITCHELL, | ) | |
| Defendants | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO, AND MEMORANDUM OPPOSING,**
**DEFENDANTS' MOTION IN LIMINE TO PRECLUDE TESTIMONY OF**
**GLENN BATES ON THE GROUNDS OF MENTAL INCOMPETENCE**

NOW COMES Plaintiff Glenn S. Bates ("Mr. Bates"), by and through his attorney, and hereby opposes the motion to preclude his testimony on the grounds of mental incompetence. There are no grounds to support this motion and, certainly, there has been no medical finding of mental incompetence that would permit Defendants the absurd advantage of precluding only his trial testimony while allowing theirs. Having offered no evidence to support the relief requested, and doing so in a clear effort to interrupt preparations for trial, Defendants should be sanctioned.

## I.    INTRODUCTION

In their motion to preclude testimony of Glenn Bates on the grounds of "mental incompetence," the defendants purport, without any legitimate factual, legal or medical support, that Mr. Bates cannot testify at his 2008 trial in this matter because they believe he has difficulty "distinguishing between fantasy and reality." Defendants' motion suffers from the malady which they contend afflicts Mr. Bates. The only supposed support Defendants' submit for the outlandish relief requested (that a plaintiff not be

allowed to testify at his own trial), is selected testimony from a 2003 criminal trial by experts offered to support a mental capacity defense to a crime committed in 2001. The testimony cited had nothing to do with whether Mr. Bates was competent to testify at his 2003 trial, much less a 2008 trial. Moreover, there was no determination in that case, and *there has never been a determination by any Court or medical provider*, that Mr. Bates is not competent to testify in Court. Indeed, Mr. Bates did testify in the very trial where the psychiatric testimony cited by Defendants was proffered. The Court there evaluated Mr. Bates and found that he had a complete understanding of the proceedings and his responsibilities in the proceedings. He was diagnosed with Schizotypal Personality Disorder, a disorder which affects thought patterns and relationships but *does not* influence a distortion of reality. In any event, Defendants have not explained in this motion why selected testimony regarding Mr. Bates' state of mind in 2001 would affect whether he can testify at a trial in 2008.

Indeed, the pending motion flies in the face of the Federal Rules of Evidence and the fairness of the judicial process. Under Federal Rule of Evidence 601 there is an overwhelming presumption that parties are competent to testify. Defendants' must overcome a nearly unprecedented burden to exclude testimony on a purported mental incapacity – a burden they say they meet merely by citing the 2003 testimony that did not regard Mr. Bates' competency to testify. Filing such a motion without any medical support is disrespectful to the Court and Mr. Bates. Further, the motion exhibits frivolousness when one considers the following: (1) Defendants have deposed Mr. Bates and proffered his testimony to this Court for purposes of their summary judgment motion and, therefore, have affirmatively represented to this Court that he is competent to testify;

and (2) Defendants have had three years to conduct discovery in this matter, identify experts and/or request an independent medical examination in order to determine Mr. Bates' competency – if they truly believed he was not competent to testify. To have the audacity to fail to conduct such discovery, wait for a twenty month lapse of the discovery deadline, and then ask this Court to exclude his testimony or allow an IME within a month of trial exhibits utter bad faith.

## II.    FACTS

The plaintiff Glenn Bates was arrested for assault and battery with a dangerous weapon on November 30, 2001 for allegedly assaulting the defendants Barry Mitchell and Christopher Kender while they were entering his home to serve a Warrant of Apprehension. Mr. Bates claims in this suit that, after the assault, he turned to retreat and the Defendants' used excessive force by shooting him in the back.

Following his arrest, Mr. Bates was evaluated at Bridgewater State Hospital on the issue of criminal responsibility. Mr. Bates submitted to a number of clinical interviews with Dr. Ira Parker, a psychologist, over a period of six weeks. Dr. Parker also spoke with his family and reviewed his complete mental history. After full review, Dr. Parker found Mr. Bates competent to stand trial. *See* Clinical Report of Dr. Parker attached hereto as Exhibit 1. He found that Mr. Bates *did not* present with "psychotic symptoms which would indicate a significant distortion of reality." *Id.* Dr. Parker reported that Mr. Bates "demonstrates a good factual understanding of the trial process, the roles of the various participants in the trial, the various plea options and potential consequences, and the specific allegations being made against him." *Id.* He further reported that Mr. Bates "can communicate coherently and rationally about these matters

and was able to provide rational reasoning for some of [his] decisions…" *Id.* Dr. Parker indicated that "most of the data indicate that although he often has a paranoid stance, he does not endorse or manifest delusional beliefs." *Id.* Dr. Parker diagnosed Mr. Bates with Schizotypal Personality Disorder, "an individual … who does not experience significant distortions of reality." *Id.*

Mr. Bates' criminal trial for the assault and battery charge took place in April 2003. At that time, Mr. Bates took the stand and testified under oath regarding the events that occurred on November 30, 2001. Therefore, the Massachusetts Superior Court judge who presided over that trial found Mr. Bates competent to testify. Mr. Bates was thoroughly questioned on both direct examination by his counsel and on cross-examination by the district attorney. His testimony was entered into evidence and presented to the jury without qualification.

In November 2004, Mr. Bates filed this action against the Town of Harwich, the Harwich Police Department, Christopher Kender and Barry Mitchell. In over three years of litigation (the case began in state court in 2004), the defendants have had full opportunity to take any discovery they wished – including thoroughly deposing Mr. Bates and requesting an independent medical or psychological examination. Indeed, Defendants took Mr. Bates' deposition and relied upon Mr. Bates' testimony under oath for their Motion for Summary Judgment. Importantly, Defendants never sought any discovery regarding Mr. Bates' competency, never requested an independent medical examination, and never retained or properly identified any experts on this, or any other, issue.

## III.    LEGAL ARGUMENT

**A.    Mr. Bates Is Clearly Competent To Testify At His 2008 Trial And There Is No Evidence Submitted By Defendants To The Contrary**

Rule 601 of the Federal Rules of Evidence provides that "every person is competent to be a witness except as otherwise provided in these rules."  Fed. R. Evid. 601; *see also United States v. Devin*, 918 F.2d 280, 292 (1st Cir. 1990) ("it is a well-established principle, embodied in Fed. R. Evid. 601, that witnesses are presumed competent to testify.")  The presence of a mental disability or history of psychiatric treatment does not meet the criteria required to preclude a witness from testifying.  *See Devin*, 918 F.2d at 292 (affirming the district court's determination that a witness with a history of psychiatric episodes was competent to testify).

Even feeble-mindedness or insanity will not render a witness incompetent to testify.  *United States v. Odum*, 736 F.2d. 104, 112 (4th Cir. 1984); *see also Devin,* 918 F.2d at 292; *quoting District of Columbia v. Armes*, 107 U.S. 519, 521-22 (1883) ("The Court said more than a century ago that even a 'lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue.'"); *United States v. Hyson*, 721 F.2d 856, 864 (1st Cir. 1983) ("There is no provision in the rules for the exclusion of testimony because a witness is mentally incompetent.  The question of competency goes to the issue of credibility, which is for the trier of fact."); *United States v. Phibbs*, 999 F.2d 1053, 1068 (6th Cir. 1993) ("the Federal Rules of Evidence strongly disfavor barring witnesses on competency grounds due to mental incapacity.").

Federal Rule of Evidence 601 essentially provides that all persons are deemed competent as long as they have personal knowledge of facts about which they testify.

*United States v. Cook*, 949 F.2d 289 (10th Cir. 1991). The advisory committee's notes to

Rule 601 state: "No mental or moral qualifications for testifying as a witness are

specified. Standards of mental capacity have proved elusive in actual

application…Discretion is regularly exercised in favor of allowing testimony. A witness

wholly without capacity is difficult to imagine. The question is one particularly suited to

the jury as one of weight and credibility, subject to judicial authority to review the

sufficiency of the evidence." Fed. R. Evid. 601. The only grounds for disqualifying a

witness are that the witness "does not have knowledge of the matters about which he is to

testify, that he does not have the capacity to recall, or that he does not understand the

duty to testify truthfully." *United States v. Lightly*, 677 F.2d 1027, 1028 (4th Cir. 1982).

