**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| GLENN S. BATES, <br> Plaintiff | ) <br> ) <br> ) <br> ) |
| v. | )    C.A. NO. 05-10489-MEL |
| CHRISTOPHER KENDER and <br> BARRY MITCHELL <br> Defendants | ) <br> ) <br> ) <br> ) <br> ) |

### PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OFFERED BY THE DEFENDANTS: A SUMMARY REPORT OF THE DISTRICT ATTORNEY

Plaintiff Glenn Bates hereby submits this Motion in Limine to exclude evidence offered by Defendants on their exhibit list, namely, *The Report of the District Attorney's Office Regarding the Discharge of a Firearm on November 30, 2001* (the "Report"). A copy of the Report is attached hereto as Exhibit 1. The Report is inadmissible because it: (1) contains hearsay, (2) unfairly prejudices the Plaintiff because of the undue deference the jury may give it, (3) lacks trustworthiness, and (4) is irrelevant to the proceedings before the court in this civil action.

Hearsay is inadmissible unless an exception applies. *See* Fed. R. Evid. 802. Although the Federal Rule of Evidence 803(8)(c) provides an exception for reports of public investigations, this exception is not unqualified. In civil cases, the exception allows for admission of "*factual findings* resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C) (emphasis added).

Here, the Report sought to be admitted by Defendants was compiled by the district attorney to form his opinion as to whether criminal charges should be brought against the Defendants for the discharge of a firearm. That issue, however, is not relevant to the case presently pending before the Court. Here, Bates contends in a civil matter that his rights were violated by Defendants' excessive use of force. There is no longer any chance that the Defendants will be charged with a crime. Further, Bates will only be required to prove his civil rights claim by a preponderance of the evidence, not the "beyond a reasonable doubt" standard considered by the district attorney. Therefore, the district attorney's opinion that there was insufficient evidence upon which a criminal conviction *beyond a reasonable doubt* could be based is wholly irrelevant.

Further, the statements and opinions in the Report are not immune to the hearsay rule merely because they were made to a public investigator. *United States v. Pagan-Santini*, 451 F.3d 258, 264 (1st Cir. 2006); *United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) ("In line with the advisory committee note to Rule 803(8), decisions in this and other circuits squarely hold that hearsay statements by third persons ... are not admissible under this exception merely because they appear within public records."). Where there is no evidence the investigator had personal knowledge of the incident, the Internal Investigation Report is not admissible. *Brooks v. Montgomery County*, 2006 WL 83045 (S.D. Ohio). In this matter, the Assistant District Attorney that reviewed the file and prepared the Report did not have personal knowledge of the incident on November 30, 2001. Rather, he reviewed the statements of the officers and their investigative reports and submitted a subjective opinion regarding whether the Commonwealth of Massachusetts could "prove beyond a reasonable doubt that the officer did not have a reasonable apprehension of great bodily harm."

Furthermore, the Report is inherently biased and unreliable because the district attorney compiled information only from witnesses within the Commonwealth's control – e.g. those persons that sided with the police officers. Importantly, Plaintiff's account of the events was not considered in reaching the conclusions found in the Report. *See Hines v. Brandon Steel Decks, Inc.*, 754 F. Supp. 199, 201 (M.D. Ga. 1991) (holding report of OSHA investigation inadmissible in part because investigator gathered information "without holding any type of hearing or affording interested parties an opportunity to cross-examine witness"), *aff'd*, 948 F.2d 1297 (11th Cir.1991), *cert. denied*, 503 U.S. 971 (1992); *Williams v. Asplundh Tree Expert Co.*, 2006 WL 2868923, *4 (M.D. Fla. 2006) (finding "even if the memorandum did set forth factual findings, exclusion would be required because the sources of information were all on one side.").

The Federal Rules of Evidence exclude hearsay because of its inherent unreliability and lack of trustworthiness as well as the lack of opportunity for a party to cross-examine the declarant regarding his perceptions. Rule 803(8)(c) allows into evidence public reports that (1) set forth factual findings (2) made pursuant to authority granted by law (3) that the judge finds trustworthy. Fed. R. Evid. 803(8)(c). Here, the factual findings (such as they exist) in the Report are unnecessary because the persons who made hearsay statements in the Report (such as the defendant officers) are available for trial. Worse, much of the Report contains the district attorney's opinions, rather than factual findings, which are clearly inadmissible.

