UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-10489-NMG

| | |
|---|---|
| GLENN S. BATES,<br><br>    Plaintiff<br>v.<br><br>TOWN OF HARWICH AND HARWICH POLICE DEPARTMENT, CHRISTOPHER KENDER, AND BARRY MITCHELL,<br><br>    Defendants | DEFENDANTS KENDER AND MITCHELL'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE DISTRICT ATTORNEY'S REPORT |

Now come defendants Christopher Kender and Barry Mitchell ("defendants"), and hereby oppose plaintiff's Motion to Preclude them from introducing into evidence a report by the Barnstable County District Attorney's Office relative to the incident underlying the Complaint. As grounds therefor, defendants rely on the within Memorandum of Reasons.

MEMORANDUM OF REASONS

In this action, plaintiff alleges that defendants, both Harwich police officers, used excessive force when Kender shot plaintiff during plaintiff's assault on him and Mitchell with a hockey stick on November 30, 2001 (an assault for which plaintiff was subsequently convicted). Shortly after the incident, the Barnstable County District Attorney's Office conducted an investigation to determine whether criminal charges should be lodged against either officer as a result of the incident. The investigation was conducted by State Police Officers from its Crime Scene Services Bureau, and consisted of interviews of the defendants and witnesses, forensic evidence gathered at the scene of the incident, and hospital records. The District Attorney's Office prepared a Report on the investigation (the "Report"), which summarized the factual findings of the investigation, analyzed said findings, and concluded that criminal charges were

not warranted, as "it cannot be said that the belief of apprehension of great bodily harm [to the officers] was unreasonable." Report of the District Attorney's Office (attached hereto).[1]

Plaintiff contends, primarily, that the report should be excluded on grounds of hearsay. However, an exclusion to the hearsay rule applies to "reports … of public offices or agencies, setting forth … in civil actions … factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." F.R.E. 803(8)(C). Contrary to plaintiff's contention, the Report is admissible pursuant to Rule 803(8)(C), as explained below.

The First Circuit interprets Rule 803(8)(C) "broadly." Lubanski v. Coleco Industries, Inc., 929 F.2d 42, 45 (1st Cir. 1991) (citing Puerto Rico Ports Authority v. M/V Manhattan Prince, 897 F.2d 1, 8 (1st Cir.1990)). Plaintiff's contention that the Rule does not allow for admission of opinions and conclusions – such as the Report's conclusion that the officers reasonably apprehended great bodily harm – is incorrect. To the contrary, "portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 170, 109 S.Ct. 439 (1998). Rather, such conclusions or opinions are admissible under the Rule "[a]s long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement." Id; see also Puerto Rico Ports Authority, 897 F.2d at 8 (finding admissible under Rule conclusory statements regarding causes of nautical accident contained in Coast Guard investigative report). The burden of showing that the Report does not satisfy the trustworthiness requirement is on the plaintiff, as the party opposing its introduction. See Robbins v. Whelan, 653 F.2d 47, 51 (1st Cir. 1981).

---

[1] The Report also contains an analysis of relevant law that may easily be redacted.

2

Here, plaintiff has failed to meet that burden. Indeed, the opinions and conclusions contained within the Report satisfy both requirements for admissibility. First, they are based on a "factual investigation" that consisted of interviews of the defendants and witnesses, forensic evidence gathered at the scene of the incident, and hospital records. See Report, p.1. Plaintiff's observation that the Report does not include his version of events goes to the weight of the Report, not its admissibility, and this fact may be presented to the jury by counsel.

Second, the conclusions within the Report satisfy the Rule's trustworthiness requirement, as they are based in large part on the forensic evidence gathered by State Police investigators, who are assigned to conduct investigations such as this one precisely *because of* their independence and neutrality.

Plaintiff's contentions as to why the Report should not be deemed trustworthy are unavailing. First, the contention that the Report's author, the First Assistant District Attorney, does not have personal knowledge of the incident is irrelevant, as his agency directed the investigation. See Robbins, 653 F.2d at 51 (report of government agency, containing information on maximum stopping distances for automobiles, met "firsthand knowledge" requirement of Rule 803(8)(c), even though its authors did not produce the figures used nor verify their accuracy, because the agency producing the report "initiated the inquiry and specified in detail the information sought, the methodology to be used in developing the information, and the statistical standards to which the manufacturers were to adhere. It then determined that the information was sufficiently reliable to publish").