This rule for determining the competency of a witness to testify is applied to *all witnesses*

– with or without mental disabilities. *Lightly*, 677 F.2d at 1028.

Whether a witness is competent to testify is left to the discretion of the judge.

Fed. R. Evid. 104. However, testimony should only be precluded where a judge finds

that a witness' testimony is so impaired it is void of any meaning in the proceedings.

*Phibbs*, 999 F.2d at 1068. In *United States v. Bedonie,* 913 F.2d 782 (C.A. 10 (Utah),

1990), the Court of Appeals for the 10th Circuit referred to one legal commentator's

observance that:

> There is no rule which excludes an insane person as such… from
> testifying, but in each case the traditional test is whether the witness has
> intelligence enough to make it worthwhile to hear him at all and whether
> he feels a duty to tell the truth.... The major reason for disqualification of
> the persons mentioned in this section to take the stand is the judges'
> distrust of a jury's ability to assay the words of a small child or of a
> deranged person. Conceding the jury's deficiencies, the remedy of
> excluding such a witness, who may be the only person available who
> knows the facts, seems inept and primitive. Though the tribunal is
> unskilled, and the testimony difficult to weigh, it is still better to let the

6

evidence come in for what it is worth, with cautionary instructions.
*McCormick on Evidence* § 62, at 156-57 (E.W. Cleary 3d ed. 1984).

After reviewing the foregoing authority, it is quickly apparent that Defendants
have filed a frivolous motion that could only have served the purpose of interrupting
plaintiff's trial preparations.  Importantly, given that the allowance of the motion would
effectively win the case for Defendants (because Mr. Bates is the only person who can
provide his version of events), it is astonishing that they have taken no discovery on this
issue and submitted *nothing* to this Court that indicates that Mr. Bates suffers from any
*present* illness or incapacity that would legitimately prevent him from testifying.

Defendants submit, rather, testimony from Mr. Bates' 2003 criminal trial that
went to a different issue – whether a purported mental issue impaired his ability to
conform his conduct to the requirements of the law *in 2001*.  Nonetheless, even with the
aforementioned psychiatric testimony *that he proffered*, Mr. Bates was permitted to
testify at his 2003 criminal trial.  Moreover, Dr. Parker found Mr. Bates competent to
stand trial, that he *did not* present with "psychotic symptoms which would indicate a
significant distortion of reality," that he "demonstrates a good factual understanding of
the trial process, the roles of the various participants in the trial, the various plea options
and potential consequences, and the specific allegations being made against him," that he
"can communicate coherently and rationally about these matters and was able to provide
rational reasoning for some of [his] decisions…,"  that he "does not endorse or manifest
delusional beliefs," and that he does not "experience significant distortions of reality."

Indeed, according to the defendants' own submission of Dr. Marc Whaley's trial
testimony, Mr. Bates "is an intelligent individual who verbally can conceptualize and

communicate in a fairly effective way and account for a number of details."[1]  Although

Mr. Bates has faced many challenges in his life, including a history of some psychiatric

ailments and the devastating affects of being shot in the back by Harwich Police Officers,

he is not incompetent to testify and has never been held to be incapable of doing so.  He

has a full understanding of his duty to tell the truth and has already testified about the

facts of this matter in Court and at an extensive and grueling deposition conducted by

Defendants' counsel.  The Federal Rules of Evidence provide sufficient avenues by

which Mr. Bates' credibility can be fully explored and tested in front of the jury and, in

the end, the jury is the best arbiter for such determinations.  Under the circumstances, it

appears that Defendants' motion itself indicates their fear that the jury will believe Mr.

Bates' very coherent, and forensically sound, version of events in this matter.

**B.    An Independent Medical Examination Is A Discovery Tool That Defendants' Failed To Avail Themselves Of, To Which They Are No Longer Entitled, And For Which There Is No Need**

Seeming to understand that their motion to exclude Mr. Bates' testimony had no

merit from the start, Defendants' alternatively seek to have this Court require Mr. Bates

to submit to a "*voir dire* examination" or an independent medical examination to

determine his competency to testify.  Again, there has been no legitimate evidence

submitted by Defendants to require such an extraordinary procedure just weeks before

trial – especially where the record shows that such an examination is wholly unnecessary.

In any event, Rule 35 of the Federal Rules of Civil Procedure allows a party to

seek an independent medical examination "when the mental or physical condition...of a

---

[1] While the plaintiff objects to the submission of Dr. Whaley's testimony and improperly proffered "opinions" pursuant to Federal Rule of Civil Procedure 37(c)(1)'s mandatory exclusion provision and the irrelevancy of his testimony, Mr. Bates refers to the testimony because Defendants' surreptitiously put it before the Court in their motion.

party…is in controversy…" Of course, since Rule 35 is a discovery tool, a party must avail itself of the benefits of the Rule within the discovery period set by the Court. In this case, the Court first set discovery to close on January 31, 2006. At Defendants' request, discovery was extended to April 30, 2006. It has been more than twenty months since discovery closed and Defendants have still never requested an IME under Rule 35. Rather, they seek to have the Court perform their discovery for them in a motion that is filed within weeks of the trial date.

Psychiatric testing on the issue of witness competency is regarded as an extraordinary measure. *Government of the Virgin Islands v. A. Leonard*, 922 F.2d 1141 (3d Cir. 1991). Here, Defendants' request is improperly and brazenly late. If this issue was important, Defendants, who have known about it since 2001 when the underlying events occured, should have requested the examination long ago. As shown above, however, the request is unnecessary and unsupported by the evidence. Subjecting Mr. Bates to such an offensive examination now, given Defendants' lack of diligence to the issue, would be an affront to Mr. Bates, disruptive to his counsel's trial preparation, and a miscarriage of justice.

## CONCLUSION

For the reasons set forth above, Mr. Bates respectfully requests that the Court deny the defendants' motion to preclude testimony of Mr. Bates on the grounds of mental incompetence and deny their request that he be required to submit to a *voir dire* examination by the Court or an independent medical examination. Mr. Bates also requests that Defendants be required to compensate his attorneys for the reasonable attorney time and expense necessary to respond to this frivolous motion.

Respectfully submitted,

GLENN S. BATES

By his attorney,

/s/ Timothy J. Perry
Timothy J. Perry (BBO#631397)
PERRY, KRUMSIEK & JACK LLP
One McKinley Square
Boston, MA  02109
TEL (617) 720-4300
FAX (617) 720-4310

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true copy of the above document was served upon counsel of record, listed below, via the Court's ECF system.

Joseph L. Tehan, Esq.
Jackie Cowin, Esq.
Kopelman and Paige, P.C.
101 Arch Street
Boston, MA 02110

Charles D. Mulcahy, Esq.
Wynn & Wynn
90 New State Highway
Raynham, MA 02767

Dated: December 21, 2007                    /s/ Timothy J. Perry
                                            Timothy J. Perry

## BRIDGEWATER STATE HOSPITAL

1

**BATES, Glenn**

BSH #50-40377

### COMPETENCE TO STAND TRIAL EVALUATION
**January 16, 2002**

Ira K. Packer, Ph.D.

### IDENTIFYING INFORMATION:

This is the second Bridgewater State Hospital (BSH) admission for this 40-year-old (DOB: March 4, 1961), Caucasian male. He is charged in the Orleans District Court with two counts of Attempted Murder, two counts of Assault and Battery with a Dangerous Weapon and Resisting Arrest in Orleans District Court. He is alleged to have assaulted two police officers, in his home, with a hockey stick, and was then shot by one of the officers. He was committed to BSH pursuant to M.G.L., Chapter 123, Section 15(b) for evaluation of competency to stand trial and criminal responsibility on December 6, 2001. On December 27, 2001, the period of observation was extended until January 17, 2002.