In addition, public reports, otherwise admissible under Rule 803(8)(c), should nonetheless be excluded in whole or in part if the trial court finds that they are either irrelevant or more prejudicial than probative. *See Rainey*, 109 S. Ct. at 448-49; *United States v. MacDonald*, 688 F. 2d 224, 230 (4th Cir. 1982), *cert. denied*, 459 U.S. 1103, 103 S. Ct. 726, 74 L.Ed.2d 951 (1983). The Advisory Comments to the rule set forth several considerations to aid in

determining the trustworthiness of a public report: the timeliness of the investigation; the skill and experience of the investigator; whether the investigator held any sort of a hearing; and the investigator's impartiality. These considerations are not meant to be exhaustive. *Advisory Committee's Notes on Fed. R. Evid.* 803(8), 28 U.S.C. App., p. 725. The 11th Circuit held that "while the inability to cross-examine the investigator cannot *per se* invalidate the report since Rule 803(8) does not depend on the availability of the declarant, it is nonetheless a proper factor to take into consideration when deciding trustworthiness." *Hines v. Brandon Steel Decks, Inc.* 886 F.2d 299, 303 -304 (11th Cir. 1989); *see also Wilson v. Attaway*, 757 F.2d 1227, 1245 (11th Cir. 1985) (report excluded for a variety of reasons including failure to afford possibility of cross-examination); *see also generally The Trustworthiness of Government Evaluation Reports*, 96 Harv.L.Rev. at 499.

The Report was merely compiled to determine whether or not the district attorney desired to bring a criminal case against the Defendants. There was no hearing conducted and the Report merely consists of a cursory review of the police investigative file. The District Attorney's impartiality is greatly hindered when reviewing the actions of a fellow public servant. Furthermore, the risk that the jury's perception of the meaning of a report submitted by the District Attorney is immense and the prejudice afforded to the plaintiff greatly outweighs the probative value of the Report considering the deference the jury would likely give it.

Lastly, the opinions offered in the Report are not factually based conclusions as to what actually occurred the night of November 30, 2001, but rather opinions proffered by the District Attorney as to the likelihood of success in proceeding with criminal charges against the Defendants. At best, therefore, the Report contains a series of opinions proffered by a purported expert on criminal prosecutions. As such, the author of the report must be appropriately

identified as an expert witness and the Plaintiff should have been provided with full Rule 26 disclosures and an opportunity to prepare a cross-examination of this witness. Defendants did not do so. Rather, they set forth the Report on their Exhibit List on the eve of trial.

WHEREFORE, Plaintiff respectfully requests the summary report of the District Attorney be excluded from the evidence at trial.

Respectfully submitted,

GLENN BATES,

/s/ Timothy J. Perry
Timothy J. Perry (BBO#631397)
Perry, Krumsiek & Jack LLP
One McKinley Square
Boston, MA 02109
(617) 720-430
FAX (617) 720-4310

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true copy of the above document was served upon the counsel of record via the ECF filing system of the US District Court for the District of Massachusetts.

Dated: February 14, 2008                    /s/ Timothy J. Perry
                                            Timothy J. Perry



# THE COMMONWEALTH OF MASSACHUSETTS

OFFICE OF THE

## DISTRICT ATTORNEY

CAPE & ISLANDS DISTRICT

PHILIP A. ROLLINS
DISTRICT ATTORNEY

3231 MAIN STREET
P.O. BOX 455
BARNSTABLE, MA 02630
(508) 362-8113

## REPORT OF THE DISTRICT ATTORNEY'S OFFICE
## REGARDING THE DISCHARGE OF A FIREARM NOVEMBER 30, 2001

There is a public interest issue when in the performance of their duty police officers discharge a weapon injuring or killing a person. There has been an investigation of this incident conducted by the Massachusetts State Police Detectives assigned to the District Attorney's office, aided by Crime Scene Services of the State Police, Middleboro, MA and Ballistics personnel from the State Police Crime Laboratory, Sudbury, MA in cooperation with the Harwich Police.

Material compiled and reviewed includes police interviews, forensic reports, hospital records, the firearms policy of the Harwich Police and the law of the Commonwealth of Massachusetts.

This report is released to provide information to the public concerning this incident.

### WITNESS STATEMENTS

Statement of Tenant

Summary of State Police interview of 69-year-old female tenant living in upstairs, front apartment at 621 Main Street, Harwichport, MA.

This woman was interviewed at approximately 10:55 am November 30, 2001.

She indicated that she resided at the residence for 4 years. She stated that Glenn Bates lived there for 18 months. She stated that she lived in fear of Mr. Bates.

She described hearing through a common wall between her apartment and Mr. Bates' apartment a male voice screaming obscenities and threats to kill on Thanksgiving morning from 4:30 am to 6:30 am.