Next, plaintiff's concern that the District Attorney's conclusion is irrelevant because it was judged against a criminal standard of "beyond a reasonable doubt," rather than the civil standard applicable in this case, may be resolved by simply instructing the jury as to this fact.

Finally, plaintiff's concern that he has not had an opportunity to cross-examine the Report's author is futile, since plaintiff may call the Assistant District Attorney as a witness at trial.

Where the conclusions drawn in the Report are based on the factual findings of independent, neutral investigators, the Report meets the indicia of trustworthiness required by Rule 803(8)(C) and should be deemed admissible.[2]

WHEREFORE, defendants Kender and Mitchell request that this Court hold that the District Attorney's Report is admissible evidence.

DEFENDANTS CHRISTOPHER KENDER
AND BARRY MITCHELL,

By their attorneys,

/s/ Jackie Cowin
Joseph L. Tehan, Jr. (BBO #494020)
Jackie Cowin (BBO# 655880)
Kopelman and Paige, P.C.
101 Arch Street
Boston, MA 02110
(617) 556-0007

CERTIFICATE OF SERVICE

I, Jackie Cowin, certify that the above document will be served upon any party or counsel of record who is not a registered participant of the Court's ECF system, upon notification by the Court of those individuals who will not be served electronically. /s/Jackie Cowin

338375/METG/0629

---

[2] There is no support for plaintiff's contention that the District Attorney should have been identified as an expert, since investigatory reports are routinely admitted under Rule 803(8)(c) without their authors being identified as experts. See, e.g., Lubanski, 929 F.2d at 44-46 (holding that report prepared by State Trooper who testified as lay witness, rather than as an expert, was admissible under Rule). In addition, plaintiff's complaint that defendants "set forth the Report … on the eve of trial" is misleading. Defendants disclosed their intention to use the Report in a pre-trial disclosure served on plaintiff on January 18, 2008.

4



# THE COMMONWEALTH OF MASSACHUSETTS

OFFICE OF THE

## DISTRICT ATTORNEY

CAPE & ISLANDS DISTRICT

**PHILIP A. ROLLINS**
DISTRICT ATTORNEY

3231 MAIN STREET
P.O. BOX 455
BARNSTABLE, MA 02630
(508) 362-8113

## REPORT OF THE DISTRICT ATTORNEY'S OFFICE
## REGARDING THE DISCHARGE OF A FIREARM NOVEMBER 30, 2001

There is a public interest issue when in the performance of their duty police officers discharge a weapon injuring or killing a person. There has been an investigation of this incident conducted by the Massachusetts State Police Detectives assigned to the District Attorney's office, aided by Crime Scene Services of the State Police, Middleboro, MA and Ballistics personnel from the State Police Crime Laboratory, Sudbury, MA in cooperation with the Harwich Police.

Material compiled and reviewed includes police interviews, forensic reports, hospital records, the firearms policy of the Harwich Police and the law of the Commonwealth of Massachusetts.

This report is released to provide information to the public concerning this incident.

### WITNESS STATEMENTS

Statement of Tenant

Summary of State Police interview of 69-year-old female tenant living in upstairs, front apartment at 621 Main Street, Harwichport, MA.

This woman was interviewed at approximately 10:55 am November 30, 2001.

She indicated that she resided at the residence for 4 years. She stated that Glenn Bates lived there for 18 months. She stated that she lived in fear of Mr. Bates.

She described hearing through a common wall between her apartment and Mr. Bates' apartment a male voice screaming obscenities and threats to kill on Thanksgiving morning from 4:30 am to 6:30 am.

She tried to reach Mr. Bates' mother in Florida several times and spoke with her Saturday November 24, 2001. She explained to the mother that she was in fear. The mother promised to return to Massachusetts and to remove Bates from the premises.

On Thursday, November 29th the Mother contacted the woman and stated that she was in the Town of Harwich staying with a friend because of her fear of her son.

Statement of Mother

Summary of State Police interview of Glenn Bates' mother conducted at 4:05pm November 30, 2001. Glenn Bates' Mother stated to police that her son's behavior has been erratic for many years and that he has seemed "angry all his life". She states that Bates is mentally ill but refuses medical treatment or medication and self-medicates with marijuana.