### WARNING ON LIMITS OF CONFIDENTIALITY AND PRIVILEGE:

At the beginning of the initial interview, Mr. Bates was informed that I am a psychologist, that I have been asked to perform an evaluation relative to the issues of his competency to stand trial, his mental state at the time of the alleged offense, and his need for treatment. He was informed that I would be preparing a report for the Court and that I might be required to testify in Court, so that any information he provided to me would not be subject to the usual rules of confidentiality. He was also informed that he was not required to answer questions but that I would be preparing a report for the Court nonetheless. Mr. Bates paraphrased his explanation, sating "You are a psychologist, here to evaluate my competency, criminal responsibility, and whether or not I need treatment." He was specifically asked whether the information he provided would be confidential, to which he responded "no, it's available to the Court." He was also asked specifically whether he was required to answer my questions, to which he responded "no." This warning was reviewed with him during subsequent evaluations and on each occasion Mr. Bates demonstrated his understanding of this warning and agreed to proceed with the interviews. It is also noted that during the first interview he requested to terminate the session until I was able to contact his attorney (which I subsequently did). His mother, whom I spoke to on the telephone, was also informed that the information she provided could be included in my report and testimony.

### SOURCES OF INFORMATION:    This evaluation is based on the following sources of information:

1.  Clinical interviews with Mr. Bates at Bridgewater State Hospital on 12/17/01, 12/19/01, 1/4/02, 1/11/02 and 1/14/02 for a total of approximately 3 hours.

2.  Telephone interviews with his mother, Priscilla Hughes, on 12/19/01 and 1/13/01 and review of a letter faxed by her on 1/14/01.

3.  Consultation with his treatment team at Bridgewater State Hospital.

## BRIDGEWATER STATE HOSPITAL

2

**BATES, Glenn**

BSH #50-40377

### COMPETENCE TO STAND TRIAL EVALUATION
<u>January 16, 2002</u>

Ira K. Packer, Ph.D.

4.     Review of his current medical chart at Bridgewater State Hospital.

5.     Review of records from his previous admission to Bridgewater State Hospital in 1988, including a 15(e) evaluation dated June 22, 1988, completed by Thomas Bull, M.D.

6.     Review of records from Pocasset Mental Health Center.

7.     Review of a Harwich Police Department report related to the alleged offense.

8.     Review of the 15(a) evaluation completed by Dr. Nicholas Petrou on 12/6/01.

9.     Telephone consultation with Mr. Bates' defense attorney, Charles Johnson (telephone number 508-362-8101) on 12/17/01.

### RELEVANT HISTORY:

Historical information was obtained from Mr. Bates and from his mother, Priscilla Hughes. It is noted that Mr. Bates was quite guarded and hesitant to discuss significant aspects of his history.

Mr. Bates is the 4th of 5 siblings born to his parents, who divorced when he was 11 years old. The children all remained with the mother. His three sisters all live in California at present and it appears that Mr. Bates has had little contact with his family since he left home when he was 16 years old. His father passed away in 1995. His mother reported that his father drank alcohol but was not a "heavy drinker." However, she described him as having a bad temper, frequently screaming, but stated that he was not violent. She also indicated that he and Glenn did not get along well. Mr. Bates claimed that his father was responsible for him being injured in an accident at age 14 (he reported a neck and back injury). He stated that he was upset when his father was dying because he wanted to get him to provide documentation of this injury for disability purposes. His mother reported that she thought he was upset that he did not have a chance to straighten matters out with his father. (As noted below, Mr. Bates was psychiatrically hospitalized for 8 days in 1995 around the time of his father's death.) When asked if he ever experienced physical or sexual abuse, Mr. Bates refused to discuss those issues. However, it is noted that his hospital records from 1995 (discussed below) indicate a history of abuse by his father.

Mr. Bates did not graduate from high school (he stated that he dropped out in 11th grade and would not discuss this matter further) but obtained a G.E.D. His mother reported that he obtained "okay grades" but had difficulty interpersonally with the other students. She stated that she "kept going to counselors who said he couldn't get along." She described him as having a few friends, but she stated that they were "the ones looking for trouble." When asked to explain, she indicated

## BRIDGEWATER STATE HOSPITAL
3

BATES, Glenn

BSH #50-40377

### COMPETENCE TO STAND TRIAL EVALUATION
January 16, 2002

Ira K. Packer, Ph.D.

that they were involved in vandalism. She indicated that she was not aware of girlfriends he had, as he did not bring them home.

Mr. Bates apparently did not maintain contact with his family for many years, during which time he lived in Florida and Massachusetts, including living in a cabin in the woods. His mother reported that she had not seen him in seven years until June, 2000. When asked about this, Mr. Bates stated that he stayed away because his mother's new husband did not like him. In June, 2000 he moved into his mother's house for a little while (she told him that he could not stay there longer) and then moved into a campsite in Nickerson State Park. In September, 2000, he moved in temporarily. He then spent 5 months in New Hampshire but there was a legal problem with the rental (apparently not having anything to do with him) so he moved back in February, 2001.  In July, 2001 when his sister moved to California, he moved into the apartment on the second floor of his mother's house (she stated that she was reluctant to have him move in there since she thought that "he needed his space" and she needed hers but she allowed him to because he had nowhere else to live).

Mr. Bates reported that he receives disability due to back injuries as well as Post-traumatic Stress Disorder, although he did not want to discuss this latter diagnosis and symptoms. He stated that he suffered a back and neck injury at the age of 14 and also was injured when he joined the army. He stated that he enlisted in the Army (age 18 or 19) but only spent 6 weeks before being discharged after hitting his chin on a bar and crushing some teeth. He claimed that when he was treated in the hospital he was given a medication to which he was allergic but he did not want to discuss this further.  He also reported that at age 29 he had oral surgery at Cape Cod Hospital but was again given a medication to which he was allergic which caused to be sick ("I fell down, didn't know where I was"). He also reported suffering a number of car and motorcycle accidents. When asked about these, he stated "it's not my fault, there are a lot of bad drivers." His mother reported that when he was 16 he fell off a bike onto his head and was given a spinal tap, but did not suffer significant injury.

As noted above, Mr. Bates reported that he receives disability income. When asked about employment, he stated that he worked for 10-12 years off and on in Landscape Construction but has not worked in the last seven years. He was unwilling to explain his recent lifestyle (e.g., how he would spend his time). He claimed that he has some friends with whom he goes to movies and the mall occasionally. He reported never being married, not having any children, and no recent intimate relationships.

Mr. Bates reported that he has not used alcohol since he was 21. He stated that prior to that he drank a few beers on weekends, denied experiencing blackouts or being told that he had a drinking problem. Initially he denied any other drug use. However, he contacted this examiner

## BRIDGEWATER STATE HOSPITAL 4

**BATES, Glenn**                                                           **BSH #50-40377**

### COMPETENCE TO STAND TRIAL EVALUATION
<u>January 16, 2002</u>                                               Ira K. Packer, Ph.D.

towards the end of this admission to correct this statement and acknowledge that he smoked marijuana, 1-2 joints, "not every day but occasionally." He claimed that a doctor recommended that he smoke marijuana to ease his back pain. He claimed that he had not smoked marijuana for a month before the alleged offense.

According to the information available, Mr. Bates has had two previous hospitalizations – one at Cape Cod & The Islands Community Mental Health Center (Pocasset) and one at Bridgewater State Hospital. A review of a Discharge Summary from Pocasset, dated 10/24/95, indicated that Mr. Bates was admitted there on 10/16/95 and remained for eight days.. His final diagnoses upon discharge were Posttraumatic Stress Disorder and Narcissistic Personality Disorder. The records indicated that Mr. Bates was admitted to the hospital based on reports that he was delusional, paranoid and threatening to blow up Cape Cod Human Services because of his concern that his therapist, Eric Larson, had made homosexual advances towards him. He alleged that the therapist offered favors in terms of how he would report to the probation officer in exchange for after hour company with gay men in Provincetown. The Discharge Summary noted that this account changed in details a number of times, with the consistent claim that the therapist had made advances. According to the hospital records, the Cape Cod Human Services agency had considered filing a Rogers petition, although they did not feel that a diagnosis of Schizophrenia could be substantiated. It is noted in these records that Mr. Bates related a long history of psychological and physical abuse at the hands of his father, including physical beatings, relegation to living in a basement and a closet. Mr. Bates was reported as not being involved with substance use.