She tried to reach Mr. Bates' mother in Florida several times and spoke with her Saturday November 24, 2001. She explained to the mother that she was in fear. The mother promised to return to Massachusetts and to remove Bates from the premises.

On Thursday, November 29th the Mother contacted the woman and stated that she was in the Town of Harwich staying with a friend because of her fear of her son.

Statement of Mother

Summary of State Police interview of Glenn Bates' mother conducted at 4:05pm November 30, 2001. Glenn Bates' Mother stated to police that her son's behavior has been erratic for many years and that he has seemed "angry all his life". She states that Bates is mentally ill but refuses medical treatment or medication and self-medicates with marijuana.

In September, 2001, the Mother was frightened by a violent outburst to the extent that she feared for her safety and changed the locks to her apartment. She informed Bates that if the behavior was repeated, she would call the police to remove him from the residence. Bates responded, "Oh no you won't, I'll kill those sons of bitches, I'm not leaving here. I'm staying here the rest of my life."

The Mother stated her tenant called her while she was in Florida expressing fear for her safety. The Mother promised to return. She did so and obtained a warrant of apprehension from the Orleans District Court on Friday, November 30, 2001.

Statement of Lt. Barry Mitchell, HPD

Summary of State Police interview of Lt. Barry Mitchell at 10:00am December 3, 2001. At about 10:00 am on November 30, 2001, Lt. Barry Mitchell was asked by Sgt. Chris Kender to assist him in serving a warrant at 621 Main Street, Harwichport, MA. They met at the address. Lt. Mitchell reviewed the warrant. Lt. Mitchell was dressed in plain clothes and Sgt. Kender was in uniform.

The officers entered an inside stairwell and began to ascend the stairs. As the officers ascended the stairs, they could see under an opening at the bottom of the door at the top of the stairs. Lt. Mitchell states that he said to Sgt. Kender, "he's in there." He then yelled "Glenn, it's the Harwich Police, we need to talk to you." The subject behind the door said, "Come on in."

Lt. Mitchell opened the door inward and observed Glenn Bates to the right of the door with an object over his head swinging it toward the doorway. Mitchell stated he pulled his head back as the hockey stick just missed his head. He began to retreat down the stairs pushing Sgt. Kender to get them out of the way of the swinging stick.

He then felt a blow to his back and next saw Sgt. Kender hit over the head with the stick. Fearing for his life, Lt. Mitchell states he continued to retreat.

Lt. Mitchell unholstered his gun and saw Sgt. Kender do the same, point it at Bates and yell "police stop stop". He stated that Bates continued to advance swinging the stick. He then observed Sgt. Kender shoot at Bates. Lt. Mitchell states that at that time he was positioned at the bottom of the stairs and Sgt. Kender was on the first or second step.

He states Glenn Bates fell face first toward the bottom of the stairway. He said Bates made a growling noise and was crawling down the stairs toward them.

Lt. Mitchell then opened the door behind him and pulled Sgt. Kender with him out of the doorway.

## Treatment of Barry Mitchell

Lt. Mitchell was transported to Cape Cod Hospital by Harwich Emergency Medical Technicians. He was treated in the emergency room and diagnosed with a "lumbosacral contusion." It was observed that he had a significant echymotic area on his back with multiple areas of abrasion.

He was discharged, told to rest, given medication and told to remain away from work for one week.

## Statement of Sgt. Christopher Kender

Summary of State Police interview of Sgt. Kender at 2:30 pm December 4, 2001. On November 30, 2001 at 10:00 am, Sgt. Kender followed Lt. Mitchell up the stairs. He heard Mitchell say "Glenn, are you home, it's the Harwich Police. We need to talk to you."

Lt. Mitchell then said, "Glenn are you home?" From behind the door the response was "come on in." Lt. Mitchell then opened the door at the top of the stairs. He next heard a loud scream and saw Bates swinging a hockey stick over his head toward the officers. He saw Mitchell retreat and when he turned, Bates hit him in the back with the hockey stick. Sgt. Kender then was hit in the head with the stick. He said he went down on one knee on the step. He states that at this time he feared for his life and drew his gun. He yelled "Stop, Glenn, stop". He said Bates kept proceeding towards him swinging the stick. He fired one shot at Bates who he says was 2 or 3 feet away. He said Bates did not stop and kept advancing down the stairs toward him.

He then fired one more shot. Sgt. Kender said he didn't know if either of the two shots hit Bates. Sgt. Kender stated that Glenn Bates dropped the stick after the second shot. He then fell and slid down to the bottom of the stairs.