In September, 2001, the Mother was frightened by a violent outburst to the extent that she feared for her safety and changed the locks to her apartment. She informed Bates that if the behavior was repeated, she would call the police to remove him from the residence. Bates responded, "Oh no you won't, I'll kill those sons of bitches, I'm not leaving here. I'm staying here the rest of my life."

The Mother stated her tenant called her while she was in Florida expressing fear for her safety. The Mother promised to return. She did so and obtained a warrant of apprehension from the Orleans District Court on Friday, November 30, 2001.

Statement of Lt. Barry Mitchell, HPD

Summary of State Police interview of Lt. Barry Mitchell at 10:00am December 3, 2001. At about 10:00 am on November 30, 2001, Lt. Barry Mitchell was asked by Sgt. Chris Kender to assist him in serving a warrant at 621 Main Street, Harwichport, MA. They met at the address. Lt. Mitchell reviewed the warrant. Lt. Mitchell was dressed in plain clothes and Sgt. Kender was in uniform.

The officers entered an inside stairwell and began to ascend the stairs. As the officers ascended the stairs, they could see under an opening at the bottom of the door at the top of the stairs. Lt. Mitchell states that he said to Sgt. Kender, "he's in there." He then yelled "Glenn, it's the Harwich Police, we need to talk to you." The subject behind the door said, "Come on in."

Lt. Mitchell opened the door inward and observed Glenn Bates to the right of the door with an object over his head swinging it toward the doorway. Mitchell stated he pulled his head back as the hockey stick just missed his head. He began to retreat down the stairs pushing Sgt. Kender to get them out of the way of the swinging stick.

He then felt a blow to his back and next saw Sgt. Kender hit over the head with the stick. Fearing for his life, Lt. Mitchell states he continued to retreat.

Lt. Mitchell unholstered his gun and saw Sgt. Kender do the same, point it at Bates and yell "police stop stop". He stated that Bates continued to advance swinging the stick. He then observed Sgt. Kender shoot at Bates. Lt. Mitchell states that at that time he was positioned at the bottom of the stairs and Sgt. Kender was on the first or second step.

He states Glenn Bates fell face first toward the bottom of the stairway. He said Bates made a growling noise and was crawling down the stairs toward them.

Lt. Mitchell then opened the door behind him and pulled Sgt. Kender with him out of the doorway.

Treatment of Barry Mitchell

Lt. Mitchell was transported to Cape Cod Hospital by Harwich Emergency Medical Technicians. He was treated in the emergency room and diagnosed with a "lumbosacral contusion." It was observed that he had a significant echymotic area on his back with multiple areas of abrasion.

He was discharged, told to rest, given medication and told to remain away from work for one week.

Statement of Sgt. Christopher Kender

Summary of State Police interview of Sgt. Kender at 2:30 pm December 4, 2001. On November 30, 2001 at 10:00 am, Sgt. Kender followed Lt. Mitchell up the stairs. He heard Mitchell say "Glenn, are you home, it's the Harwich Police. We need to talk to you."

Lt. Mitchell then said, "Glenn are you home?" From behind the door the response was "come on in." Lt. Mitchell then opened the door at the top of the stairs. He next heard a loud scream and saw Bates swinging a hockey stick over his head toward the officers. He saw Mitchell retreat and when he turned, Bates hit him in the back with the hockey stick. Sgt. Kender then was hit in the head with the stick. He said he went down on one knee on the step. He states that at this time he feared for his life and drew his gun. He yelled "Stop, Glenn, stop". He said Bates kept proceeding towards him swinging the stick. He fired one shot at Bates who he says was 2 or 3 feet away. He said Bates did not stop and kept advancing down the stairs toward him.

He then fired one more shot. Sgt. Kender said he didn't know if either of the two shots hit Bates. Sgt. Kender stated that Glenn Bates dropped the stick after the second shot. He then fell and slid down to the bottom of the stairs.

At the bottom of the stairs Lt. Mitchell used Sgt. Kender's shoulder microphone to radio to the police station: "Shots fired, we need an ambulance." Sgt. Kender stated that Sgt. Jacek arrived and Sgt. Jacek and Lt. Mitchell took Bates out of the hallway onto the flat ground. Sgt. Jacek began CPR and first aid on Glenn Bates.