The course of hospitalization was summarized as indicating that Mr. Bates was very guarded upon admission and then "disinhibited about stories of miseries of his childhood. He had no overt psychotic symptoms whatsoever. He was angry, anxious, depressed at times, during his initial interview. He was resentful and suspicious at times. Speech was articulate. No language disorder. He vehemently denied any intent to threaten or hurt anybody whatsoever." Mr. Bates was also described as being "suspicious and guarded about what might happen to him here in the hospital. He was defensive, he was angry at his therapist and denied allegations he felt were made against him." It is noted in the records that during that brief hospitalization, Mr. Bates' father passed away and Mr. Bates was "very upset, anxious, crying and angry, flooded with feeling about past events and abuse and his lost opportunity to resolve tensions between himself and his father. He was temporarily placed on Ativan as it was non-productive for him to be so flooded." Upon discharge, he was described by Richard Fellman, M.D. as "At this point he is leaving the hospital without any medication or any plan for formal psychiatric services. He does have the number for emergency services. The patient is euthymic and he is without homicidal or assaultive ideas. There is no evidence of psychosis."

# BRIDGEWATER STATE HOSPITAL                    5

**BATES, Glenn**                                              BSH #50-40377

---

### COMPETENCE TO STAND TRIAL EVALUATION
**January 16, 2002**                                    Ira K. Packer, Ph.D.

Mr. Bates had one previous admission to Bridgewater State Hospital, on May 18, 1988 from the Barnstable District Court under Section 15(e) (aid-in-sentencing) following the finding of guilt on charges of Assault with a Dangerous Weapon, two counts of Assault and Battery on a Police Officer and Simple Assault on a Female. These charges stemmed from an incident on July 9, 1987. He was admitted to BSH following an evaluation at the Barnstable District Court Clinic by Barbara R. Lewis, MSS LISW. Ms. Lewis described him on 5/18/88 as presenting with flat affect and "his general manner of presentation and his responses to specific questions was vague, most guarded and circumstantial. He denied either visual or auditory hallucinations in the past or present. Mr. Bates denied suicidal or homicidal ideation in the past or present. Mr. Bates denied the presence of delusions, however, at several points in the clinical interview, Mr. Bates appeared to present delusional material, on which he would not expand, involving the police in Harwich finding "someone else to bother" now that he has moved out of town. Ms. Lewis suggested a possible diagnosis of Schizophrenia, Paranoid Type. However, she also indicated "the possibility of neurological impairment should be ruled out given subject's reported history of head trauma."

The 15(e) evaluation completed by Thomas Bull, M.D. and dated June 22, 1988 concluded with diagnoses of Schizotypal Personality Disorder and Antisocial Personality Disorder. Dr. Bull related that "In the interview situation the patient's affect was terse, rigid and somewhat militaristic. His manner was distant and he did not intend to engage in the evaluator in a relationship. He spoke in goal-directed sentences, there was no loosening of associations, tangentially, abnormal use of words or sentences or flight of ideas. The patient denied auditory hallucinations, thought insertion, thought broadcasting, ideas of reference or delusional thinking. However, his description of his relationships with mother, father, stepfather and older sister impressed the examiner as being unrealistic and far-fetched. In relating events around the large number of arrests the patient has had, he consistently reflected a total lack of responsibility for his behavior as well as a lack of empathy for others. He denied hyperactivity, periods of elevated mood, religiosity, hypersexuality or euphoria. The patient denied periods of depression, crying spells, flattened diurnal cycle, anorexia, insomnia or suicidal ideation. The patient denied homicidal ideation. The patient appeared to be of average intelligence and insight was lacking."

During the present interviews, Mr. Bates denied any suicidal history, although his mother reported that he once threatened to jump off the Sagamore Bridge. She also reported that he was often "paranoid... afraid of things". When asked to be more specific, she stated that he was fearful of the police, thought they were watching him, and was suspicious when people (such as Jehovah's Witnesses) came to the door. She stated that she never observed him to be talking to imaginary voices, although she wrote in a letter that he complained of being harassed by the Mafia and the Russians (he denied this). She also stated that he would yell and swear, which frightened her, although he was never violent towards her. She also described (second-hand) an incident around Thanksgiving, 2001 in which he called his sister in California asking for his mother's cellphone

**BRIDGEWATER STATE HOSPITAL**                                          6

BATES, Glenn                                                   BSH #50-40377

COMPETENCE TO STAND TRIAL EVALUATION
January 16, 2002                                          Ira K. Packer, Ph.D.

number and when the sister did not give it to him, he "was yelling and swearing and carrying on" and threatened to kill his sister. Mr. Bates denied to this examiner that he threatened his sister.

A review of Mr. Bates' CORI record indicates that in addition to the current charges, he has been arraigned on 106 other occasions since 1979. However, it is noted that many of the charges were either dismissed, nolle prossed or resulted in not guilty findings. The charges for which he has been convicted include Knowingly Receiving Stolen Property (1982), Compulsory Insurance Violation, Operating to Endanger, Trespassing, Possession of a Dangerous Weapon (all 1982), Disorderly Person (1983), Shoplifting, Assault and Battery (1984), Assault and Battery (1985), Counterfeiting Motor Vehicle Document (1986), Assault and Battery on a Police Officer (1987), Assault and Battery on a Police Officer, Assault with a Dangerous Weapon (1988), Assault and Battery Dangerous Weapon (1991), Assault and Battery, Operating to Endanger, Trespassing, Operating After Suspended License (all 1993), Assault With Dangerous Weapon, Malicious Destruction of Property, Operation to Endanger, Failure to Obey Police Officer, Threatening, Trespassing, Disorderly Person, Operating to Endanger (all 1996). There are no charges noted since 1996 until the current alleged offense.

## CIRCUMSTANCES OF ADMISSION:

The 15(a) evaluation completed at the Orleans District Court by Nicholas Petrou, Ph.D. on 12/6/01, indicated that the interview was conducted in ICU at the patient's bedside at Cape Cod Hospital. Dr. Petrou noted that Mr. Bates reported multiple head injuries over the years, most recently being hit by a car or truck during the past summer and claimed to have seizures since then, although no seizures were observed in the hospital. At the time of the evaluation, Mr. Bates was receiving morphine, Depakote (an antiseizure medication), Zyprexa (an antipsychotic medication) and an antibiotic. Mr. Bates denied to Dr. Petrou any history of detoxification or rehabilitation. He denied drug use but "vaguely acknowledges past alcohol abuse." Dr. Petrou described Mr. Bates as "sedated, moderately groggy, but surprisingly alert and aware once aroused. Fairly cooperative given circumstances. Externalizing, blaming police. Unable to adequately assess [mood/affect] given circumstances. Denied acute depression. Denied suicidal ideation...Reportedly had been agitated, needing to be restrained, sedated in ICU but no overt problem during interview." Dr. Petrou described Mr. Bates' thought processes as "fairly organized and coherent given circumstances. No gross signs of psychosis." Dr. Petrou also indicated that Mr. Bates denied any suicidal or homicidal ideation, although his mother reported that he threatened to jump off the Sagamore Bridge in the past.

Regarding the issue of competence to stand trial, Dr. Petrou noted that "He actually performed fairly well in response to CST type questions regarding charge, knowing someone could receive 10 years, plea bargaining, alternative outcomes, etc. He did show some confusion regarding roles of some courtroom officials...thought I was the prosecutor, but this could be the effects of his

### BRIDGEWATER STATE HOSPITAL                              7

BATES, Glenn                                          BSH #50-40377

---

### COMPETENCE TO STAND TRIAL EVALUATION

<u>January 16, 2002</u>                                Ira K. Packer, Ph.D.

medical condition and sedation.  Dr. Petrou recommended a 15(b) evaluation for competence to stand trial and criminal responsibility at Bridgewater State Hospital."