At the bottom of the stairs Lt. Mitchell used Sgt. Kender's shoulder microphone to radio to the police station: "Shots fired, we need an ambulance." Sgt. Kender stated that Sgt. Jacek arrived and Sgt. Jacek and Lt. Mitchell took Bates out of the hallway onto the flat ground. Sgt. Jacek began CPR and first aid on Glenn Bates.

### Treatment of Christopher Kender

Sgt. Kender was transported to Cape Cod Hospital by Harwich Emergency Medical Technicians. He was treated in the emergency room and diagnosed with a "mild concussion and cervical contusion and strain." He was given several medications and told to remain away from work for one week.

## FORENSIC EVIDENCE

Both officers' weapons were secured at the scene. Sergeant Douglas Weddleton of MSP Ballistics was given custody of Sgt. Kender's weapon. Two shell casings recovered at the scene were consistent with having been fired from Sgt. Kender's gun, a .40 millimeter Glock model G-23 bearing serial #CZK763US issued to him by the Harwich Police Department.

A hole in the left stairwell wall approximately 36 inches above the tenth stair of a 14 stair stairwell was examined and a bullet recovered from an interior wooden stud. The trajectory of the bullet was upward from low to high and from right to left.

There was medium velocity blood spatter on the right side wall below the handrail adjacent to stairs 2, 3, 4 and 5 and blood spatter on the vertical head wall above the first stair. This was also of medium velocity.

## LAW

The law with respect to the issue of the use of deadly force is well settled within the Commonwealth.

Deadly force is defined as "force intended or likely to cause death or great bodily harm." *Comm. v Klien 363 NE 2nd 1313 (1977)*

In the same case the Court discussed the issue of self-defense. The Court held that "...in order to create a right to defend oneself with a dangerous weapon likely to cause serious injury or death, it must appear that the person using the weapon had a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm." *Comm. v Klien (supra).*

In addition when self-defense is fairly raised by the evidence in a case, "the burden of proving beyond a reasonable doubt that (*the actor*) was not justified in his use of deadly force to defend himself (rests) on the Commonwealth. *Commonwealth v Rodriquez 352 NE2nd 203 (1976)*.

## ANALYSIS

An analysis of the appropriateness of the police action in a case of this nature begins by asking the question: Was the conduct of the police in any way criminal? This is the question which this section of the report seeks to answer. It answers it through the application of the legal principles described in the previous section to the evidence gathered in the investigation.

In any contemplated prosecution of the police officer in this incident, the Commonwealth would have to prove beyond a reasonable doubt that the officer did not have a reasonable apprehension of great bodily harm.

This position would not be supported by the evidence in the case.

On the contrary, the totality of the evidence would suggest that these two officers were assaulted in the performance of their duty. They were invited through a doorway at the top of the stairs, where the assailant began to swing a hockey stick at them. They began to retreat down the stairs. Sgt. Kender saw Bates hit Lt. Mitchell in the back with the stick. Sgt. Kender was then hit in the head with the stick sustaining a concussion. He went down on one knee on the step. He feared for his life and drew his gun. He warned the assailant to stop. Bates continued to advance swinging the stick and Sgt. Kender fired one shot. The assailant continued to advance and Sgt. Kender fired a second shot stopping the assailant.

The forensic evidence is consistent with the shooter being below the subject on the staircase and firing upward toward the subject above him. The subject would have to have been further up the stairs in order for medium velocity cast off blood to have been deposited on the vertical headwall above the stairs.

The forensic evidence is further consistent with Sgt. Kender's account that he fired upward at the assailant as he advanced upon him from further up the stairs. The trajectory of the round which missed and lodged in the left side wall is consistent with Sgt. Kender having been on the right firing from right to left and from below. The wound path of the round which struck the assailant is also consistent with an upward right to left shot into the body of the assailant as he exposed his right flank to the officer.

The round's path is consistent with it having entered the right flank of the assailant an inch from the right side of the posterior midline and it having exited from the left back at about the level of the chest.

On this evidence it cannot be said that the belief of apprehension of great bodily harm was unreasonable.

It would be, on the other hand, reasonable to conclude under these circumstances that the next blow might render an officer or both officers unconscious exposing one or both firearms to the assailant or that a subsequent blow might have resulted in the serious incapacitation or death of an officer.

Therefore, because Sgt. Kender had a reasonable apprehension of great bodily harm or death, his use of deadly force in self-defense and defense of another was not unjustified.

In light of the foregoing there will be no action taken against Sgt. Kender or Lt. Mitchell.

_____
Michael O'Keefe
First Assistant District Attorney

December 14, 2001