Treatment of Christopher Kender

Sgt. Kender was transported to Cape Cod Hospital by Harwich Emergency Medical Technicians. He was treated in the emergency room and diagnosed with a "mild concussion and cervical contusion and strain." He was given several medications and told to remain away from work for one week.

## FORENSIC EVIDENCE

Both officers' weapons were secured at the scene. Sergeant Douglas Weddleton of MSP Ballistics was given custody of Sgt. Kender's weapon. Two shell casings recovered at the scene were consistent with having been fired from Sgt. Kender's gun, a .40 millimeter Glock model G-23 bearing serial #CZK763US issued to him by the Harwich Police Department.

A hole in the left stairwell wall approximately 36 inches above the tenth stair of a 14 stair stairwell was examined and a bullet recovered from an interior wooden stud. The trajectory of the bullet was upward from low to high and from right to left.

There was medium velocity blood spatter on the right side wall below the handrail adjacent to stairs 2, 3, 4 and 5 and blood spatter on the vertical head wall above the first stair. This was also of medium velocity.

## LAW

The law with respect to the issue of the use of deadly force is well settled within the Commonwealth.

Deadly force is defined as "force intended or likely to cause death or great bodily harm." *Comm. v Klien 363 NE 2nd 1313 (1977)*

In the same case the Court discussed the issue of self-defense. The Court held that "…in order to create a right to defend oneself with a dangerous weapon likely to cause serious injury or death, it must appear that the person using the weapon had a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm." *Comm. v Klien (supra).*

In addition when self-defense is fairly raised by the evidence in a case, "the burden of proving beyond a reasonable doubt that (*the actor*) was not justified in his use of deadly force to defend himself (rests) on the Commonwealth. *Commonwealth v Rodriquez 352 NE2nd 203 (1976).*

## ANALYSIS

An analysis of the appropriateness of the police action in a case of this nature begins by asking the question: Was the conduct of the police in any way criminal? This is the question which this section of the report seeks to answer. It answers it through the application of the legal principles described in the previous section to the evidence gathered in the investigation.

In any contemplated prosecution of the police officer in this incident, the Commonwealth would have to prove beyond a reasonable doubt that the officer did not have a reasonable apprehension of great bodily harm.

This position would not be supported by the evidence in the case.

On the contrary, the totality of the evidence would suggest that these two officers were assaulted in the performance of their duty. They were invited through a doorway at the top of the stairs, where the assailant began to swing a hockey stick at them. They began to retreat down the stairs. Sgt. Kender saw Bates hit Lt. Mitchell in the back with the stick. Sgt. Kender was then hit in the head with the stick sustaining a concussion. He went down on one knee on the step. He feared for his life and drew his gun. He warned the assailant to stop. Bates continued to advance swinging the stick and Sgt. Kender fired one shot. The assailant continued to advance and Sgt. Kender fired a second shot stopping the assailant.

The forensic evidence is consistent with the shooter being below the subject on the staircase and firing upward toward the subject above him. The subject would have to have been further up the stairs in order for medium velocity cast off blood to have been deposited on the vertical headwall above the stairs.

The forensic evidence is further consistent with Sgt. Kender's account that he fired upward at the assailant as he advanced upon him from further up the stairs. The trajectory of the round which missed and lodged in the left side wall is consistent with Sgt. Kender having been on the right firing from right to left and from below. The wound path of the round which struck the assailant is also consistent with an upward right to left shot into the body of the assailant as he exposed his right flank to the officer.

The round's path is consistent with it having entered the right flank of the assailant an inch from the right side of the posterior midline and it having exited from the left back at about the level of the chest.

On this evidence it cannot be said that the belief of apprehension of great bodily harm was unreasonable.

It would be, on the other hand, reasonable to conclude under these circumstances that the next blow might render an officer or both officers unconscious exposing one or both firearms to the assailant or that a subsequent blow might have resulted in the serious incapacitation or death of an officer.

Therefore, because Sgt. Kender had a reasonable apprehension of great bodily harm or death, his use of deadly force in self-defense and defense of another was not unjustified.

In light of the foregoing there will be no action taken against Sgt. Kender or Lt. Mitchell.

Michael O'Keefe
First Assistant District Attorney

December 14, 2001