## COURSE OF HOSPITALIZATION:

Mr. Bates was admitted to Bridgewater State Hospital on December 11, 2001 from the Lemuel Shattuck Hospital (where he was transferred after being treated at Cape Cod Hospital for a gunshot wound which he reportedly sustained at the time of his arrest.  Upon admission, the following medical problems were noted:  left nephrectomy (removal of kidney) and splenectomy (removal of spleen), and fractured lumbar vertebrae.  On 12/13/01, Dr. Norris, the treating psychiatrist, indicated that Mr. Bates was probably suffering from paranoia.  He prescribed Zyprexa, an antipsychotic medication, although Mr. Bates took the medication for only a couple of days before discontinuing it.  Since that time, he has not been on any other antipsychotic or mood-stabilizing medications.  The progress notes do not indicate overt signs of psychosis.  Dr. Becker, his treating psychologist, noted that on 12/18/01 he was "abrupt and dismissive", refusing to sign a release for her to speak with his mother.  On 12/19/01 she described him as manifesting flashes of irritability."  Since that time he was described as being demanding and entitled but not demonstrating symptoms of a psychotic or mood disorder.

Mr. Bates has been housed in the Medical Building, first in the Infirmary and then in the Medical West Unit, during the entire course of this hospitalization due to his medical injuries.  A note from Susanne Brodeur, R.N., D.NSC dated 1/9/02 indicated as follows:  "Per Dr. Khan [physician] patient will require eval by physician upon arrival to facility for 1.  Left nephrectomy/splenectomy, 2. History of fracture L3-L4.  Patient is presently being treated for UTI [urinary tract infection] with Ampicillian 500 mg p.o. t.i.d. x 7 days (till 1/12/02).  Patient ambulates in hallway alone and has not used walker for several days.  However, evaluation for possible physical therapy is recommended.  Discussion with nurse at HSU in Barnstable House of Correction (508-375-6200) stated that they are anticipating this patient's return and able to meet his needs for medical care, evaluation, and housing."

## MENTAL STATUS AND CURRENT MENTAL FUNCTIONING:

Mr. Bates is a tall, thin, Caucasian male who looks approximately his stated age.  During the initial interviews, he was taking pain medications, appeared in great discomfort, and complained of feeling sedated.  At that time he needed the aid of a walker to ambulate.  However, at the time of the last two interviews, his medical condition had improved, he was able to walk about unaided and was not taking any medications.  He was alert and oriented to person, place, and time.  He demonstrated no difficulty in comprehending this examiner's questions and was able to respond in a coherent, goal-directed manner, without evidence of a formal disorder of a thought disorder such

## BRIDGEWATER STATE HOSPITAL                                          8

**BATES, Glenn**                                                    BSH #50-40377

### COMPETENCE TO STAND TRIAL EVALUATION
<u>January 16, 2002</u>                                            Ira K. Packer, Ph.D.

as loosening of associations (shifting from one topic to another in an unrelated manner) or tangentially (i.e., veering off from the topic at hand to related topics). He also denied psychotic symptoms such as hallucinations (e.g., responding to imaginary voices) or delusions (i.e., bizarre irrational beliefs such as believing that one's mind is being controlled or that one is the subject of an elaborate plot). He did present, though, as an individual who is suspicious and distrustful of others. He denied believing that there is a conspiracy against him, although he stated that he feels he has been treated unfairly by the police over the years (pointing to the recent incident in which they shot him as evidence that his fears were not unfounded). He focused a great deal of attention on a gas leak in his apartment, which he indicated was the source of all of his recent problems. (His mother confirmed that there is a problem with an old heating system and indicated that it had been investigated by the gas company.) He did not report grandiose beliefs and also denied feelings of depression and suicidal or homicidal thoughts. He reported no difficulties in his sleeping or eating patterns and none were noted during his hospitalization.

Mr. Bates presented as emotionally distant and it was difficult to establish rapport with him. He presented as distrustful and frequently demonstrated flashes of anger and irritability, including making sarcastic comments. He was quite impatient and intolerant of the interview process, occasionally stating "next question" and asking how much longer the interview would last. He was guarded and unwilling to divulge a lot of information about his past or his mental status. He also was demanding, insisting that this examiner allow him to read various documents. However, when informed of the limits of information that could be shared, he backed down.

Although Mr. Bates reported that he has been diagnosed with Posttraumatic Stress Disorder, when asked specifically about symptoms of intrusive thoughts, images, nightmares, or startle responses, he denied experiencing any of those. He denied periods of having either very low or very high energy levels as well. Mr. Bates appeared to attend to and concentrate well during the interview and denied any problem with his memory. He appears to be of at least average intelligence. During the current interview he was able to recall three simple items and a number after approximately a five minute delay. He was able to converse about the recent major current events (the War in Afghanistan, the World Trade Center Bombing). When asked to name the current President and the previous three Presidents, he correctly identified the current President as Bush and then claimed that he could not remember the President before him. When cued to the first name, he did come up with the name of Clinton and also identified President Reagan. When asked about what other President in between, with the aid of a cue, he was able to recall the previous President Bush. On a digit span test, he was able to repeat accurately seven digits forward and five digits backwards. He appeared embarrassed when he felt that he did not perform as well as he expected on these measures. When asked to explain similarities between two items, he indicated that an apple and a banana were both fruit and air and water are "stuff you need to survive." When asked to interpret proverbs, he provided a concrete response to the proverb about



**BATES, Glenn**                                                    BSH #50-40377

**COMPETENCE TO STAND TRIAL EVALUATION**

__January 16, 2002__                                        Ira K. Packer, Ph.D.

people in glass houses shouldn't throw stones ("the windows will break") but did state that's the way the cookie crumbles means "that's the way it goes."

Mr. Bates expressed a desire to be released from Bridgewater to return home. He was also aware that, given the nature of his current charges, he could be held on bail. He indicated that he would have no problems adjusting to a House of Correction (other than appropriate concerns about his medical needs) and indicated that he would prefer jail to the hospital.

## CRITERIA FOR DETERMINING COMPETENCY TO STAND TRIAL:

> Whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. (*Commonwealth vs. Vailes*, 1971)

## ABILITIES RELEVANT TO COMPETENCE TO STAND TRIAL:

### Understanding of the Charges, Pleas and Potential Consequences:

Mr. Bates identified his charges as two counts of Attempted Murder, two counts of Assault with a Dangerous Weapon, and Resisting Arrest. He indicated his understanding that specifically he is being charged with assaulting two police officers with a hockey stick in his residence. He acknowledged that the charges are serious, that he is being charged with a felony, and that if convicted he could go to jail for "a long time." When asked about plea options he identified the options as pleading guilty to all the charges, pleading guilty to reduced charges, and pleading not guilty. He identified other options including nolo contendre, which he indicated means "not disputing the charges" and not guilty by reason of insanity, which he indicated means "you are not criminally responsible for your actions at the time, based on insanity." He indicated his understanding that if he were found not guilty he would be released, and if he were found not guilty by reason of insanity he would be sent to "a place like this [Bridgewater State Hospital]." He was also able to describe the concept of plea bargaining, indicating that it involves "a sentence offered much less than what you are facing, you have to plead guilty to one of the charges." Although Mr. Bates initially identified the charges against him as involving assaults, when this examiner corrected him and indicated that it involved assault and battery, he acknowledged this, stating "I meant to say battery" and then offered his understanding that an assault is simply a threat but battery involves contact.

### Understanding of the Trial Process:

Mr. Bates indicated his understanding that going to trial involved a process in which his guilt or innocence would be determined. He identified the role of a defense attorney as the person who

## BRIDGEWATER STATE HOSPITAL

10

**BATES, Glenn**

BSH #50-40377

### COMPETENCE TO STAND TRIAL EVALUATION

<u>January 16, 2002</u>

Ira K. Packer, Ph.D.

defends him, indicated that the District Attorney is the person who tries to prosecute him and show that he is guilty and that a decision would be made by a jury unless he chose a bench trial. He also indicated his understanding that a Judge ruled on questions of law and imposes a sentence if a defendant is found guilty. He also discussed possible witnesses in this case.

### <u>Ability to Assist Counsel in Preparing and Implementing a Defense:</u>

Mr. Bates identified his attorney as Mr. Charles Johnson and provided me with his phone number. He indicated during one of the interviews that he was considering, with his mother's assistance, obtaining a privately funded attorney (rather than a public defender) but during the last interview he indicated that this was not going to happen. He expressed a willingness to work with his attorney and, indeed, on several occasions he indicated that he did not want to answer certain questions (related to possible defenses or to specifics of the alleged offense) until he had a chance to discuss it with his attorney. He was able to provide his own account of the alleged offense and to contest statements in the police report with which he did not agree. He was able to do so in a coherent manner and appears capable of communicating with his attorney about this case in a rational, coherent manner. He appears quite motivated to obtain a positive outcome for himself in this case.

### <u>Ability to Make Relevant Decisions:</u>

Mr. Bates was able to discuss with this examiner his various plea options and to provide his rationale for why he would choose certain options rather than others. For instance, he indicated that one of the problems with a plea bargain is that it would involve a guilty finding which would be part of his record. He also discussed the options of a bench trial versus a jury trial, stating that he felt that a jury would be more fair. He also demonstrated an ability to consider and weigh the importance of potential facts relevant to his case.

### <u>CLINICAL IMPRESSIONS REGARDING COMPETENCE TO STAND TRIAL:</u>

Although, as discussed below in the section on need for care and treatment, Mr. Bates presents with some paranoid thinking, constricted affect, and significant impairments in interpersonal relationships, which are indicative of a mental disorder, he does not present with psychotic symptoms which would indicate a significant distortion of reality. He demonstrates a good factual understanding of the trial process, the roles of the various participants in the trial, the various plea options and potential consequences, and the specific allegations being made against him. He is able to provide his own account of the alleged offense and contest some of the statements being made in the police report. He can communicate coherently and rationally about these matters and was able to provide rational reasoning for some of the decisions he might have to make about entering pleas or a defense strategy. Furthermore, he demonstrated an ability and willingness to work with his attorney, for instance, specifically declining to answer certain questions until he had a chance to discuss the matter with his attorney.

**BRIDGEWATER STATE HOSPITAL**                                                11

BATES, Glenn                                                         BSH #50-40377

COMPETENCE TO STAND TRIAL EVALUATION

January 16, 2002                                                Ira K. Packer, Ph.D.

Thus, based on the above data, it is this examiner's opinion that Mr. Bates does not present evidence of significant impairments in those abilities usually associated with competency to stand trial. He appears to have a factual and rational understanding of the charges and appears capable of working with his defense attorney in a rational manner.

## CLINICAL IMPRESSIONS REGARDING THE NEED FOR CARE AND TREATMENT:

Mr. Bates presents as an individual with poor interpersonal skills, tending to be isolative and having difficulty relating to others, acting at times entitled and demanding, easily irritated, with a tendency to be suspicious and distrustful of others. Most of the data indicate that although he often has a paranoid stance, he does not endorse or manifest delusional beliefs (i.e., significant distortions of reality). The only data to the contrary comes in a letter from his mother in which she reported that he has complained of the Mafia and Russians being after him but he denies this. He seems rigidly preoccupied with the effects of a gas leak in his apartment on his well-being. Although he may be overly invested in this issue, his mother confirms that there is indeed a smell of gas in the apartment. Based on the available data, the most likely diagnosis for Mr. Bates is Schizotypal Personality Disorder, which describes an individual with odd thought patterns and poor relatedness but who does not experience significant distortions of reality. Due to Mr. Bates' guardedness and unwillingness to provide information, it is difficult to be more definitive about a diagnosis.

Mr. Bates does not present with homicidal or suicidal ideations or intentions. He has not presented as depressed or manic during this current hospitalization. Although his treating psychiatrist at Bridgewater did prescribe medication for him initially (Zyprexa), Mr. Bates discontinued it after a short period of time and indicated no desire to take the medication. There was no noted deterioration in his mental status after he discontinued the medication. Although it is likely that he could benefit from psychiatric treatment, he refuses such treatment at present. He does not present evidence of posing a risk of harm to himself or others and thus does not meet criteria for involuntary hospitalization.

## BRIDGEWATER STATE HOSPITAL

12

BATES, Glenn

BSH #50-40377

COMPETENCE TO STAND TRIAL EVALUATION

January 16, 2002

Ira K. Packer, Ph.D.

The Barnstable House of Correction was contacted to coordinate his medical care if he is held in custody by the court. It is also recommended that he be evaluated and monitored by mental health personnel there. According to information obtained from his treatment team, if he is discharged from custody by the Court, he can obtain follow-up medical services on an outpatient basis.

Ira K. Packer, Ph.D., (ABPP Forensic)
Forensic Mental Health Supervisor
Director of Forensic Services
Bridgewater State Hospital

IKP/ls

BRIDGEWATER STATE HOSPITAL                           6

BATES, Glenn                                            BSH #50-40377

---

### CRIMINAL RESPONSIBILITY EVALUATION

<u>January 16, 2002</u>                                 Ira K. Packer, Ph.D.

was often "paranoid... afraid of things". When asked to be more specific, she stated that he was fearful of the police, thought they were watching him, and was suspicious when people (such as Jehovah's Witnesses) came to the door. She stated that she never observed him to be talking to imaginary voices, although she wrote in a letter that he complained of being harassed by the Mafia and the Russians (he denied this). She also stated that he would yell and swear, which frightened her, although he was never violent towards her. She also described (second-hand) an incident around Thanksgiving, 2001 in which he called his sister in California asking for his mother's cellphone number and when the sister did not give it to him, he "was yelling and swearing and carrying on" and threatened to kill his sister. Mr. Bates denied to this examiner that he threatened his sister.

A review of Mr. Bates' CORI record indicates that in addition to the current charges, he has been arraigned on 106 other occasions since 1979. However, it is noted that many of the charges were either dismissed, nolle prossed or resulted in not guilty findings. The charges for which he has been convicted include Knowingly Receiving Stolen Property (1982), Compulsory Insurance Violation, Operating to Endanger, Trespassing, Possession of a Dangerous Weapon (all 1982), Disorderly Person (1983), Shoplifting, Assault and Battery (1984), Assault and Battery (1985), Counterfeiting Motor Vehicle Document (1986), Assault and Battery on a Police Officer (1987), Assault and Battery on a Police Officer, Assault with a Dangerous Weapon (1988), Assault and Battery Dangerous Weapon (1991), Assault and Battery, Operating to Endanger, Trespassing, Operating After Suspended License (all 1993), Assault With Dangerous Weapon, Malicious Destruction of Property, Operation to Endanger, Failure to Obey Police Officer, Threatening, Trespassing, Disorderly Person, Operating to Endanger (all 1996). There are no charges noted since 1996 until the current alleged offense.

### <u>CIRCUMSTANCES OF ADMISSION:</u>

The 15(a) evaluation completed at the Orleans District Court by Nicholas Petrou, Ph.D. on 12/6/01, indicated that the interview was conducted in ICU at the patient's bedside at Cape Cod Hospital. Dr. Petrou noted that Mr. Bates reported multiple head injuries over the years, most recently being hit by a car or truck during the past summer and claimed to have seizures since then, although no seizures were observed in the hospital. At the time of the evaluation, Mr. Bates was receiving morphine, Depakote (an antiseizure medication), Zyprexa (an antipsychotic medication) and an antibiotic. Mr. Bates denied to Dr. Petrou any history of detoxification or rehabilitation. He denied drug use but "vaguely acknowledges past alcohol abuse." Dr. Petrou described Mr. Bates as "sedated, moderately groggy, but surprisingly alert and aware once aroused. Fairly cooperative given circumstances. Externalizing, blaming police. Unable to adequately assess [mood/affect] given circumstances. Denied acute depression. Denied suicidal ideation...Reportedly had been agitated, needing to be restrained, sedated in ICU but no overt problem during interview."

BRIDGEWATER STATE HOSPITAL                    7

BATES, Glenn                                         BSH #50-40377

_____

CRIMINAL RESPONSIBILITY EVALUATION
January 16, 2002                                Ira K. Packer, Ph.D.


Dr. Petrou described Mr. Bates' thought processes as "fairly organized and coherent given circumstances. No gross signs of psychosis." Dr. Petrou also indicated that Mr. Bates denied any suicidal or homicidal ideation, although his mother reported that he threatened to jump off the Sagamore Bridge in the past.

Regarding the issue of competence to stand trial, Dr. Petrou noted that "He actually performed fairly well in response to CST type questions regarding charge, knowing someone could receive 10 years, plea bargaining, alternative outcomes, etc. He did show some confusion regarding roles of some courtroom officials...thought I was the prosecutor, but this could be the effects of his medical condition and sedation. Dr. Petrou recommended a 15(b) evaluation for competence to stand trial and criminal responsibility at Bridgewater State Hospital."


**COURSE OF HOSPITALIZATION:**
Mr. Bates was admitted to Bridgewater State Hospital on December 11, 2001 from the Lemuel Shattuck Hospital (where he was transferred after being treated at Cape Cod Hospital for a gunshot wound which he reportedly sustained at the time of his arrest. Upon admission, the following medical problems were noted: left nephrectomy (removal of kidney) and splenectomy (removal of spleen), and fractured lumbar vertebrae. On 12/13/01, Dr. Norris, the treating psychiatrist, indicated that Mr. Bates was probably suffering from paranoia. He prescribed Zyprexa, an antipsychotic medication, although Mr. Bates took the medication for only a couple of days before discontinuing it. Since that time, he has not been on any other antipsychotic or mood-stabilizing medications. The progress notes do not indicate overt signs of psychosis. Dr. Becker, his treating psychologist, noted that on 12/18/01 he was "abrupt and dismissive", refusing to sign a release for her to speak with his mother. On 12/19/01 she described him as manifesting flashes of irritability." Since that time he was described as being demanding and entitled but not demonstrating symptoms of a psychotic or mood disorder.

Mr. Bates has been housed in the Medical Building, first in the Infirmary and then in the Medical West Unit, during the entire course of this hospitalization due to his medical injuries. A note from Susanne Brodeur, R.N., D.NSC dated 1/9/02 indicated as follows: "Per Dr. Khan [physician] patient will require eval by physician upon arrival to facility for 1. Left nephrectomy/splenectomy, 2. History of fracture L3-L4. Patient is presently being treated for UTI [urinary tract infection] with Ampicillian 500 mg p.o. t.i.d. x 7 days (till 1/12/02). Patient ambulates in hallway alone and has not used walker for several days. However, evaluation for possible physical therapy is recommended. Discussion with nurse at HSU in Barnstable House of Correction (508-375-6200) stated that they are anticipating this patient's return and able to meet his needs for medical care, evaluation, and housing."

BRIDGEWATER STATE HOSPITAL                    8

BATES, Glenn                                              BSH #50-40377

_____

CRIMINAL RESPONSIBILITY EVALUATION
January 16, 2002                                        Ira K. Packer, Ph.D.


## MENTAL STATUS AND CURRENT MENTAL FUNCTIONING:

Mr. Bates is a tall, thin, Caucasian male who looks approximately his stated age. During the initial interviews, he was taking pain medications, appeared in great discomfort, and complained of feeling sedated. At that time he needed the aid of a walker to ambulate. However, at the time of the last two interviews, his medical condition had improved, he was able to walk about unaided and was not taking any medications. He was alert and oriented to person, place, and time. He demonstrated no difficulty in comprehending this examiner's questions and was able to respond in a coherent, goal-directed manner, without evidence of a formal disorder of a thought disorder such as loosening of associations (shifting from one topic to another in an unrelated manner) or tangentially (i.e., veering off from the topic at hand to related topics). He also denied psychotic symptoms such as hallucinations (e.g., responding to imaginary voices) or delusions (i.e., bizarre irrational beliefs such as believing that one's mind is being controlled or that one is the subject of an elaborate plot). He did present, though, as an individual who is suspicious and distrustful of others. He denied believing that there is a conspiracy against him, although he stated that he feels he has been treated unfairly by the police over the years (pointing to the recent incident in which they shot him as evidence that his fears were not unfounded). He focused a great deal of attention on a gas leak in his apartment, which he indicated was the source of all of his recent problems. (His mother confirmed that there is a problem with an old heating system and indicated that it had been investigated by the gas company.) He did not report grandiose beliefs and also denied feelings of depression and suicidal or homicidal thoughts. He reported no difficulties in his sleeping or eating patterns and none were noted during his hospitalization.

Mr. Bates presented as emotionally distant and it was difficult to establish rapport with him. He presented as distrustful and frequently demonstrated flashes of anger and irritability, including making sarcastic comments. He was quite impatient and intolerant of the interview process, occasionally stating "next question" and asking how much longer the interview would last. He was guarded and unwilling to divulge a lot of information about his past or his mental status. He also was demanding, insisting that this examiner allow him to read various documents. However, when informed of the limits of information that could be shared, he backed down.

Although Mr. Bates reported that he has been diagnosed with Posttraumatic Stress Disorder, when asked specifically about symptoms of intrusive thoughts, images, nightmares, or startle responses, he denied experiencing any of those. He denied periods of having either very low or very high energy levels as well. Mr. Bates appeared to attend to and concentrate well during the interview and denied any problem with his memory. He appears to be of at least average intelligence. During the current interview he was able to recall three simple

BRIDGEWATER STATE HOSPITAL                    9

BATES, Glenn

BSH #50-40377

CRIMINAL RESPONSIBILITY EVALUATION

January 16, 2002

Ira K. Packer, Ph.D.

items and a number after approximately a five minute delay. He was able to converse about the recent major current events (the War in Afghanistan, the World Trade Center Bombing). When asked to name the current President and the previous three Presidents, he correctly identified the current President as Bush and then claimed that he could not remember the President before him. When cued to the first name, he did come up with the name of Clinton and also identified President Reagan. When asked about what other President in between, with the aid of a cue, he was able to recall the previous President Bush. On a digit span test, he was able to repeat accurately seven digits forward and five digits backwards. He appeared embarrassed when he felt that he did not perform as well as he expected on these measures. When asked to explain similarities between two items, he indicated that an apple and a banana were both fruit and air and water are "stuff you need to survive." When asked to interpret proverbs, he provided a concrete response to the proverb about people in glass houses shouldn't throw stones ("the windows will break") but did state that's the way the cookie crumbles means "that's the way it goes."

Mr. Bates expressed a desire to be released from Bridgewater to return home. He was also aware that, given the nature of his current charges, he could be held on bail. He indicated that he would have no problems adjusting to a House of Correction (other than appropriate concerns about his medical needs) and indicated that he would prefer jail to the hospital.

## CRITERIA FOR DETERMINING CRIMINAL RESPONSIBILITY:

Commonwealth vs. McHoul, (1967)

"An individual is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he lacked either the substantial capacity to appreciate the criminality (wrongfulness) of his acts or to conform his conduct to the requirements of the law."

## OFFICIAL VERSION OF THE ALLEGED OFFENSE:

Only a brief synopsis of the police report was available to this examiner. It stated "On 11/30/01, officers of the Harwich Police Department responded to 621 Main Street, Harwichport, to serve a Warrant of Apprehension on the defendant. After being invited into the residence by the defendant, the officers were attacked by the suspect. The suspect struck each officer numerous times about the head, neck and back area with a hockey stick causing at least one officer to fall to the ground. Due to the severity of the assault upon the officers, one officer discharged a round from his service pistol in self-defense, striking the suspect. Suspect was taken into custody. Suspect and both officers were transported to Cape Cod Hospital."

BRIDGEWATER STATE HOSPITAL                    10

BATES, Glenn                                                    BSH #50-40377

CRIMINAL RESPONSIBILITY EVALUATION
January 16, 2002                                              Ira K. Packer, Ph.D.


## COLLATERAL SOURCES OF INFORMATION:

Priscilla Hughes, the defendant's mother, reported that she owns a bed and breakfast and recently allowed her son to live in an apartment above her house. On September 19, 2001, he went into a rage, saying that he hated her, hated everyone, and that noone tries to help him He then left the house. Although she reported being frightened by his outburst, she also reported that he returned the next day, acting as if nothing had happened . She also reported that he has never been violent towards her.

Ms. Hughes also reported that she was in Florida after Thanksgiving when she received a call from her tenant. The tenant reported that Mr. Bates was up at 4 a.m., was loud, and throwing things. She also reported that he called his sister in California to obtain her (his mother's) cellphone number and when she would not give it to him, he became extremely angry and threatening over the phone (Ms. Hughes indicated that she learned about this incident from her daughter). She then returned from Florida, went to the police station to get him help and was told to go to court in the morning to get a warrant of apprehension so that he could be picked up by the police (she indicated that the police were familiar with him) and evaluated at the courthouse. She was subsequently informed that he had been shot.

## DEFENDANT'S ACCOUNT OF THE ALLEGED OFFENSE:

Mr. Bates reported that he was living in an apartment in his mother's house and that he had complained repeatedly about gas fumes coming from a defective furnace. He stated that on the night prior to the alleged offense he had closed all the windows in the house and turned up the heat but woke up in the morning feeling "dizzy, I couldn't see straight, my mouth was dry, dehydrated" as a result of being overcome by the fumes. He indicated that he had gone down stairs to open the door to let some fresh air in and then return upstairs. He stated that he heard someone coming up the stairs, saw the door open to his room, and "was scared it was someone breaking into my house." He explained that previously he had seen a black man trying to enter his house and he had chased the man away, and now thought that this man or someone else was trying to break in. He stated that "I only saw one man with a gun" and he then grabbed a hockey stick "for self-defense" and used the stick to knock the gun out of his hands. He stated that he does not recall hitting the second person and then was shot. He insisted that he never heard the men identify themselves as police officers and claimed that he saw a man, dressed in plain clothes, with a gun in his hand starting to enter his bedroom. He insisted that had he known that the men were police officers, he would have cooperated with them and would not have swung the hockey stick. He stated that he knew it would have been wrong to assault a police officer and noted that in 1995 when the police brought him to Pocasset Mental Health Center he had cooperated with them.

BRIDGEWATER STATE HOSPITAL                    11

BATES, Glenn                                          BSH #50-40377

CRIMINAL RESPONSIBILITY EVALUATION
January 16, 2002
                                          Ira K. Packer, Ph.D.

When this examiner attempted to ask more specific questions about the alleged offense, including details around his swinging of a hockey stick, he stated that he did not want to answer any more of those questions. When the police account, which indicated that they were invited into the house, was reviewed with him, he insisted that this was not accurate and became very excited, stating that that proves that the police were lying. He indicated that he never invited them in and was not aware that they were in the house until he observed through his bedroom door a man with a gun. He angrily stated that "You know it as well as I do! I would never invite policemen into my house. I don't like policemen, they are nothing but trouble. All they have is lies."

Mr. Bates denied using any drugs or alcohol around the time of the alleged offense, insisting that he has not had anything to drink for many years and that he had not used marijuana for a month. He also denied taking any prescribed medications at the time. When questioned about general paranoid concerns of people breaking into his house, he specifically denied this and stated that the only incident that had occurred was three months before the alleged offense at which point he encountered a man who was trying to come into the house. Asked whether it was possible that this man was not trying to break in but was just there for some other reason, he became sarcastic and stated "Nobody comes by. He wasn't coming by to drop something off."

Mr. Bates insisted that the only problem he had been experiencing around the time of the alleged offense related to the effects of a faulty furnace, resulting in gas leaks in the house. He stated that the gas leak caused him to have headaches, feel dizzy, and dehydrated. He claimed that when the emergency medical technicians came to the house after he was shot, he heard them make a statement about smelling gas. He also claimed that he had told his mother repeatedly about the gas problem but that she was unable to get her stepson (who either owns or manages the property) to fix the problem. When questioned about the tenant's report that he had been loud at 4 a.m., he denied any unusual behaviors. He stated that he may have woken up early to open windows due to the gas but denied screaming, yelling, or any other such behaviors.

## CLINICAL IMPRESSIONS REGARDING CRIMINAL RESPONSIBILITY:
It is difficult to offer a definitive diagnosis for Mr. Bates given his guardedness and unwillingness to provide personal information about various aspects of his life and functioning. However, based on the available data, the most appropriate diagnosis appears to be Schizotypal Personality Disorder. Individuals with this disorder are marked by significant deficits in interpersonal relationships and some distortions in their thinking (such as paranoid thoughts) but not of a severity to be considered delusional (i.e., not a

BRIDGEWATER STATE HOSPITAL                    12

BATES, Glenn                                                      BSH #50-40377

CRIMINAL RESPONSIBILITY EVALUATION
January 16, 2002                                        Ira K. Packer, Ph.D.

significant distortion of reality).  It appears that Mr. Bates has a longstanding pattern of
being paranoid about others' intentions towards him, including that of the police.

Regarding the specific alleged offense, the current evaluation is limited by the paucity of
information available about the details of what transpired. Although the police report
contains a statement that the officers were invited into the house, Mr. Bates adamantly
denies doing so. This factual disagreement is an issue for  the trier of fact.  From the
available information, the following can be offered for consideration regarding this issue.
Mr. Bates, as noted above, tends to be paranoid and distrustful, meaning that he is quick
to impute hostile intentions to others. However, his thinking is not characterized by
significant (psychotic) distortions of reality. He claims that the officers did not identify
themselves (and that the man he saw was not wearing a police uniform) and he attacked
in self-defense since he thought someone was breaking into his house. He stated
emphatically that if they had identified themselves as police, he would not have attacked
them since he knew that would have been wrong.

At this point, in the absence of any other information about the alleged offense and in the
face of Mr. Bates' insistence that he did not know the men were police officers, any
alternative explanations for his behavior at that time would be only speculative. If
additional information which would suggest a different scenario becomes available, then
the issue of criminal responsibility could be re-examined. This could be done through
review of records and further interviews of Mr. Bates wherever he is located.

## CLINICAL IMPRESSIONS REGARDING THE NEED FOR CARE AND TREATMENT:

Mr. Bates presents as an individual with poor interpersonal skills, tending to be isolative
and having difficulty relating to others,  acting at times entitled and demanding, easily
irritated, with a tendency to be suspicious and distrustful of others.  Most of the data
indicate that although he often has a paranoid stance, he does not endorse or manifest
delusional beliefs (i.e., significant distortions of reality). The only data to the contrary
comes in a letter from his mother in which she reported that he has complained of the
Mafia and Russians being after him but he denies this. He seems rigidly preoccupied with
the effects of a gas leak in his apartment on his well-being. Although he may be overly
invested in this issue, his mother confirms that there is indeed a smell of gas in the
apartment. Based on the available data, the most likely diagnosis for Mr. Bates is
Schizotypal Personality Disorder, which describes an individual with odd thought
patterns and poor relatedness but who does not experience significant distortions of
reality. Due to Mr. Bates' guardedness and unwillingness to provide information,  it is
difficult to be more definitive about a diagnosis

## BRIDGEWATER STATE HOSPITAL                    13

BATES, Glenn                                         BSH #50-40377

### CRIMINAL RESPONSIBILITY EVALUATION

January 16, 2002                                  Ira K. Packer, Ph.D.

Mr. Bates does not present with homicidal or suicidal ideations or intentions. He has not presented as depressed or manic during this current hospitalization. Although his treating psychiatrist at Bridgewater did prescribe medication for him initially (Zyprexa), Mr. Bates discontinued it after a short period of time and indicated no desire to take the medication. There was no noted deterioration in his mental status after he discontinued the medication. Although it is likely that he could benefit from psychiatric treatment, he refuses such treatment at present. He does not present evidence of posing a risk of harm to himself or others and thus does not meet criteria for involuntary hospitalization.

The Barnstable House of Correction was contacted to coordinate his medical care if he is held in custody by the court. It is also recommended that he be evaluated and monitored by mental health personnel there. According to information obtained from his treatment team, if he is discharged from custody by the Court, he can obtain follow-up medical services on an outpatient basis.

Ira K. Packer, Ph.D., (ABPP Forensic)
Forensic Mental Health Supervisor
Director of Forensic Services
Bridgewater State Hospital

IKP/ls